**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SUBHASH PATEL, Individually and On Behalf of All Others Similarly Situated,<br><br>    *Plaintiff*,<br><br>    v.<br><br>KONINKLIJKE PHILIPS N.V., FRANS VAN HOUTEN, and ABHIJIT BHATTACHARYA,<br><br>    *Defendants*. | 21-CV-4606 (MKB) (MMH)<br><br>(Oral Argument Requested) |

<br><br>

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

<br><br>

Sharon L. Nelles
William B. Monahan
Elizabeth N. Olsen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Counsel for Defendants*

March 4, 2022

## TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ............................................................................. 1

**ALLEGATIONS OF THE AMENDED COMPLAINT** ........................................... 5

     A.     The Parties ................................................................................... 5

     B.     Non-Party Philips RS .................................................................. 5

     C.     KPNV's April 2021 Provision ..................................................... 6

     D.     Philips RS's June 2021 Voluntary Recall ................................... 6

     E.     The FDA's Form 483 Inspection Report Concerning Philips RS ........................ 7

     F.     The Alleged Misrepresentations ................................................. 8

**ARGUMENT** ......................................................................................................... 9

**I.**     **PLAINTIFFS DO NOT ALLEGE PARTICULARIZED FACTS TO SUPPORT A COGENT AND COMPELLING INFERENCE OF FRAUD** ............. 9

     A.     Plaintiffs Have Not Alleged Any Cognizable Motive To Defraud ...................... 10

     B.     Plaintiffs Have Not Alleged a "Strong Inference" of "Conscious Misbehavior or Recklessness" ................................................. 11

           1.     The FDA's Form 483 Inspection Report Regarding Philips RS Cannot Support a Strong Inference of the KPNV Defendants' Scienter ........................................... 11

           2.     Courts in This Circuit Have Squarely Rejected Plaintiffs' Remaining Scienter Allegations ............................. 14

     C.     The Plausible Nonculpable Explanation Is at Least as Compelling .................. 16

**II.**     **PLAINTIFFS DO NOT ALLEGE A MATERIAL MISREPRESENTATION** ...... 17

     A.     Defendants' Statements About Compliance, Quality and Safety Were Neither False Nor Material ................................................. 18

     B.     Plaintiffs Have Not Alleged Facts That Support Any Earlier Duty To Disclose ................................................................. 20

     C.     KPNV's Increase to Its Reserves Does Not Demonstrate a Misstatement Regarding the Earlier Estimate ............................... 22

     D.     Defendants Said Nothing False or Misleading Regarding Ozone or the Replacement Foam ....................................................... 23

**III.**     **IF ANY CLAIMS SURVIVE DISMISSAL, THE CLAIMS SHOULD BE NARROWED** ................................................................................. 25

**CONCLUSION** ..................................................................................................... 25

## TABLE OF AUTHORITIES

*Page(s)*

### CASES

*Atl. Gypsum* v. *Lloyds Int'l*,
753 F. Supp. 505 (S.D.N.Y. 1990) ........................................................................ 17

*Bd. of Trs.* v. *Mechel*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011),
*aff'd*, 475 F. App'x 353 (2d Cir. 2012) ................................................................ 5

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
506 Fed. App'x 32 (2d Cir. 2012) ................................................................... 3, 20

*Boguslavsky* v. *Kaplan*,
159 F.3d 715 (2d Cir. 1998) .............................................................................. 25

*Chill* v. *Gen. Elec.*,
101 F.3d 263 (2d Cir. 1996) .............................................................................. 11

*City of Monroe* v. *Hartford Fin.*,
2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ........................................................ 12

*City of Pontiac General Employees' Ret. Sys.* v. *Stryker*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) .................................................................. 18

*City of Pontiac Policemen's & Fireman's Ret. Sys.* v. *UBS*,
752 F.3d 173 (2d Cir. 2014) .......................................................................... 19, 25

*City of Westland Police & Fire Ret. Sys.* v. *Metlife*,
129 F. Supp. 3d 48 (S.D.N.Y. 2015) ...................................................................... 16

*Defer LP* v. *Raymond James Fin.*,
654 F. Supp. 2d 204 (S.D.N.Y. 2009) ..................................................................... 14

*Denny* v. *Barber*,
576 F.2d 465 (2d Cir. 1978) .............................................................................. 25

*Dura Pharm.* v. *Broudo*,
544 U.S. 336 (2005) ......................................................................................... 1

*ECA, Loc. 134 IBEW Joint Pension Tr.* v. *JP Morgan Chase*,
553 F.3d 187 (2d Cir. 2009) ........................................................................... 9, 11

*Fait* v. *Regions Fin.*,
  655 F.3d 105 (2d Cir. 2011) ................................................................ 22

*Fischer* v. *Tynan*,
  1993 WL 213025 (S.D.N.Y. June 16, 1993) ........................................... 4

*Frankfurt-Trust* v. *United Techs.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018) ................................................... 11

*Ganino* v. *Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ............................................................. 2, 10

*Gillis* v. *QRX Pharma*,
  2016 WL 3685095 (S.D.N.Y. July 6, 2016) .......................................... 17

*Hou Liu* v. *Intercept Pharms.*,
  2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ..................................... 4, 22

*In re Aegon N.V. Sec. Litig.*,
  2004 WL 1415973 (S.D.N.Y. June 23, 2004) ....................................... 14

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ................................................... 10

*In re Axis Capital*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................... 21

*In re Baesa Sec. Litig.*,
  969 F. Supp. 238 (S.D.N.Y. 1997) ......................................................... 2

*In re Carter-Wallace Sec. Litig.*,
  150 F.3d 153 (2d Cir. 1998) ................................................................ 21

*In re Carter-Wallace Sec. Litig.* (*Carter-Wallace II*),
  220 F.3d 36 (2d Cir. 2000) ............................................................ 21, 22

*In re CIT Grp. Sec. Litig.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004) ................................................... 23

*In re CRM Holdings, Ltd. Sec. Litig.*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2012) ....................................... 24

*In re Elan Sec. Litig.*,
  543 F. Supp. 2d 187  (S.D.N.Y. 2008) ............................................... 4, 22

*In re Federated Dep't Stores Sec. Litig.*,
2005 WL 696894 (S.D.N.Y. Mar. 25, 2005) ........................................................ 14

*In re Henry Schein*,
2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ........................................... 12, 16, 20

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................. 17

*In re Marsh & McLennan*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................................ 15

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009) ................................................................ 11

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................................ 16

*In re Turquoise Hill Resources Secs. Litig.*,
2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ..................................................... 15

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................................................ 16

*Jackson* v. *Abernathy*,
960 F.3d 94 (2d Cir. 2020) ............................................................................... 13

*Jackson* v. *Halyard Health*,
2018 WL 1621539 (S.D.N.Y. Mar. 30, 3018) ............................................... 10, 15

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001) ......................................................................... 2, 11

*Lentell* v. *Merrill Lynch*,
396 F.3d 161 (2d Cir. 2005) ............................................................................. 17

*Leonard* v. *Abbott Labs.*,
2012 WL 764199 (E.D.N.Y. Mar. 5, 2012) ........................................................ 20

*Loreley Fin. (Jersey) No. 3* v. *Wells Fargo*,
797 F.3d 160 (2d Cir. 2015) ............................................................................. 13

*McGuire* v. *Dendreon*,
2008 WL 1791381 (W.D. Wash. Apr. 18, 2008) ................................................. 18

*Merrill Lynch, Pierce, Fenner & Smith* v. *Dabit*,
  547 U.S. 71 (2006) ........................................................................................... 9

*Metzler Inv.* v. *Chipotle*,
  2020 WL 4644799 (2d Cir. Aug. 12, 2020) ................................................. 26

*Morrison* v. *National Australia Bank*,
  561 U.S. 247 (2010) ........................................................................................ 5

*Ong* v. *Chipotle*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018) ..................................................... 3, 19

*Panther Partners* v. *Ikanos Commc'ns*,
  347 F. App'x 617 (2d Cir. 2009) ................................................................. 25

*Pathfinder Mgmt.* v. *Mayne Pharma*,
  2009 WL 4250061 (D.N.J. Nov. 25, 2009) ................................................. 13

*Plumber & Steamfitters* v. *Can. Imperial Bank of Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) ........................................................ 14

*Plumbers & Pipefitters Nat'l Pension Fund* v. *Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015) .......................................................... 15

*Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance*,
  753 F. Supp. 2d 166 (S.D.N.Y. 2010) ........................................................ 15

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004) ........................................................................ 21

*S. Cherry St.* v. *Hennessee Grp.*,
  573 F.3d 98 (2d Cir. 2009) .......................................................................... 11

*Schnell* v. *Conseco*,
  43 F. Supp. 2d 438 (S.D.N.Y. 1999) .......................................................... 18

*Setzer* v. *Omega Healthcare Invs.*,
  968 F.3d 204 (2d Cir. 2020) ........................................................................ 21

*Shemian* v. *Research In Motion*,
  2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ............................................ 14

*Sieppel* v. *Sidley Austin*,
  2005 WL 388561 (S.D.N.Y. Feb. 17, 2005) ................................................. 1

*Silvercreek Mgmt.* v. *Citigroup*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017) ................................................................ 2, 13

*Singh* v. *Cigna*,
    918 F.3d 57 (2d Cir. 2019) ................................................................................ 9, 19

*Teamsters Allied Benefit Funds* v. *McGraw*,
    2010 WL 882883 (S.D.N.Y. Mar. 11, 2010) ........................................................ 14

*Teamsters* v. *Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008) ............................................................................... 13

*Tellabs* v. *Makor*,
    551 U.S. 308 (2007) ......................................................................... 3, 9, 10, 16

*Tyler* v. *Liz Claiborne*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011) ................................................................ 16

*Valentini* v. *Citigroup*,
    837 F. Supp. 2d 304 (S.D.N.Y. 2011) ............................................................ 13, 14

*Waterford Twp. Police & Fire Ret. Sys.* v. *Regional Mgmt.*,
    2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016) .................................................. 4, 23

*Woolgar* v. *Kingstone*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) ................................................................ 23

*Zucker* v. *Sasaki*,
    963 F. Supp. 301 (S.D.N.Y. 1997) ..................................................................... 25

## STATUTES AND RULE

PSLRA, 15 U.S.C. § 78u-4 ....................................................................................... 9

21 U.S.C. § 360bbb-3 ............................................................................................. 20

Fed. R. Civ. P. 9(b) ................................................................................................. 9

## OTHER AUTHORITY

FOOD & DRUG ADMIN., EMERGENCY USE AUTHORIZATION (Mar. 24, 2021) ............................ 20

**PRELIMINARY STATEMENT**

Defendant Koninklijke Philips N.V. is a Dutch company headquartered in The Netherlands.  KPNV has nearly 300 subsidiaries across the globe, operating in a range of industries.  In June 2021, one of its approximately 70 U.S. subsidiaries—non-party Philips RS North America LLC, a Delaware corporation headquartered in Pennsylvania that KPNV had acquired in 2008—voluntarily recalled certain medical devices Philips RS had manufactured to treat sleep apnea and other respiratory conditions.  Philips RS discovered that sound abatement foam it had installed in the devices might degrade and then be inhaled by users, potentially causing injury.  Since the Philips RS recall, KPNV's stock price has declined.

Plaintiffs, two individual shareholders, attempt to manufacture securities fraud from these facts, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of a putative class of all purchasers of KPNV common stock between February 2016 and November 2021.  Plaintiffs accuse KPNV, its Chief Executive Officer, and its Chief Financial Officer of artificially inflating the stock price by concealing the foam defect and health risks from investors.  But the securities laws do not "provide investors with broad insurance against market losses."  *Dura Pharm.* v. *Broudo*, 544 U.S. 336, 345 (2005).  One of the primary reasons Congress enacted the Private Securities Litigation Reform Act was to "restrict abuses in securities class action litigation" of the type occurring here—"the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability."  *Sieppel* v. *Sidley Austin*, 2005 WL 388561, at *2 (S.D.N.Y. Feb. 17, 2005).  Plaintiffs do not plead any facts, let alone with the required particularity, showing that either of the Individual Defendants, or anyone else involved in the alleged misrepresentations, knew any contrary information at the time of the challenged statements.

The Court should dismiss the Amended Complaint for the following reasons:

        **1.**     *No Cogent and Compelling Inference of Scienter.*  To sufficiently allege scienter, Plaintiffs had to plead specific facts as to each defendant that (1) give rise to a "strong inference" that the defendant "had both motive and opportunity to commit fraud," or (2) provide "strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino* v. *Citizens Utils.*, 228 F.3d 154, 168-69 (2d Cir. 2000).  Because Plaintiffs have no cognizable motive theory, their pleading burden is even higher:  they must "plead scienter by identifying circumstances indicating conscious behavior by the defendant," and "the strength of the[ir] circumstantial allegations must correspondingly be greater." *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

        To show conscious misbehavior or recklessness, Plaintiffs rely almost entirely on preliminary observations in a November 2021 report of the FDA.  That report concerned an inspection in 2021 of a single factory at a single KPNV subsidiary.  The inspector observed that unspecified employees *of Philips RS in Murrysville, Pennsylvania* learned of customer complaints regarding foam degradation beginning in 2015.  The report said literally nothing about KPNV, the Individual Defendants, or any other senior executive of KPNV in The Netherlands.  Even if the report could "satisfy [the scienter] standard as to [KPNV's] subsidiary, if it were a party, the law in this Circuit is clear that a subsidiary's fraud cannot be automatically imputed to its corporate parent." *In re Baesa Sec. Litig.*, 969 F. Supp. 238, 242 (S.D.N.Y. 1997).  Plaintiffs also do not allege that either of the Individual Defendants—two of the senior-most executives at KPNV—had any involvement in the day-to-day management of Philips RS.  Nor do they allege that any Philips RS employees had anything to do with KPNV's challenged statements.  "[U]nder Second Circuit precedent, it is not enough to separately allege misstatements by some individuals and knowledge belonging to some others where there is no strong inference that, in fact, there was a connection between the two." *Silvercreek Mgmt.* v. *Citigroup*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017).

Plaintiffs' theory of scienter also is not "at least as compelling as any opposing inference one could draw from the facts alleged," as required to plead scienter. *Tellabs* v. *Makor*, 551 U.S. 308, 324 (2007). According to Plaintiffs, Defendants (i) knew of the foam issue as early as 2015 (although this allegation is based entirely on the FDA report regarding Philips RS), (ii) knew, at least by 2016, of an *alternative* foam that would *not* degrade, and (iii) simply chose not to ask Philips RS to substitute the alternative foam for the problematic foam. Plaintiffs never explain how or why the Individual Defendants would have chosen to wait *five years*—all the while continuing to allow Philips RS to sell devices with defective foam—if they knew of alternative foam. The far more plausible inference is that Defendants first learned of an issue regarding the foam shortly before the voluntary recall—and promptly disclosed it. (*Infra* Section I.)

**2. *No Material Misrepresentation.*** Plaintiffs challenge generalized statements regarding KPNV's commitment to quality, safety and compliance, such as that KPNV was "committed to compliance with regulatory product approval and quality system requirements in every market we serve." Plaintiffs fail to plead facts showing that these statements were false. They are also "quintessential examples" of "inactionable puffery." *Ong* v. *Chipotle*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018).

Plaintiffs next theorize that Defendants' concededly *accurate* statements regarding the historical financial performance of the sleep and respiratory care business were misleading because Defendants omitted that sales were "unsustainable" given the likelihood of a recall. But "statements about . . . earnings" that are "literally true" are not made misleading "because they did not acknowledge . . . long-term unsustainability." *Boca Raton Firefighters* v. *Bahash*, 506 Fed. Appx. 32, 38 (2d Cir. 2012). Moreover, a company does not have a disclosure obligation to investors absent a "scientifically reliable basis for inferring a potential causal link between the

-3-

[drug or medical device] and the adverse event." *Hou Liu* v. *Intercept*, 2020 WL 1489831, at *7 (S.D.N.Y. Mar. 26, 2020). Plaintiffs point to device user complaints—to Philips RS, not KPNV—regarding degrading foam, but offer no allegations that anyone at KPNV (or even at Philips RS) was aware prior to the voluntary recall of any *adverse health effects*, let alone a "causal link" between the two. *See In re Elan*, 543 F. Supp. 2d 187, 212-13 (S.D.N.Y. 2008) ("Such risks did not become material until a causal link was established, and neither opinion and speculation as to the degree of such risk nor the existence of adverse event reports were in themselves material.").

Plaintiffs likewise fail to allege any facts to support their theory that Defendants purposefully understated a €250 million reserve KPNV took in April 2021, two months prior to the voluntary recall. The fact that KPNV later increased its reserve is insufficient. *See Waterford Twp. Police* v. *Regional Mgmt.*, 2016 WL 1261135, at *11 (S.D.N.Y. Mar. 30, 2016) (plaintiffs "failed to plead facts demonstrating that [the] earlier loss reserve provisions were not the product of sincere opinions regarding appropriate loss reserves, notwithstanding the subsequent substantial increase in those provisions"). And KPNV also expressly warned investors that "the amount of the provision may change at a future date." (*Infra* Section II.)

**3.     *No Reliance on Alleged Misrepresentations Made After Last Stock Purchase Date.*** Plaintiffs' last alleged stock purchase was in November 2020, but the Amended Complaint alleges misrepresentations after that date. Because Plaintiffs have "standing to complain only of the alleged misstatements or omissions occurring prior to" their last stock purchase, all claims based on the later alleged misrepresentations should be dismissed. *Fischer* v. *Tynan*, 1993 WL 213025, at *2 (S.D.N.Y. June 16, 1993); *infra* Section III.

**4.     *No Claims on Behalf of Investors Who Did Not Purchase Their Stock on the NYSE.*** KPNV is a dual-listed stock, traded on both the New York Stock Exchange and the

Euronext Amsterdam exchange.  To the extent Plaintiffs seek to assert claims on behalf of anyone other than purchasers of KPNV common stock on the NYSE, those claims should be dismissed under *Morrison* v. *National Australia Bank*, 561 U.S. 247 (2010).  (*Infra* Section III.)

**ALLEGATIONS OF THE AMENDED COMPLAINT**[1]

### A.  The Parties

Plaintiffs—individuals Richard Sun and Subhash Patel—allege that they purchased 2,000 and 50 shares of KPNV stock, respectively, on July 29 and November 30, 2020, respectively. (ECF Nos. 1, 16-1.)  KPNV, a multinational health technology company, is a Dutch *naamloze vennootschap* headquartered in Amsterdam, The Netherlands.  (Ex. 1 ("Compl.") ¶¶ 38, 45.)  Frans van Houten is the CEO of KPNV, and Abhijit Bhattacharya is the CFO of KPNV.  (*Id*. ¶¶ 39-40.) Both are members of KPNV's Board of Management and Executive Committee.  (*Id*.)

### B.  Non-Party Philips RS

Philips RS, formerly known as Philips Respironics, Inc., is one of KPNV's approximately 300 subsidiaries.  (Compl. ¶ 38; *see* Ex. 7 at Exhibit 8.)  It is a Delaware corporation headquartered in Pennsylvania.  (Compl. ¶ 38.)  KPNV acquired Philips RS (then Respironics, Inc.) in 2008.  (Ex. 2.)  Philips RS manufactures a variety of devices for its sleep and respiratory care business, including a series of Continuous Positive Airway Pressure ("CPAP"), ventilator and other devices designed to treat respiratory conditions, such as sleep apnea.  (Compl. ¶¶ 38, 46, 49.)

---

[1]    Citations to "Ex. _" refer to the exhibits to the Declaration of William B. Monahan.  On a motion to dismiss, the Court may consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint . . . , (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken."  *Bd. of Trs.* v. *Mechel*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011), *aff'd*, 475 F. App'x 353 (2d Cir. 2012).  All emphasis is added and internal quotation marks are omitted unless otherwise indicated.

### C.     KPNV's April 2021 Provision

On April 26, 2021, KPNV issued a press release announcing its quarterly results, in which it disclosed that Philips RS had discovered that sound abatement foam included in certain of its CPAP and other devices might degrade.  (Compl. ¶¶ 9, 296.)  During the related earnings call, Mr. van Houten explained that while "this will also be discussed with the regulator," the devices were "safe to be continued to use to the best of our knowledge at this time."  (Ex. 11 at 13.)  KPNV also disclosed that it would be provisioning €250 million for anticipated costs to repair devices in the field, but warned that "[t]he actual amounts of the costs are dependent on a number of factors the outcome of which is uncertain, and, as a consequence, *the amount of the provision may change at a future date*."  (Compl. ¶¶ 9, 296; Ex. 9 at 6.)  Mr. van Houten noted that remedial measures were at an "early stage because we wanted to go out immediately and we are, also in parallel, engaging the regulatory agencies with whom we have to detail out the field safety notice as is customary practice."  (Ex. 11 at 10.)  However, the "precautionary measures" might "change" if "the discussion with regulators lead us to a different conclusion."  (*Id*.)

### D.     Philips RS's June 2021 Voluntary Recall

Less than two months later, on June 14, 2021, Philips RS voluntarily recalled the devices.  (Compl. ¶ 12.)  Philips RS had discovered that the foam not only might degrade, but also could "enter the device's air pathway" and "off-gas certain chemicals," resulting in potential personal injury.  (*Id*. ¶ 319.)  Philips RS advised users to discontinue using their devices and consult with their physician regarding treatment options.  (Ex. 13.)  Also on June 14, KPNV increased its provision by an additional €250 million.  As KPNV explained, "[t]he updated instructions for use of the affected devices have resulted in adjustments to and acceleration of the repair and replacement program, as well as intensified communication with customers and patients."  (*Id*.)  These additional actions "led to an increase of EUR 250 million in the expected

-6-

costs of the corrective actions." (*Id.*) In a section titled "Forward Looking Statements," KPNV warned that "these statements involve risk and uncertainty because they relate to future events and circumstances and there are many factors that could cause actual results and developments to differ materially from those expressed or implied by these statements." (*Id.*)

In its July 26, 2021 quarterly report, KPNV disclosed that it was "increasing its production, service and repair capacity," and had "requested the relevant regulatory clearances for the repair and replacement actions." (Ex. 10; *see* Compl. ¶ 333.) KPNV again warned, however, that "future developments are subject to significant uncertainties, which require management to make estimates and assumptions about items such as quantities, costs to repair or replace and duration," and as such, "[a]ctual outcomes in future periods may differ from these estimates and affect the company's results of operations, financial position and cash flows." (Ex. 10.)[2]

**E.    The FDA's Form 483 Inspection Report Concerning Philips RS**

On November 12, 2021, the FDA released a Form 483 report summarizing its inspector's observations from her inspection of *a Philips RS* manufacturing facility in *Murrysville, Pennsylvania*. (Ex. 16.) The FDA made clear that the statements in the report were "inspectional observations, and do not represent a final Agency determination" regarding "compliance." (*Id.*) Every page of the FDA's report states that the "Firm" to which the observations applied was "Philips Respironics, Inc." in Murrysville. (*Id.*) The FDA confirmed in an accompanying news release that the report summarized "an inspection of Philips' Respironics manufacturing facility" and "d[id] not constitute a final FDA determination of whether any condition is in violation of the Federal Food, Drug, and Cosmetic Act or any of its implementing regulations." (Ex. 17.)

---

[2]    Although not alleged in the Amended Complaint, on January 12, 2022, following FDA approval of Philips RS's repair and replacement program for certain of the devices, KPNV took an additional €225 million provision "mainly due to [the] higher volume of units now requiring remediation and increased supply cost to do that." (Ex. 12 at 3.)

The FDA preliminarily observed in the report that Philips RS's quality procedures were not sufficient and that Philips RS had not established the adequacy of its processes for escalating and responding to user complaints. (Ex. 16 at 2.) According to the FDA, customer complaints received by Philips RS regarding degrading foam should have triggered an earlier investigative process. (*Id*. at 3.) The FDA's report does not identify any complaints allegedly received by Philips RS regarding adverse health effects relating to the degrading foam. And it certainly does not identify any information known to KPNV or any of its senior executives; indeed, the report says *nothing* about KPNV, the Individual Defendants, or anyone else at KPNV at all.

## F. The Alleged Misrepresentations

The Amended Complaint, which purports to bring claims on behalf of all KPNV stock purchasers between February 23, 2016 and September 1, 2021, alleges essentially three categories of alleged misrepresentations.

*First*, the Complaint points to generalized statements regarding KPNV's "commitment" to quality, safety, and compliance. (Compl. ¶¶ 128-29.) For instance, in its 2015 annual report, KPNV stated that it was "committed to compliance with regulatory product approval and quality system requirements in every market we serve, by addressing specific terms and conditions of local and national regulatory authorities including the US FDA." (*Id*. ¶ 129.) Similarly, during an October 2017 earnings call, Mr. van Houten said that "[w]e are committed to delivering high-quality innovative products and solutions and over the last years," and "we have made significant progress in our quality management regulation compliance." (*Id*. ¶ 172.)

*Second*, Plaintiffs allege KPNV's financial reporting, including regarding sales from the sleep and respiratory care business, was misleading. (*See, e.g., id.* ¶ 227 ("The Sleep & Respiratory Care business grew mid-single digit, partly offset by a decline in home ventilation.").) Plaintiffs do not allege *any* inaccuracy in its financial reporting, but instead attempt to manufacture

a misrepresentation based on the theory that KPNV did not *also* disclose that Philips RS's sales were "unsustainable" given the "substantial risk of regulatory action or product recall." (*Id*. ¶ 122.)

*Third*, the Complaint alleges that KPNV's €250 million reserve in April 2021 was materially misleading because KPNV later increased the reserve. (*Id*.)

## ARGUMENT

"To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege: '(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation.'" *Singh* v. *Cigna*, 918 F.3d 57, 62 (2d Cir. 2019). Fed. R. Civ. P. 9(b) and the PSLRA "insist[] that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Merrill Lynch* v. *Dabit*, 547 U.S. 71, 81-82 (2006).

## I.   PLAINTIFFS DO NOT ALLEGE PARTICULARIZED FACTS TO SUPPORT A COGENT AND COMPELLING INFERENCE OF FRAUD.

The heart of any securities fraud case is scienter—"a mental state embracing intent to deceive, manipulate, or defraud"—and the Amended Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with" such intent. *Tellabs*, 551 U.S. at 314, 319. "[T]he facts alleged must support an inference of an intent to defraud the plaintiffs," *i.e.*, shareholders, "rather than some other group." *ECA, Loc. 134 IBEW* v. *JP Morgan Chase*, 553 F.3d 187, 198 (2d Cir. 2009). To qualify as "strong," the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309. A plaintiff can establish scienter only by pleading specific facts as to each defendant that (1) give rise to a "strong inference" that the

-9-

defendant "had both motive and opportunity to commit fraud," or (2) provide "strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino*, 228 F.3d at 168-69.

Even if there had been a material misrepresentation—and there was not (*see* Section II, *infra*)—dismissal is warranted "based on Plaintiff's failure to plead scienter alone." *Jackson* v. *Halyard Health*, 2018 WL 1621539, at *6 (S.D.N.Y. Mar. 30, 3018).

### A. Plaintiffs Have Not Alleged Any Cognizable Motive To Defraud

The Amended Complaint is bereft of allegations of financial self-interest sufficient to establish motive, such as that "defendants sold stock or profited" during the putative class period. *Rombach* v. *Chang*, 355 F.3d 164, 177 (2d Cir. 2004). In fact, judicially noticeable SEC filings rebut any theory of motive: both of the Individual Defendants *increased* their stockholdings throughout the class period—at the same time that, according to Plaintiffs, they were artificially inflating the price of the stock "unsustainabl[y]." (Compl. ¶ 122; Exs. 3-8; *see In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) (CFO's increased stockholdings during class period "undermine[d] an inference that defendants . . . sought to capitalize on the necessarily time-limited artificial inflation of [company]'s stock price" and was "wholly inconsistent with fraudulent intent").)[3] KPNV also carried out multiple share buybacks, totaling several billion euros, during the class period (Exs. 4-8), when Plaintiffs allege Defendants knew the stock price was inflated. "[S]hare repurchases tend to negate a finding of scienter because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated." *Frankfurt-Trust* v. *United Techs.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018).

---

[3]     SEC filings also show that the Individual Defendants' stockholdings during the period of the alleged price inflation were well above the amount they were required to hold under KPNV's share ownership policy, further undermining any inference of scienter. (*E.g.*, Ex. 8, at 7-8.)

To attempt to plead motive, Plaintiffs allege Defendants engaged in fraud to "artificially inflate and maintain the market price of Philips securities." (Compl. ¶ 411.) But the Second Circuit has squarely held that "[t]he desire for the corporation to appear profitable and the desire to keep stock prices high" is insufficient to plead motive as a matter of law. *ECA, Local 134*, 553 F.3d at 206; *see Chill* v. *Gen. Elec.*, 101 F.3d 263, 268 n.8 (2d Cir. 1996) ("If we accept [increasing stock price] as sufficient motive, then we must accept as motive that every publicly-held corporation desires its stock to be priced highly by the market. At that point, the motive requirement becomes meaningless.").

### B.    Plaintiffs Have Not Alleged a "Strong Inference" of "Conscious Misbehavior or Recklessness."

Because Plaintiffs have not pled a cognizable motive to commit securities fraud, Plaintiffs must allege "*conscious recklessness—i.e.*, a state of mind approximating *actual intent*." *S. Cherry St.* v. *Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009). Plaintiffs must identify "circumstances indicating conscious behavior" by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142; *see In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) ("Second Circuit cases uniformly rely on allegations that [1] specific contradictory information was available to the defendants [2] at the same time they made their misleading statements."). There is a "significant burden on the plaintiff in stating a fraud claim based on recklessness." *Chill*, 101 F.3d at 270.

#### 1.    The FDA's Form 483 Inspection Report Regarding Philips RS Cannot Support a Strong Inference of the KPNV Defendants' Scienter.

"Unlike many securities class actions, [P]laintiffs do not rely on a single confidential witness or internal document" to support scienter. *City of Monroe* v. *Hartford Fin.*, 2011 WL 4357368, at *1 (S.D.N.Y. Sept. 19, 2011). Instead, Plaintiffs' allegations begin and effectively end with the FDA's Form 483 inspection report. The "observations" made by the FDA

-11-

inspector were just that—observations—not final conclusions or formal findings by the FDA. Even if the interim report could provide an inference of scienter against anyone, it says absolutely *nothing* about KPNV, the Individual Defendants, or anyone else involved in preparing or making the statements Plaintiffs challenge.   Allegations that "do[] not include any reference to [the Individual Defendants] cannot create an inference that either acted with the requisite state of mind." *In re Henry Schein*, 2019 WL 8638851, at \*19 (E.D.N.Y. Sept. 27, 2019).

Plaintiffs seek to obscure this fatal fact by defining "Philips" in their Complaint to include not just Philips RS, but also KPNV and another of its U.S. subsidiaries (Philips North America in Massachusetts).  (Compl. ¶ 38; *see* Ex. 7 at Exhibit 8.)  But the FDA's report contains observations only about "your firm," which the FDA expressly defined as ***"Philips Respironics, Inc."***  (Ex. 16; *see* Compl. ¶ 347 (report provides "observations about what [inspector] found wrong during her inspection of *Philips Respironics, Inc.*").)  Thus, although Plaintiffs misleadingly allege that an indistinct "Philips" became aware of complaints regarding degrading foam in "at least 2015" (Compl. ¶ 81), the report actually states that the complaints had been received by "your firm," *i.e.*, "Philips Respironics, Inc."  (Ex. 16 at 24.)  Similarly, although Plaintiffs claim that "Philips management" was apprised of the foam degradation in 2020 (Compl. ¶¶ 27, 374), the report referred to "firm management"—*i.e.*, "Philips Respironics, Inc." management.  (*Id.*)  The FDA's report does not contain a single reference—not one—to KPNV, Mr. van Houten, Mr. Bhattacharya, or any other senior KPNV executive.

The FDA's interim report cannot provide the requisite "strong inference" of scienter as to the Individual Defendants or anyone else involved in preparing the challenged statements whose scienter could be imputed to KPNV.  *See Loreley Fin. (Jersey) No. 3* v. *Wells Fargo*, 797 F.3d 160, 177 (2d Cir. 2015) (corporate scienter only by "pleading facts sufficient to

create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading"); *Teamsters* v. *Dynex Cap. Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) (plaintiff required to plead facts showing that "someone whose scienter is imputable to the corporate defendants and who was responsible for the statements made was at least reckless toward the alleged falsity of those statements").  Plaintiffs do not allege that anyone at Philips RS had any involvement in preparing or making any of the challenged statements.  *See Jackson* v. *Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (plaintiff "provide[d] no connective tissue between those employees [who allegedly knew about the misconduct] and the alleged misstatements"); *Silvercreek*, 248 F. Supp. 3d at 440 (dismissing Section 10(b) claims for failure to meet the "nexus requirement," because "the Complaint nowhere alleges that any of the authors of those reports, or anybody directly responsible for approving their contents, was aware of [the] financial manipulation so as to render the statements in the reports knowingly and intentionally false").

Moreover, even if the alleged knowledge of Philips RS employees could be imputed to *Philips RS*, "the knowledge and actions of [the] subsidiary company's agents cannot be imputed to the parent."  *Pathfinder Mgmt.* v. *Mayne Pharma*, 2009 WL 4250061, at *9 (D.N.J. Nov. 25, 2009); *see Valentini* v. *Citigroup*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) (although plaintiffs adequately alleged knowledge of employees of two corporate defendants, "[p]laintiffs provide . . . no allegations tying the *other* two [corporate] defendants" to those employees).  Nor do Plaintiffs plead any basis for imputing the alleged knowledge of Philips RS to KPNV, as the "mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate."  *Valentini,* 837 F. Supp. 2d at 317; *see Defer LP* v.

-13-

*Raymond James Fin.*, 654 F. Supp. 2d 204, 218-19 (S.D.N.Y. 2009) (no basis to impute subsidiary's alleged scienter to parent company "where there are no allegations as to the existence of an agency relationship or other foundation on which to premise the parent's vicarious liability").

### 2. Courts in This Circuit Have Squarely Rejected Plaintiffs' Remaining Scienter Allegations.

Without the FDA's Form 483 report, Plaintiffs are left with only a handful of remaining scienter allegations. Plaintiffs allege that "because of their positions" and "their access to material information," the Individual Defendants must have known information contrary to their alleged misrepresentations. (Compl. ¶¶ 43, 413-14.) Plaintiffs fail to identify any of this "material information" or how it conflicted with any of their statements. Allegations that "Defendants had access to adverse undisclosed information because of their senior positions with the company . . . are insufficient to establish scienter." *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004); *accord Shemian* v. *RIM*, 2013 WL 1285779, at *17 (S.D.N.Y. Mar. 29, 2013); *Teamsters Allied Benefit Funds* v. *McGraw*, 2010 WL 882883, at *11 (S.D.N.Y. Mar. 11, 2010); *Plumber & Steamfitters* v. *Can. Imperial Bank*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

Plaintiffs similarly allege that Mr. van Houten attended meetings of KPNV's Quality & Regulatory Committee ("KPNV QRC") and that those meetings vaguely concerned "[c]omplaint handling and post market surveillance." (Compl. ¶¶ 105, 423.) Plaintiffs nowhere allege any discussion at those meetings about the degradation of foam in devices sold by one of KPNV's approximately 300 affiliates. "These vague allegations of 'discussions' do not support an inference that Defendants had access to specific information contradicting their public statements." *In re Federated*, 2005 WL 696894, at *5 (S.D.N.Y. Mar. 25, 2005) (allegations that CEO attended quarterly meetings at which "[a subsidiary's] receivables and reserve policies were discussed in some unspecified manner is not a fact constituting strong circumstantial evidence that

-14-

Defendants acted recklessly regarding the receivables problem at [subsidiary]"); *Plumbers' Union* v. *Swiss Reinsurance*, 753 F. Supp. 2d 166, 185-86 (S.D.N.Y. 2010) ("Nor does the plaintiffs' allegation that the individual defendants served on an executive committee that monitored 'operational risks' give rise to a strong inference of scienter in the absence of any particularized allegation of contrary information possessed by the members of the committee."); *Jackson*, 2018 WL 1621539, at *9 ("Vague allegations that [defendants] attended meetings" without "includ[ing] any specific allegations as to the information actually discussed at the alleged meetings . . . do not demonstrate that the Individual Defendants 'actually possessed' adverse information.").[4]

In the same vein, Plaintiffs point to routine Sarbanes-Oxley Act certifications made by the Individual Defendants (*e.g.*, Compl. ¶ 124), but a "plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements." *Plumbers & Pipefitters* v. *Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015); *see In re Turquoise Hill Resources Secs. Litig.*, 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) ("Similarly unavailing is Plaintiff's reliance on allegations of individual Defendants' Sarbanes-Oxley certifications [to create inference of scienter]," as "Plaintiff has not offer[ed] any particularized allegation of an inference that . . . the related CEO and CFO certifications pursuant to the Sarbanes-Oxley Act were not honestly and reasonably believed to be true when made."). Plaintiffs have no allegations that the Individual Defendants "possessed, or had access to, any

---

[4]     Plaintiffs attempt to obscure the difference between the *Philips RS* management review meetings referenced in the Form 483 report (Compl. ¶ 374)—which Plaintiffs do not allege any of the Individual Defendants attended—and *the KPNV* QRC meetings.  *See In re Marsh & McLennan*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) (allegations that CEO "attended some . . . meetings in which contingent commissions were discussed and that improper steering was discussed at some . . . other meetings" were insufficient to infer CEO's scienter).

specific, contemporaneous information that contradicted" the financial statements they were certifying.  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008).

Finally, Plaintiffs make no particularized allegations that any of the Individual Defendants believed in April 2021 that the €250 million reserve KPNV took that month "would be inadequate."  (Compl. ¶ 122.)  The mere fact of a later increase to the reserve, especially given the inherent uncertainty in setting any reserve, is not evidence of scienter at the earlier time.  *See, e.g., City of Westland Police & Fire Ret. Sys.* v. *Metlife*, 129 F. Supp. 3d 48, 72-76 (S.D.N.Y. 2015) (increase in recall reserves not evidence of scienter); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 361-62 (S.D.N.Y. 2011) (in "the absence of particularized allegations that [defendant] was experiencing or internally predicting losses exceeding their set reserves, the subsequent disclosures provide no basis to conclude that Defendants recklessly misstated previous reserve levels").[5]

### C.     The Plausible Nonculpable Explanation Is at Least as Compelling.

To plead a "strong inference" of scienter, Plaintiffs' theory must be "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  "The inquiry is inherently comparative," and "a court must consider plausible, nonculpable explanations for the defendant's conduct."  *Id*. at 323-24.  Plaintiffs' theory does not come close.

According to Plaintiffs, Defendants knew the foam was problematic and had identified alternative, defect-free foam as early as 2016, but nonetheless chose to do nothing for five years—during which time Philips RS continued to sell devices with the defective foam to

---

[5]     Plaintiffs also allege that "the Sleep Business is €1.1 billion" (Compl. ¶ 340), presumably in a misguided attempt to invoke the "core operations" doctrine, which "cannot create [an inference of scienter] where none exists."  *In re Henry Schein*, 2019 WL 8638851, at *22.  In any event, Plaintiffs do not (and cannot) allege that the "Sleep Business" constituted "nearly all of [KPNV's] business," as required for the "core operations" doctrine to even plausibly apply.  *Tyler* v. *Liz Claiborne*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011).

millions of users, creating the potential for far greater liability and financial exposure. (Compl. ¶ 92.) Philips RS is also subject to close oversight by the FDA, and the FDA would inevitably have received user complaints regarding degrading foam. *See Gillis* v. *QRX Pharma*, 2016 WL 3685095, at \*30-31 (S.D.N.Y. July 6, 2016) (scienter allegations insufficient where "as pled, the scheme . . . lacks a coherent rational objective . . . [and] by its nature . . . could not have continued in perpetuity"). In the face of this, it "defies credulity to believe" that with the availability of a "fix," "defendants would purposely have avoided implementing it." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 583 (S.D.N.Y. 2014). The more plausible, and far more straightforward and compelling, explanation is that Defendants did not know of the degrading foam until shortly before KPNV's April 2021 provision, when they promptly disclosed it. *See Atl. Gypsum* v. *Lloyds Int'l*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent.").

## II.   PLAINTIFFS DO NOT ALLEGE A MATERIAL MISREPRESENTATION.

Plaintiffs allege a series of misrepresentations over a six-year period, but they fall within three main categories: *First*, Defendants allegedly made false statements regarding KPNV's commitment to quality, safety, and compliance. (Compl. ¶ 122.) *Second*, when disclosing the performance of the sleep and respiratory care business, Defendants allegedly misleadingly omitted that Philips RS's sales were "unsustainable." (*Id*. ¶¶ 122, 219.) *Third*, Defendants allegedly understated the financial implications of the foam issue because KPNV ultimately increased its original €250 million provision. (*Id*. ¶ 122.) All of these theories fail.[6]

---

[6]   Plaintiffs also vaguely purport to allege a fraudulent "scheme" (Compl. ¶¶ 411-12), but nowhere explain the basis for any scheme claim beyond Defendants' alleged misstatements and omissions. *See, e.g.*, *Lentell* v. *Merrill Lynch*, 396 F.3d 161, 177 (2d Cir. 2005) (plaintiff did not state a scheme claim "where the sole basis for such claims is alleged misrepresentations or

A.      **Defendants' Statements About Compliance, Quality and Safety Were Neither False Nor Material.**

Plaintiffs conclusorily allege (without citation) that Defendants "stated" that KPNV was "complying with all FDA regulations" (Compl. ¶ 7), but Defendants never said that.  For instance, Defendants stated that KPNV was "committed" to quality, innovation and safety and had established processes for product design, manufacturing and distribution that complied with applicable regulations.  KPNV also stated that it "actively maintains FDA/ISO Quality Systems globally that establish standards for its product design, manufacturing, and distribution processes." (*Id*. ¶¶ 213, 241, 245.)

To attempt to establish falsity, Plaintiffs rely entirely on the FDA inspector's report (*e.g.*, *id*. ¶¶ 81-83, 346), but the report explicitly states that the inspector's observations "d[o] not constitute a final FDA determination of whether any condition is in violation of the Federal Food, Drug, and Cosmetic Act or any of its implementing regulations." (Ex. 17 at 1-2.)  Observations in a Form 483 report do not render a defendant's statements concerning compliance misleading, because they are "not the final word on whether [a] facility was in compliance with FDA regulations." *City of Pontiac* v. *Stryker*, 865 F. Supp. 2d 811, 825 (W.D. Mich. 2012); *see McGuire* v. *Dendreon*, 2008 WL 1791381, at *7 (W.D. Wash. Apr. 18, 2008) ("Plaintiffs inappropriately conflate the . . . issuance of a Form 483 with a finding of non-compliance," but "the Form 483 is not a final agency determination of non-compliance.").

Plaintiffs also do not allege particularized facts showing that any of these statements were false.  The Complaint does not plead facts showing, for instance, that KPNV was not "committed to delivering high-quality innovative products and solutions" or that it had not

omissions"); *Schnell* v. *Conseco*, 43 F. Supp. 2d 438, 447-48 (S.D.N.Y. 1999) (purported "scheme" impermissibly consisted of aggregation of alleged misrepresentations).

-18-

"over the last years" "made significant progress in our quality management regulation compliance." (Compl. ¶ 172.)  Nor does the Complaint plead facts sufficient to challenge KPNV's statement that "[w]e continue to drive quality and regulatory performance improvement."  (*Id.* ¶ 180.)  Plaintiffs also fail to plead facts showing that KPNV did not "actively maintain[] Quality Systems globally that establish processes for its design, manufacturing and distribution processes" or that those standards were not "in compliance with [FDA]/[ISO] requirements."  (*Id.* ¶ 80); *see Stryker,* 865 F. Supp. 2d at 824-25 (defendant's statement that "the manufacturing and quality control procedures it employs meet the requirements of [FDA's Quality System] regulations"  was not false or misleading, because it "did not refer to any particular investigation or facility," despite plaintiffs' allegations that "[d]efendants had been on notice of 'continual' patient complaints" and the "FDA had issued a Form 483 . . . identifying serious quality control deficiencies").

Additionally, Plaintiffs were required to allege misstatements "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome."  *City of Pontiac* v. *UBS*, 752 F.3d 173, 185 (2d Cir. 2014).  Here, all challenged statements are "textbook example[s] of 'puffery,'" which cannot form the basis for a securities claim.  *Singh*, 918 F.3d at 63 (statement claiming "to have 'established policies and procedures to comply with applicable requirements'" not actionable); *see Ong*, 294 F. Supp. 3d at 232 (defendant "committed to serving safe, high quality food," and its "food safety programs are also designed to ensure that [defendant] compl[ies] with applicable federal, state and local food safety regulations").  Statements of compliance that fail to identify specific laws or provide detailed descriptions of compliance efforts are mere puffery, because they are "too general to cause a reasonable investor to rely upon them."  *Leonard* v. *Abbott Labs.*, 2012 WL 764199, at *22

(E.D.N.Y. Mar. 5, 2012) ("General statements about compliance with safety and quality standards are non-actionable 'puffery' where . . . they fail to identify specific requirements or standards.").[7]

### B.    Plaintiffs Have Not Alleged Facts That Support Any Earlier Duty To Disclose.

Plaintiffs point to KPNV statements concerning historical financial performance, *e.g.*, that the sleep and respiratory care business "grew high single-digit, driven by mid-teens growth in sleep," in the second quarter 2016, or that "sales in the Connected Care decreased 1% with low-single digit growth in Sleep & respiratory care" in the first quarter 2019.  (Compl. ¶¶ 140, 219.)   But Plaintiffs do not allege that anything in these historic financial statements was inaccurate.  Instead, Plaintiffs theorize they were misleading because KPNV did not *also* inform investors that "sales revenues" were "unsustainable" due to the foam issue.  (*Id*. ¶ 142.)  This omission-based misrepresentation theory fails for at least three reasons.

*First*, Defendants' "literally true" statements about historical sales or performance do not become actionable "because they did not acknowledge [] long-term unsustainability." *Boca Raton*, 506 Fed. App'x at 38; *see In re Henry Schein*, 2019 WL 8638851, at *16 (rejecting plaintiff's argument that defendants' statements conveying "numbers for the healthcare distribution segment" were misleading "because [defendants'] numbers were inflated by [d]efendants' collusive conduct," since such statements were "based on accurate historical data"

---

[7]    Plaintiffs also attempt to allege a series of misstatements related solely to the E30 ventilator product sold by Philips RS.  For example, Plaintiffs point to the statement that the E30 was developed "with the needs of healthcare workers and COVID-19 patients in mind while also complying to medical device quality standards."  (Compl. ¶ 78.)  This statement—and others related to the E30 ventilator specifically—was not false or misleading for the additional reason that the FDA authorized sale of the E30 ventilator pursuant to an Emergency Use Authorization. (*Id*. ¶ 8.)  Under the FDA's Emergency Use Authorization, "[c]urrent good manufacturing practice requirements, including the quality system requirements under 21 CFR Part 820 with respect to the design, manufacture, packaging, labeling, storage, and distribution of the authorized ventilators, ventilator tubing connectors, and ventilator accessories," *are waived.*  FOOD & DRUG ADMIN., EMERGENCY USE AUTHORIZATION (Mar. 24, 2021); *see also* 21 U.S.C. § 360bbb-3(e)(3).

and thus "cannot form the basis of a securities violation"); *In re Axis Capital*, 456 F. Supp. 2d 576, 586 (S.D.N.Y. 2006) (statements of performance not misleading even if "unsustainable" and dependent on "illegal anticompetitive agreements").

*Second*, Plaintiffs have not pled (let alone with the requisite particularity) that KPNV or any of the Individual Defendants knew of the foam issue or any related complaints at the time of their challenged statements. (*See* Section I.) This precludes Plaintiffs' theory, as the Second Circuit rejects omissions-based misrepresentation claims when "Plaintiffs do not allege facts and circumstances that would support an inference that defendants knew of specific facts that are contrary to their public statements." *Rombach* v. *Chang*, 355 F.3d 164, 176 (2d Cir. 2004); *see Setzer* v. *Omega Healthcare*, 968 F.3d 204, 215 (2d Cir. 2020) ("In securities fraud cases alleging a material omission," plaintiffs are required to "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements.").

*Third*, the Second Circuit has confirmed that "reports of illnesses suffered by users" need *not* be disclosed unless and until the defendant has "statistically significant evidence that the ill effects may be caused by—rather than randomly associated with—use of the [medical product] and are sufficiently serious and frequent to affect future earnings." *In re Carter-Wallace Sec. Litig.*, 150 F.3d 153, 157 (2d Cir. 1998); *see also In re Carter-Wallace Sec. Litig. (Carter-Wallace II)*, 220 F.3d 36, 41 (2d Cir. 2000) ("[Defendant] had no sound reason to doubt the commercial viability of [the medical product] or the value of its inventory until the reports of [product]-associated deaths became statistically significant."). Here, the Complaint alleges that user complaints asserted only that the foam was "disintegrating and breaking." (Compl. ¶¶ 87, 96, 98, 102, 110-19.) Plaintiffs do not allege that any user, let alone a "statistically significant" group of users, reported that they had ingested the foam or had suffered adverse health effect relating to it.

Thus, even had Plaintiffs pleaded that KPNV had knowledge of the device user complaints (they have not), they have not pled a basis for imposing a duty of disclosure to investors without a "meaningful or statistically significant relationship" between the degrading foam and an adverse health effect. *See In re Elan*, 543 F. Supp. at 213 ("Even if scientists suspected that [drug] might cause severe adverse events and Defendants knew of these suspicions, these facts would not have required Defendants to conclude that these effects were real before such a relationship was established using accepted statistical methods and standards of proof."); *Carter-Wallace II*, 220 F.3d at 42 ("[T]he early medical reports may have indicated a potential problem, but until a connection between [drug] and any illness could be made, we would not expect [defendant] to abandon its product on what, at the time, would have been speculation."); *Hou Liu,* 2020 WL 1489831, at *7 ("adverse events" are not material until "there is a 'scientifically reliable basis for inferring a potential causal link' between the drug and the adverse event").

**C.  KPNV's Increase to Its Reserves Does Not Demonstrate a Misstatement Regarding the Earlier Estimate.**

Plaintiffs allege Defendants made misleading statements about the initial €250 million reserve solely because KPNV later increased the reserve. (Compl. ¶ 122.) But determining the amount of "reserves is not a matter of objective fact," as "[s]uch a determination is inherently subjective," and "estimates will vary depending on a variety of predictable and unpredictable circumstances." *Fait* v. *Regions Fin.*, 655 F.3d 105, 113 (2d Cir. 2011). "[L]oss reserves are statements of opinion" that are not actionable where, as here, Plaintiffs do not allege specific facts showing that, when KPNV took the initial provision, the Individual Defendants "did not honestly believe their opinions regarding the strength or adequacy of the Company's loss reserves, or that they believed those estimates to be false." *Woolgar* v. *Kingstone*, 477 F. Supp. 3d 193, 222-25 (S.D.N.Y. 2020); *see Waterford*, 2016 WL 1261135, at *11 (failure to plead facts demonstrating

-22-

that defendant's earlier provisions were "not the product of sincere opinions . . . , notwithstanding the subsequent material increase in those provisions"). "That defendants later decided to revise the amount of loan loss reserves . . . provides absolutely no reasonable basis for concluding that defendants did not think [initial] reserves were adequate." *In re CIT Grp.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004).

In addition, when KPNV announced the initial €250 million reserve in April 2021, it warned that "[t]he actual amounts of the costs, are dependent on a number of factors the outcome of which is uncertain, and, as a consequence, the amount of the provision may change at a future date." (Ex. 9 at 6); *see CIT Grp.*, 349 F. Supp. 2d at 689-90 (defendants' cautionary language that they "cannot be certain that our consolidated reserve for credit losses will be adequate over time to cover credit losses . . . clearly indicated that they did not guarantee that loan loss reserves would be adequate"). Here, circumstances changed after the initial provision, requiring an updated reserve. For example, after the initial reserve, Philips RS issued a voluntary recall, set up extensive communication channels for users of recalled devices, and began repairing and replacing devices consistent with the FDA-authorized recall plan. (Exs. 13-15.)

### D.    Defendants Said Nothing False or Misleading Regarding Ozone or the Replacement Foam.

Plaintiffs advance two additional theories of alleged misrepresentations. *First*, Plaintiffs claim that Defendants misled investors when they stated that ozone cleaners should not be used with Philips RS's devices. For example, Mr. van Houten stated on an April 2021 earnings call that "the use of unauthorised detergents in cleaning the machine," such as ozone cleaners, can have "an impact on the foam used in the machine which makes it degrade." (Compl. ¶ 299.) According to Plaintiffs, based entirely on unproven allegations made in a suit by SoClean (a

manufacturer of an ozone-cleaning device), Defendants' statements were misleading because they falsely "sought to deflect responsibility by blaming ozone cleaning products." (*Id.* ¶¶ 122, 344.)

The fact that SoClean has sued KPNV and Philips RS for purported harm to SoClean's business is not evidence of securities fraud. *See, e.g.*, *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *26 (S.D.N.Y. May 10, 2012) (declining to consider "[p]laintiffs' citation to 'unproven allegations' made in the [other] complaints" on a motion to dismiss; "[p]laintiffs may not rely on these sources as evidence of the alleged fraud"). Moreover, the FDA itself has confirmed the accuracy of Defendants' ozone statements: in June 2021, the FDA told users of the Philips RS recalled devices *not* to use ozone cleaners with their devices, precisely because "[o]zone cleaners may worsen the breakdown of the foam." (Ex. 14 at 3.)[8]

*Second*, Plaintiffs allege that Defendants' statements in September 2021 concerning the FDA-authorized repair and replacement program for certain Philips RS devices were misleading because Defendants failed to disclose that "the silicone-based foam used in the replacement [devices] . . . failed a safety test." (Compl. ¶ 122.) In fact, the FDA has not "recalled the recall" or concluded that there is anything wrong with the replacement silicone foam. Rather, the FDA has expressly stated that this one test result is inconclusive, and that further testing is required to determine "what, *if any*, potential safety risks may be posed to patients by the silicone-based foam." (Ex. 17 at 2 (cited in Compl. ¶ 379).) Plaintiffs also have failed to plead facts establishing that Defendants were under a duty to disclose this single test to investors, or, again, that any of the Individual Defendants were even aware of this one test in September 2021.[9]

---

[8] The fact that the FDA confirmed Defendants' statements regarding ozone also rebuts any inference of scienter.

[9] Because Plaintiffs have not pleaded a primary violation of Section 10(b), their Section 20(a) "control person" claim against the Individual Defendants should also be dismissed. *See*

### III.   IF ANY CLAIMS SURVIVE DISMISSAL, THE CLAIMS SHOULD BE NARROWED.

All claims should be dismissed.  But to the extent any claims survive, they should be narrowed in at least two additional respects:

*First*, Plaintiffs last purchased any KPNV stock on November 30, 2020, yet purport to allege misrepresentations continuing through September 1, 2021.  Any claims relating to those alleged misrepresentations must be dismissed.  *Denny* v. *Barber*, 576 F.2d 465, 468 (2d Cir. 1978); *see Zucker* v. *Sasaki*, 963 F. Supp. 301, 306 (S.D.N.Y. 1997) (granting motion to dismiss because "[a]llegedly false statements made after the named plaintiff's last stock purchase are not actionable because the plaintiff could not possibly have relied on such statements in purchasing the stock").

*Second*, KPNV stock is dual-listed.  To the extent the putative class includes purchasers on the Euronext Amsterdam exchange, all those claims must be dismissed, because "*Morrison* does not support the application of § 10(b) of the Exchange Act to claims by a foreign purchaser of foreign-issued shares on a foreign exchange simply because those shares are also listed on a domestic exchange."  *UBS*, 752 F.3d at 181.

### CONCLUSION

This Court should dismiss the Amended Complaint in its entirety with prejudice.[10]

---

*Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) ("In order to establish a *prima facie* case of liability under § 20(a), a plaintiff must show . . . a primary violation by a controlled person.").

[10]   "There is no general rule that just because the complaint is brought under the federal securities laws, a plaintiff will automatically receive leave to amend." *Panther Partners* v. *Ikanos Commc'ns*, 347 F. App'x 617, 621 (2d Cir. 2009).  Dismissal should be with prejudice, especially because Plaintiffs have already amended once. *See Metzler Inv.* v. *Chipotle*, 2020 WL 4644799, at *12 (2d Cir. Aug. 12, 2020) ("It seems to us to be self-evident that a plaintiff afforded attempt after attempt—and consequently, additional time to investigate—might one day succeed in stating a claim.  But the federal rules and policies behind them do not permit such limitless possibility.").

Dated:  New York, New York
        March 4, 2022

Respectfully submitted,


/s/ *Sharon L. Nelles*

Sharon L. Nelles
William B. Monahan
Elizabeth N. Olsen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Counsel for Defendants*