```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

-------------------------------X  Docket#
SUBHASH PATEL,                  : 21-cv-04606-ERK-MMH
                                :
            Plaintiff,          :
                                :
   - versus -                   : U.S. Courthouse
                                : Brooklyn, New York
KONINKLIJKE PHILIPS N.V.,        :
et al.,                         :
                                : April 24, 2024
            Defendants          : 3:13 p.m.
-------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE


**A  P  P  E  A  R  A  N  C  E  S:**


**For the Plaintiff**:          **Emma Gilmore, Esq.**
                                **Villi A. Shteyn, Esq.**
                                Pomerantz LLP
                                600 Third Avenue
                                New York, NY 10016


**For the Defendants**:         **Jenny R. Kramer, Esq.**
                                **Scott MacDonnell O'Brien, Esq.**
                                Alston & Bird LLP
                                90 Park Avenue
                                New York, NY 10016

                                **William B. Monahan, Esq.**
                                **James Browne, Esq.**
                                Sullivan & Cromwell LLP
                                125 Broad Street
                                New York, NY 10004


**Transcription Service**:      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

THE CLERK:  Civil Cause for Oral Argument in 21-cv-4606, *Patel v. Koninklijke Philips N.V., et al.*

Counsel, please state your appearances for the record.

MS. GILMORE:  Emma Gilmore from Pomerantz for the plaintiff.  Good afternoon, your Honor.

MR. MONAHAN:  Judge, my name is Bill Monahan. I'm with my colleague James Browne.  We represent KPNV, the Dutch issuer parent company, as well as its former CEO, Mr. Van Houten and its current CFO, Mr. Bhattacharya.

MS. KRAMER:  Good afternoon, your Honor.  My name is Jenny Kramer.  I'm here with my colleague Scott O'Brien.  We're with the firm of Alston & Bird.  We represent John Frank in connection with this litigation.

THE COURT:  Who do you represent?

MS. GILMORE:  The plaintiffs, your Honor.

THE COURT:  You're sitting too far away.

(Pause in proceedings)

THE COURT:  I'm bad at remembering names particularly after I've heard it once.  So I'll try to address (inaudible).  Okay.  I've already forgotten who represents who.  Whose motion is this?

MS. KRAMER:  It's our motion on behalf of the defendants.  (Inaudible) in -- I almost said the

Transcriptions Plus II, Inc.

3

Proceedings

indictment, the complaint with (inaudible).4

THE COURT:  Okay.  It's your motion.

MR. MONAHAN:  So Judge, I'm going to take the lead because I represent the issuer companies, the Dutch parent company KPNV.

We've moved -- I also represent the former CEO and the current CFO.

Ms. Frank represents John Frank.

MS. KRAMER:  Ms. Kramer.

MR. MONAHAN:  Ms. Kramer represents -- I'm going to do that several times.  Ms. Kramer represents John Frank.  He is the former head not of the issuer but of a company called Respironics which later changed its name to Philips Respironics.  And that is one of my client's, KPNV's, more than 70 U.S. subsidiaries and 300 affiliates across the globe.  Philips bought Respironics in 2008.  Mr. Frank had been working at Respironics for about 15 years before then.  So that's sort of who we are here a little bit, Judge.

Do you have, before I go on, Judge, any sort of preference as to timing?  I wasn't really sure what you wanted on that.  No?

THE COURT:  I can cover the clock.

MR. MONAHAN:  I will try to be brief.  I'll try to be certainly under a half hour --

Transcriptions Plus II, Inc.

4

Proceedings

THE COURT:  You don't have to be brief.

MR. MONAHAN:  -- if that works for you.

THE COURT:  There's no time limits here.

MR. MONAHAN:  Okay.  Very good.  Thank you, Judge.

So let me start with I think the obvious.  Sometimes --

THE COURT:  Again, who do you represent?

MR. MONAHAN:  So I'm Bill Monahan.  I represent KPNV which is a long name.  It stands for Koninklijke Philips N.V.  It's the company in the Netherlands, the Dutch parent company.

THE COURT:  I know, I know.

ESR OPERATOR:  I'm not hearing you, but I need to, Judge.  So if you want to hold this in your hand?  Would that be better?  Or you can hold this.  Either one.

THE COURT:  Okay.

MS. KRAMER:  Perhaps, your Honor, for purposes of today's argument, we can refer, Mr. Monahan can refer to his client the parent company --

MR. MONAHAN:  Sure.

MS. KRAMER:  -- just for ease of reference.

MR. MONAHAN:  I will try.

MS. KRAMER:  Yeah.  You

THE COURT:  Can you hear me now?  I've put the

Transcriptions Plus II, Inc.

5

Proceedings

smaller one.  Well, I haven't succeeded.  I spoke too soon.  That's good to have them with us.  Okay.

MR. MONAHAN:  So let me start with I think what's the obvious, Judge, and that is sometimes the stock prices drop and there's bad news.  Bad news can be things like a recall, significant recall.

Here there was a product recall.  It was a recall done by one of my client's 300 affiliates around the globe, a company called Respironics.  It's not a defendant in this case.  But that doesn't make it securities fraud, let alone securities fraud by the issuer.

We have, in our dealing with multi-district litigation in Pittsburgh, I go there twice a month basically, where we are dealing with the consumer fraud allegations, where we're dealing with the personal injury theories.  We deal with that.  That's that litigation.  That's not this.

This is a suit by plaintiffs on behalf of the parent company's investors.  It's an investor suit.  Now, because of that, we're here under the PSLRA, the Private Securities Litigation Reform Act, and that puts significant burdens, much more than Rule 8, even greater than Rule 9(b) on the plaintiffs at the pleading stage.  They have I would say three sort of heightened

6
Proceedings

obligations.

One, a very strict pleading standard with respect to scienter.  They have to state with particularity facts giving rise to a strong inference of scienter.  That's from the *Davit* case, U.S. Supreme Court.

Second, they must allege particularized facts on why the statement was materially misleading.

And then the third, and in some sense I think the most important, is the weighing that the PSLRA requires.  And in particular, you look at plaintiff's theory of scienter and then you look at alternative non-fraudulent theories and you weigh them.  And plaintiffs only succeed at the pleading stage of their inference of scienter is at least as compelling as any opposing inference.  And that's from the (indiscernible) stage. Again, all of this is the pleading stage.

And this is now their third attempt to state a claim.  This lawsuit has been pending since 2021.  Third attempt to state a claim.  And we think it fails at each of those levels.

I want to start with scienter because as courts have said, scienter is at the heart of every securities case.  I think here, while there's a number of pleading deficiencies, I think the most obvious and apparent ones

7

Proceedings

are with respect to scienter.  The standard in the Second Circuit, this is from the *Benino* (phonetic) case, is they have to allege specific facts giving rise to a strong inference of either motive and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness.  I align that to not only being the ostrich, but knowing you're the ostrich, purposely burying your head in the sand when you know that there's things that are missing.

Because motive is traditionally where you start, I'm going to talk about that very, very briefly because I think they do argue motive but it's somewhat less I would say and I don't think their motive arguments are their premier arguments that they're advancing.

Your Honor said in the *Acedo* case about five years ago, 2019, that motive requires a concrete benefit to be realized by the claimed fraud.  And most typically in these security cases the concrete benefit would be if you are an insider and you sell stock during the class period before the bad news is revealed.  There's none of that here.

They cite a First Circuit case, it's called *Mississippi Public Employees*.  That's sort of their main case on motive.  If you look at that, the insider defendants own literally hundreds of millions of dollars

Transcriptions Plus II, Inc.

8

Proceedings

of stock during the class period.

Here, it's even better for us.  Not only do we not have any sales, but we also have the two individual clients I represent, Mr. Van Houten -- let me put it this way.  The former CEO of the parent and the current CFO of the parent.  They increased, they bought stock during the class period.

And also my client, the parent company itself did share repurchases during the class period.  They actually bought stock.  And we cited the cases, I won't go through them, but those theories, those events are fully inconsistent with motive.  And that's all I'll say about that for now unless your Honor has a question.

But I do want to transition to sort of the meat of their scienter argument which is the second part, consciousness behavior or recklessness.

As the Second Circuit said in the *South Cherry* case, those words mean approximating actual intent.  So conscious recklessness that knowing you're the ostrich approximates actual intent.  And as the Second Circuit said in the *Calmit* (phonetic) case, when you're in a world where you don't have motive and you only have this consciousness behavior argument, your circumstantial obligations have to be even greater.

I don't believe they have anything of what you

Transcriptions Plus II, Inc.

9

Proceedings

would traditionally or usually see in a well played securities complaint. Cases that survive the pleading stage have things like an internal report that went to the CEO and the CFO and it's completely inconsistent with the statement. Or you have confidential witnesses who sit down, you know, in a room one on one and are talking about things that are flatly inconsistent with the statements. You have none of that here. What you have here, Judge, is a lot of would haves and should haves.

And I think I'm going to break their arguments then into sort of four parts.

The first one I'll be very quick on I think. It's their argument that because my clients, the individual clients, are senior people at the company that they must have known, they would have known. That theory is squarely rejected across all courts ever I think in the Second Circuit. I won't spend time on it.

And they have to be a little more specific on their arguments. They allege that complaint handling and post-market surveyance was addressed at meetings of the parent company's quality and regulatory committee meetings which Mr. Van Houten, that's the CEO, and the former CEO attended. Okay. What was said at those meetings is none of that. Who was there besides Mr. Van Houten, who said what? When were these meetings. Was

10

Proceedings

foam discussed?

The core underlying issue here that's leading to my MDL in Pittsburgh is that there was degrading foam, allegedly at least, degrading foam from these CPAP units. That's one.

But two, that actually if you inhaled or ingested that foam, that that was bad for you. So we're dealing with that in the personal injury cases.

There's no allegations that any of these foam issues were discussed at the parent company quality and regulatory meetings.

Setting that aside, was anything said at these meetings that were inconsistent, inconsistent with anything my client said? The answer is no. The answer is that there's no detail on any of this here.

And I would refer to Judge Brodie, Chief Judge Brodie's decision in the *Henry Shine* case where she emphasizes that these are the sorts of details under the PSLRA that you need to plead a strong inference of scienter. None of their confidential witnesses attended these quality and regulatory committee meetings. They focused, plaintiffs focused on a statement that the CEO made in April of 2021. April 2021 is when there was the first disclosure and provision reserve related to the foam issue. And what the CEO said was that the issue was

Transcriptions Plus II, Inc.

11

Proceedings

identified through quote/unquote post market surveyance. And they take the inference that the post market surveyance must have been the parent company's quality and regulatory committee meetings. That is not a reasonable inference. Post market surveyance is done at all the subsidiaries, all the 300 subsidiaries, certainly at Respironics.

THE COURT: What does that mean exactly? The word surveyance, for example.

MR. MONAHAN: It means that you're getting complaints in from the field, your looking at the complaints, you're diligencing them, and you're trying to figure out from the complaints if there's a big issue. That's fundamentally what it means.

And so this happens at the subsidiaries. It happens at Respironics. And there's an FDA report that they heavily rely on. I'm going to talk about that in a moment. But even there it just sort of rebuts their theory. The FDA report says that the post market surveyance, the complaint identification, was at Respironics. The FDA report is entirely about Respironics.

So not only does the theory inference make no sense, it's also rebutted by the record and there's no particularized allegations except maybe the best

Transcriptions Plus II, Inc.

12

Proceedings

conclusory allegation. Right? The most conclusory allegations that any of this was discussed in an earlier period at the parent company's quality and regulatory committee meetings.

The third thing -- so one was the quick one. Two is the complaint in the quality and regulatory committee meetings. There is confidential witnesses. They have two. They're barely saying two. Confidential witness one was employed at Respironics, the subsidiary. He didn't report to any of the defendants. He was four levels removed from the CEO, three levels removed from Ms. Kramer's client, Mr. Frank, three levels from him. And of course remoteness from the individual defendant is relevant to the credibility and whether they could provide competent allegations as to whether the individual had contrary knowledge. That comes from the *Blandford* case.

THE COURT: Well, how did these people claim to know the information that they were giving?

MR. MONAHAN: The thing is, Judge, that's a great question, and they don't have any information they were given. The extent of the testimony is that Mr. Van Houten and Mr. Frank talked. They had meetings. That's it. There's nothing about a meeting, what was discussed at that meeting, whether that meeting talked about

13

Proceedings

something inconsistent with the statement.  It's just sort of like at companies people report to people, people talk to people.  I would say it's totally unremarkable.  There's actually not even an allegation that either of the confidential witnesses ever spoke to Mr. Frank or my client.  Never even spoke to them.  So they talked.  Okay.  There's an allegation that the foam issue would have been, I'm quoting paragraph 414, would have been escalated to the CEO, my client.  I would say that's textbook conclusory speculation.  I would cite the *Glaser* decision where SDNY, quote, "Mere conclusory allegations that defendants would have or should have had knowledge are insufficient."

And I think another problem with confidential witness one is that traditionally notice of the document show that he's getting things wrong.  In particular, he says, based on the allegations, confidential witness one says that Mr. Frank was on the Philips', the parent company's executive committee.  They say that.  The SEC filings actually list the members of the Philips executive committee and Mr. Frank is not on it.  He's not a member of the KPNV executive committee.

So I think that takes a step further towards rebutting any sort of inference you might draw, if any, from the confidential witnesses.  The second confidential

14

Proceedings

witness, more of the same if not less.

I want to talk now about the FDA report which features heavily in plaintiff's complaint.  It's a November 2021 report.  That's after the recall at Respironics.  What is the document?  It's a report of an inspection by an FDA examiner of a Respironics facility in Murrysville, Pennsylvania, a long ways away from Respironics.  It contains the examiner's observations of an inspection.  The documents says literally nothing, literally nothing about the issuer or the parent, the CEO was the CFO, or any other executive at KPNV.  Every page says on the top Respironics is what this document is about, not KPNV.

The theory on why this somehow matters to this case I think is the following.  Mr. Frank, the former head of Respironics, he was the head of Respironics, he came over 15 years at Respironics, that according to plaintiff's read of this document, Mr. Frank knew about foam complaints earlier and that establishes his scienter.  And then there's another leap.  So that's one leap and Ms. Frank, Ms. Kramer is going to talk about that.  That's one leap.

And then with Mr. Frank's scienter, that that should be ported across the Atlantic to all of my clients and give them scienter.

Transcriptions Plus II, Inc.

15

Proceedings

So I think this theory sort of fails at four turns, and I don't want to take Ms. Kramer's thunder. And she's going to talk about the theory of scienter as to Mr. Frank. I'll pass on that. But I think there's some significant problems on that.

What I want to talk about are the other three arguments. Even if his scienter was adequately pled, even if, it can't be imputed to the parent company in the Netherlands. He's not KPNV. He's not the parent company. He's Respironics. He's been Respironics for decades. This is from the *Pathfinder* case, District of New Jersey. It's also from the *Valentini* case, SDNY. "The knowledge and actions of the subsidiary company's agents cannot be imputed to the parent company."

They seem to try again by going back to confidential witness one and saying well confidential witness one says he was on the parent company's executive committee. Wrong. The SEC filings show that it's not.

Then they rely on *Lincoln*. Now, to whatever extent *Lincoln* has any relevancy or probative value here, I mean all I'll say is this. What *Lincoln* says is he worked for Philips. That's all it says. It doesn't say he worked for the Dutch parent company, it doesn't say he worked for KPNV. Obviously, Philips is the brand name. It's obviously what people call the group of companies,

16

Proceedings

Philips.  It's a brand name.  And on another website, which is the Philips website, and we cite this in our papers, it shows that he was employed by Respironics, not KPNV, so not by the parent company.

So I think that that's one leap, the across the Atlantic leap let me call it.

The second -- the third, Ms. Kramer is going to talk about the first.  Across the Atlantic is second. The third is even if he had scienter and even if it went across the Atlantic, you need in the Second Circuit to impute scienter to the parent company.  It needs to be somebody sufficiently senior at the company to serve as a quote/unquote proxy for the company's scienter.  That's from a case called *Patel*, like this case, (SDNY 2016). It might be the same plaintiff, I'm not sure.  So it has to be a proxy of the parent company's scienter.

What do we know from SEC filings?  Mr. Frank was not on the executive committee.  He was not on the supervisory board, he was not on the management board. And the fact that he had a significant role, he was CEO of one of the 70 subsidiaries, the fact that he had that role at a subsidiary in Murrysville, Pennsylvania doesn't make him a proxy to a parent company in Amsterdam.

The last point I'll make, Judge, on scienter is even if you get past all of this, all of it, plaintiffs

Transcriptions Plus II, Inc.

17

Proceedings

got past all of it, there are no particularized allegations that he had any involvement in the challenge statements by my clients.  No allegations.  And that's independently fatal.  As the Second Circuit said in *Jackson* and the SDNY said in *Silver Creek*, there must be a nexus, one court said nexus, another court said there must be a connective tissue between the person who supposedly has knowledge, Mr. Frank, and the challenge statement.  You can't just take people with knowledge and other people with the statements and create scienter.  There has to be a linking there.

And what do we have in the complaint?  No particularized allegations about what specific info Mr. Frank had or supplied to the parent company.  Who did he give it to at the parent company?  When did he do that?  How is it misleading?  Did he review any of the statements?  When did he review that?  There's just none of that connective tissue.

I have a bunch of cases here.  I'll just briefly mention them for the transcript as to this connective tissue and why this is exactly on point.

*Renewable Energy*, (2d Cir. 2022); *Jackson*, (2d Cir. 2020); *Francisco*, (SDNY 2022); and *Menora Mibtachin*, M-I-B-T-A-C-H-I-N, (SDNY 2021).  And all these cases stand fundamentally for the linking point that's

18

Proceedings

completely absent from the complaint here.

The last point I'll make on scienter, again Judge, I think we can sort of stop at scienter because I think this is a straightforward failure at the scienter level but we can talk about the other issues. But the last piece on scienter, very important under the PSLRA, is that comparison of the inferences, that weigh in. Theirs has to be at least as compelling as a non-fraudulent inference.

Here's the theory. The parent company knew about the foam issues for years. I think they go back as 2015 or 2016. The parent company knew about that. We intentionally purposely chose to do literally nothing about that for five years. We then said, Judge, Respironics keeps selling that even though we know about all the problems, keeps selling that. All the while --

THE COURT: Keep selling what?

MR. MONAHAN: Keeps selling the devices with the bad foam. I call it the bad foam. Keep doing it. All the while we knew, this is their theory, we knew that there was a non-defective foam out there and could be put into those devices instead of the so-called bad foam. That doesn't make sense. It's economically irrational.

As the Second Circuit said in the *Shields* case, it's hard to see what benefits accrue from a short

19

Proceedings

respite from an inevitable day of reckoning. And that theory, the theory that we know about an alternative foam and we just sort of just ignore it and just say Respironics keep doing that bad foam, obviously there's going to be a recall at some point in the future. It's just that inevitable day of reckoning. And we're making it worse by Respironics putting more of the bad foam into the market. It's just going to create more liability. I'm going to be in Pittsburgh much more on that one.

THE COURT: Yes, I was about to say that.

MR. MONAHAN: So let me suggest a more plausible, compelling, reasonable, and by the way accurate alternative inference which is that the parent company didn't know of the problem until shortly before April 2021 which is precisely when it made its disclosure and precisely when it took this provision. That is a much more alternative and reasonable --

THE COURT: That's precisely when it took what?

MR. MONAHAN: They made a disclosure of the existence of a foam issue.

THE COURT: Yes, I know that.

MR. MONAHAN: And they took a provision, they reserved 250 million Euros to deal with the problem.

THE COURT: Right.

MR. MONAHAN: So that's my scienter spiel,

20
Proceedings

Judge.

Let me talk a little bit about, and I will try to be brief, on the misstatements but, you know, I don't think that -- well, we can go there too.

So there are three categories of -- remember, they made a material misstatement. There's three categories of allegedly material misstatements that we have here.

The first is that the parent company defendants allegedly made misrepresentations about the company's overall commitment to quality compliance, regulatory, safety, things of that nature. And what that is is that commitment to quality, commitment to safety, what that is his puffery. And I will cite the Court to the Second Circuit's *Boca Raton* case. Statements are puffery when they're "too general to cause a reasonable investor to rely on them."

I would also say this is the exact quote from the *Singh* case, S-I-N-G-H, (2d Cir. 2019). The statement in that case by the company was that the company had established policies and procedures to comply with applicable regulatory requirements. And if you look at the statements, they obviously point to a lot of statements, they're all very similar to that same statement which is puffery. The Second Circuit said it's

Transcriptions Plus II, Inc.

21

Proceedings

puffery.  There's a good case from Judge Spatt as well, *Leonard*, that talks about these issues as well.

There's also, setting aside the puffery issue, nothing that's pled, certainly not with particularity, that any of those statements are false.  There is nothing that shows that the parent company wasn't actually committed to quality, safety, regulatory, et cetera. Obviously, there's an issue with a subset of products of one subsidiary, Respironics, out of multitudes of products in multiple industries -- Philips doesn't just sell CPAP, they sell a whole bunch of different types of stuff -- of 300 subsidiaries.  And just because you have that one problem doesn't mean any statement made about quality and compliance is false, let alone materially false.

The second category of alleged misstatement are in the annual and quarterly reports about historical or financial report revenue and this segment is blank, sales in this segment are blank.  And that is theoretically from plaintiffs a misleading omission here because they're saying sales were unsustainable because of the foam issues and that created a disclosure obligation I suppose.  They don't actually dispute the accuracy of any of the historical financial reporting.  That's the first point.  Why did we have to disclose that sales were

22

Proceedings

unsustainable?  Because we said that inventory of products improved patient outcomes, I'm quoting, "improved patient outcomes, were safe, and were well received."  And those statements, products are safe and well received, purportedly drove sales.  And because we were pushing sales through words like well received, that that created an omission and securities fraud.

And I would say that there's three notable problems with this whole theory.

First, *Boca Raton*, Second Circuit case, "Accurate financial statements are not rendered misleading even by omission when you don't acknowledge long-term un-sustainability."

Second, these words that they're point to that created the disclosure obligation according to them, you know, safe, well received, improved patient outcomes. Those are all puffery.

And then the third thing I would say that there is no duty to disclose, e cite cases on pages 21 and 22 of our brief, 12 to 13 of our reply brief, whenever a company gets a product complaint.  Let's say we know about these complaints, which there's no evidence of that, you don't have, when you get complaints, the post market surveyance, an immediate duty to then disclose it. And that's especially true here.  Remember what I said

Transcriptions Plus II, Inc.

23

Proceedings

earlier we're talking about CPAPs and inside the CPAPs there's foam, sound abatement foam.  And some of it, according to the pleading, degraded and that was found out by some complaints.  Okay.  We're talking about foam here, Judge.  I'm sitting on foam, you're sitting on foam.  Foam is everywhere around us in this courtroom.  That doesn't create like an issue, a deal, unless you think and know that it's a health issue.  And we're talking about foam, we're not talking about asbestos or something like that.  And so --

THE COURT:  Well, if somebody is inhaling foam --

MR. MONAHAN:  Is it bad for you?  That's the next question.

THE COURT:  I just mean intuitively that I wouldn't do it.

MR. MONAHAN:  Actually, Judge --

MS. GILMORE:  You're smart.

MR. MONAHAN:  You know but the thing is we actually have tested this.  I'm going a little outside the record but I know all this.

THE COURT:  It's okay.  Doesn't matter.

MR. MONAHAN:  The foam is not bad for you. Anyway, I'm just saying.  Maybe it makes you a little uncomfortable.

Transcriptions Plus II, Inc.

24

Proceedings

THE COURT:  I don't know what not bad, I don't want to get side tracked, but I don't know what not bad for you means.  I mean would you inhale foam?

MR. MONAHAN:  I mean how many things do we inhale all the time?  I mean I don't know.  I wouldn't want to.  Certainly wouldn't choose to, Judge.  But I don't think it's going to cause a problem for me.  That's the thing.  I wouldn't want it.  Who wants to eat foam?  I don't think it would cause me any problems.  That's my core point.

And the thing is what the cases are saying is that you don't just have to disclose complaints.  You have to disclose complaints, or not complaints, you have make a disclosure when there's like an issue and you know about it, a health issue, a real health scare, health effect.  And there's no allegation in the pleadings here that anybody at KPNV knew any of that information at an earlier time.

The third thing is the provision, the reserve.  The theory is is that when we in April 2021 disclosed that there was a foam problem, took a 250 million Euro provision that because it later went up that that's securities fraud.  And of course, it's well established in the Second Circuit and district courts here that there is uncertainty in setting reserves, reserves are

25

Proceedings

inherently opinions.  If you get it wrong, that's not securities fraud.

CIT case in the southern district 2004, statements about reserves are not actionable unless there's particularized facts that the executive involved in setting the provision knew at the time it was set that reserve wouldn't be enough.  No allegations on that.

And even I should win on that one alone, but then there's an additional reason we should win and that is that the disclosure, which included the reserve, had an expressed caution.  The caution is as follows.  The actual amounts of the costs are dependent on a number of factors, the outcome of which is uncertain.  And as a consequence, the amount of the provision may change at a future date.  That sort of cautionary language also protects me.

I want to end, Judge, just sort of again a little bit where I started.  This case was filed in 2021. We are seeking a dismissal without leave to re-plead.  I believe the other side is contesting that a bit.  This is the third attempt to state a claim.  There was an original complaint, a first amended complaint.  We're now on a second amended complaint.

THE COURT:  When they were dismissed, were they dismissed by the Court or were they --

Transcriptions Plus II, Inc.

26

Proceedings

MR. MONAHAN:  No, they were not previously dismissed.  Here's how it worked.  There was an original complaint.  Then there was a leadership application.  They won the leadership application.  Traditionally, as always, leadership then files the first one.  They filed the first amended complaint.  We were before Judge Brodie at this time, by the way.  Fully briefed motion.  Judge Brodie doesn't decide it.  They write to us and say we want to make some changes to our complaint.  We can't as a matter of right make those changes but we want your agreement to allow us to make these changes.  I think they thought they could do better.  We said okay, fine.

They filed their second amended complaint.  They brought Mr. Frank in at that time and they beefed up their complaint trying to do better.  They haven't.  They haven't identified any issue that could be fixed here by a re-pleading.  They've already tried, we agreed that they could try again.  And the length of this case for three years now, we think it's time to end.

Unless your Honor has any questions, I'm going to pass it over to Ms. Kramer to talk about Mr. Frank's specific issues.

THE COURT:  Okay.

MS. KRAMER:  Hello, your Honor.  And thank you very much for that, Mr. Monahan.

27

Proceedings

And I think we ended in a perfect spot where I wanted to start with, your Honor, this afternoon.

First and foremost, Mr. Monahan covered a lot of information that I planned on touching upon, so I will try to be short and succinct with our presentation because again, we represent John Frank who, as Mr. Monahan just informed the Court, was essentially hauled into this litigation a year and a half after the filing of the initial complaint. And why is that important? I just wanted to take a minute to talk about the importance of a timeline here.

This complaint initially filed August 16, 2021. It was amended six months later, as Mr. Monahan just walked the Court through. And then the initial motion to dismiss was filed four months after that by Sullivan & Cromwell on May 18, 2022.

It was not until November of 2022, about a year and a half after the initial institution of this complaint when Mr. Frank was brought into this. So it's a year and change later. And why is that important? I think as practitioners, as a judge obviously, we are so used to litigating these cases. What gets lost along the way is the impact of being a named defendant in a case in federal court. Mr. Frank has had to endure reputational, professional, and personal harm as a result of the mere

Proceedings

bringing of this lawsuit and he's had to live with it for a really long time.

And why is that important, your Honor?  That's important because as we bring this motion to dismiss, as we're doing so now, which requires that -- the pleadings here require allocations of material misstatements and scienter, as we have discussed.  The standard that the plaintiffs are held to is remarkably high.  And there's a reason that the burden and the standard is so high because they're alleging that the parent company, the current CFO and former CEO and our client, Mr. Frank, lied.  They are alleging that statements were made that individuals in the company knew were false when they were being made.  Those are very serious allegations.  The gravity of those allegations should not be lost in the process of this case.

So let's just talk for a second about that heightened pleading requirement that Mr. Monahan was walking through earlier today.  The plaintiffs must state with particularity that heightened burden when they are alleging a fraud took place.  So what is that particularity?  What is required?  They need to allege who the speaker is, where the statement took place, when the statement was made, and why the statement is fraudulent.  Plaintiffs have done none of that in there

Proceedings

more than 500 paragraph complaint that again they've had three bites of the apple at already.

So in addition to the material misstatement and that heightened burden that they face, they also have to show not just scienter, there has to be a strong inference of scienter.  That's the centerpiece of any fraud allegation, intent.  What was the person thinking?  Did they know the statement was false when they made it?

So just for a moment I want to talk to your Honor a little bit about who is John Frank, who is this person?  He's not sitting here today, but he's a human being in all of this.

With that as the backdrop, this is a man who devoted the better part of his entire career to being in the healthcare space.  And he did, as Mr. Monahan said, work at Respironics for 15 years prior to the acquisition by the parent company.  But let me talk to you for a moment about who he isn't.

Mr. Frank isn't and wasn't a maker of any public (indiscernible) SEC statement or filing on behalf of the parent company.  He is not a former employee of KPNV which is the parent company.  He is not a former officer or director of the parent company.  He did not appear on earnings calls, and he was not on the executive committee, and he was not on any supervisory board.  He

30

Proceedings

was not a part of the parent company.  And to Mr. Monahan's, I'll say that a lot, earlier point, the parent company has lots and lots of subsidiaries.  Mr. Frank was the CEO of one such subsidiary and Philips has the benefit of having diversified products and many of them. But at no point in time was he part of or employed by the parent company.

So this case and this motion to dismiss is as much about who he wasn't, who Mr. Frank wasn't, as it is about who he was in the fray and the facts.

So now I want to move to the statements, the material misstatements that have been alleged.  And the reason why I want to park there for a minute is we don't even think the Court needs to get to scienter because we don't believe that the plaintiffs have adequately or sufficiently pled with the material misstatements are.

So again, the complaint spans more than 500 paragraphs.  When it comes to the alleged material misstatements there are two that the plaintiffs attribute to Mr. Frank.  Neither one of these statements, and I'll walk through them now, is actionable.  Both statements, as we will discuss, are non-actionable puffery, as Mr. Monahan referred to before, or opinion statements. They're completely innocuous.

THE COURT:  What?

Transcriptions Plus II, Inc.

31

Proceedings

MS. KRAMER:  Opinion.

THE COURT:  Oh.

MS. KRAMER:  Opinion or puffery.

THE COURT:  I'm sorry, I didn't hear that.

MS. KRAMER:  Which the Second Circuit, all of the case law that we cited in our extensive briefing all allows for, you know, opinions, puffery, general corporate optimism.  That is all fair game, it is all permissible.

So the first statements that I'll read just into the record took place in September of 2018 and that's an important date because it predates what Mr. Monahan was talking before about which was this initial disclosure in 2021, April of 2021.  So in September of 2018 there's a press release and in that press release, that statement, it is stated, "Worldwide chronic conditions are on the rise presenting continually growing care challenges.  Time and again, we have seen the positive impact that connected care can have not only on patients but on the care teams that serve them.  With effective treatment options, chronic respiratory conditions can be managed effectively.  Trilogy Evo is our next evolution of work in connected care solutions making therapy management for chronic conditions easier and safer."

Transcriptions Plus II, Inc.

32

Proceedings

And by the way, for reference on the record, that appears as quoted in the second amended complaint at paragraph 227. And again, that was from a September 21, 2018 Philips press release regarding the launch of the Trilogy Evo ventilator which by the way, your Honor, is not the machine or the product that was the subject of the ultimate recall. It's a separate product.

So let's just talk about that statement because the plaintiffs are alleging that that is a material misstatement that is actionable. It's not.

First of all, there are no allegations as to why this statement is in fact fraudulent. There are simply no allegations around that. The first three sentences merely state that chronic conditions are on the rise. Well, your Honor, it's a fact, chronic conditions are on the rise. That's not a false statement, certainly not a materially false actionable statement. And it goes on to say that connected care is important during these times. The personalization of healthcare through electronic communication and technology can have a positive impact on the treatment.

And the last sentence of that press release is that this product, the Trilogy Evo, is the next evolution of Philips' work in connected care and will make therapy easier and safer. That's it. That's all the statement

Transcriptions Plus II, Inc.

33

Proceedings

has to offer.  And generalized statements such as this that are corporate optimism, that are opinion, that are puffery are not actionable for fraud.  And we cited a number of cases.  It's all in our brief.

I'll just for the record now refer to *Arkansas Public Employees Retirement System v. BMS*, (2d Cir. 2022).  In that case the defendant's drug failed a clinical trial and the plaintiff claimed that the defendant misled investors by making misstatements about specific assets of the clinical trial that impacted its likelihood of success.  And the district court dismissed and the Second Circuit affirmed due to failure to allege that the defendant had an obligation to disclose the precise details of its clinical trials.  Compare that to the statement that the plaintiffs are alleging here is materially false.  It's just not actionable.

Another case, *Steamfitters Local 449 Pension Plan v. ATT&T*, (2d Cir. 2022).  Here ATT&T executives made optimistic statements about a new product the company was launching to respond to the loss of subscribers to its satellite TV service.  In that case the plaintiffs claimed that these statements were misleading because the product was not a viable means of offsetting the losses.  Again, the district court dismissed for failure to state a claim and the Second

Transcriptions Plus II, Inc.

34

Proceedings

Circuit confirmed.

And particularly relevant here are the alleged misstatements that were made before or within a few days of the launch of a new product which is exactly what this is with the Trilogy Evo.

The cases go on and on. They're in our brief. But I wanted to mention a couple of cases to emphasize and underscore the point that this statement, this press release from 2018 is not actionable, it's not a misstatement, and the plaintiffs have failed terribly and fatally to articulate and particularize the who, the what, the when, the where, and critically, your Honor, the why. Why is there anything allegedly fraudulent in that statement? So that covers the first alleged misstatement.

The second one, your Honor, is a July 2019 article and this article appeared I believe in an online periodical called Smart Business. The text of that July 2019 statement reads in part as follows. "It's in our DNA, it's what we do quite well and our belief is innovation happens only when you stay deeply connected to your core values. And that extends very close to the markets you serve. It's easy to say, often difficult to do. But our success is based on having very deep insight following the patients' journey, following the pain point

35

Proceedings

they go through."  So that's the second alleged misstatement attributable to Mr. Frank, our client.  And again, it appears in a July 2019 article.  Remember, the timeline is critical here.  We've got 2018 and we've got 2019 all predating the disclosure in 2021.

So the plaintiff seems to take issue with the commentary about it's in our DNA and this belief in innovation.  But again, your Honor, there's no reference here to any product whatsoever.  And these are generalized statements of corporate optimism about being innovative.  There's nothing wrong with that.  Businesses are allowed to do that.

What the plaintiff should not be allowed to do is have a 500 paragraph complaint hauling into the complaint as a defendant after a year and a half of the pending litigation claiming that this is somehow a material misstatement.  That's what they shouldn't be allowed to do.

So this is in sum the two statements that they are attributing to Mr. Frank.

And just briefly in terms of the case law on the second statement I think a very important case, and again we've cited all of these cases in our brief, is *Greco*, and this is a 2022 case and it's out of the Southern District of New York.  In that case, and it

36

Proceedings

really again underscores how high of a burden it is for the plaintiff to allege a fraud. In that case, the *Greco* case, the plaintiff claimed that the defendant company failed to disclose its actual violating of Chinese regulations. There were actual violations of regulations and a narrowing of its Chinese lending legend rendering a statement the company made that quote, you know, regulatory compliance within "our DNA" actionable. That was the statement there. You have a company that did violate regulations and then was making a statement that regulatory compliance is in the company's DNA, similar to the statement here where there's a reference to it being in the DNA.

The district court in that case, which had a far more egregious statement so to speak, found that the statements were non-actionable puffery because they were "too general to cause a reasonable investor to rely upon them and did not assert that the defendant is compliant with all regulations or that the defendant has never faced regulatory issues. Instead, they are general statements regarding defendant's attempt to remain compliant with regulations." It's okay. Companies are allowed to do that, executives are allowed to speak that way. It's part of the business operation. And you know what? Mr. Frank believed in that, that the company was

Transcriptions Plus II, Inc.

37

Proceedings

part of innovation and it was part of the company's DNA. That doesn't make it actionable and it doesn't make it a misstatement.

So these are undeniably, as far as we are concerned and what we respectfully submit to your Honor, not actionable puffery. There is no who, what, when, where, and critically why. And the plaintiff has fatally failed to come even close, even close to the standards. It's not a suggestion, the standard. It's a requirement that they plead this type of allegation with particularity. And again, it's required because of the import of the allegations that are being made.

So while we submit respectfully that the analysis should really end here for the Court and that no amount of time afforded or amendment allowed will cure fatal deficiencies, I want to very briefly touch upon scienter. Mr. Monahan did a wonderful job of covering all of the various points. Scienter again is usually the centerpiece of any, you know, allege fraud claims. But let's just briefly touch upon that because as Mr. Monahan noted, in order to properly allege scienter, there's got to be some kind of allegation of motive or opportunity. Plaintiffs essentially concede that there was no motive here. There is absolutely nowhere in the complaint that we can find a proper allegation of a motive here.

38

Proceedings

Generally, there are general references to the fact that executives at the parent company want to maintain a high stock value. That's not enough. That's not motive. Motive hasn't been pled here and it hasn't been pled, your Honor, because the plaintiffs can't plead it. The facts don't support the type of particularized allegations that the plaintiff had to put forth in order to survive. So motive has been pled, certainly not properly. So again, we would submit the analysis ends there.

But let's talk a little bit more about what that means when no motive has been pled. What it means is that the strength of the allegations of strong circumstantial evidence of conscious misbehavior or recklessness has to now be correspondingly greater. So there is an even higher burden, as there should be, because these are serious, serious claims. So the general allegation that the plaintiff has put forth is that, you know, there's this FDA form 483. So I want to just park on this for just a second. This form, this FDA form 483 is really of no moment here and let me explain why. In attempting to cobble together the allegations to manufacture a complaint and tie it to Mr. Frank, the plaintiffs are left essentially with no option other than to look to the FDA form 483 and say this form, this

39

Proceedings

document, references some kind of a notice about complaints dating as far back as 2015. The problem the plaintiffs have with this is -- there are multiple levels of the problem that they have.

The first problem they have with this, your Honor, is that the notice of this and the existence of these complaints going back to 2015 doesn't occur until 2020. And the report itself says the earliest possible conversations around these issues would have taken place the earliest conceivable date January 31, 2020. So remember the timeline I was talking about before, the alleged misstatements? Well, last I checked, 2018 and 2019 predated 2020. So that's one major fatal flaw with relying on it.

But let's talk about another flaw. The FDA report, the form 483, doesn't reference John Frank at all. There's a passing reference to an executive at Respironics and meetings that took place. And let's just assume for the sake of argument it is a reference directly to John Frank. It is of no moment and it is entirely irrelevant that this FDA report that refers to complaints about a different product, a CPAP machine that had the allegedly degrading foam in it, which was not the same foam used in the Trilogy Evo, that was a separate product that was not designed to include that foam that

40

Proceedings

ultimately it was determined was degrading.  They are two separate products.  So the fact that the FDA form 483 says nothing to make that 2018 or 2019 statement, it was a 2018 statement, false, it still remains true, everything that Mr. Frank said in the 2018, September 2018 statement.  There is nothing about the FDA report that changes the analysis.  It's completely irrelevant.

The only connection, there were a couple of Trilogy Evo machines that years after Mr. Frank made the statement ended up being recalled because they, due to supplier error, had the degrading foam in them and they were recalled as a result.  But as a whole, the product does not contain nor was it designed to contain the same foam that was the subject of the report.

So that FDA report is critical for the plaintiff to look to but it's meaningless in this case and its wholly irrelevant certainly to scienter or any alleged misstatement.

So for all of those reasons, again, we believe that, you know, they have fatally failed to properly allege this case in a way that is legally required, they are legally required to do.

So now that I touched upon the FDA report, very, very briefly I want to talk about the confidential witnesses.  I spent almost ten years as a federal

41

Proceedings

prosecutor and, you know, I love dealing with CWS and, you know, they're mysterious and it sounds really exciting.

THE COURT: You relied on plenty of them.

MS. KRAMER: I dealt with more than I care to talk about.

When we're talking about the confidential witnesses here, it's to Mr. Monahan's excellent point. These are two people, I don't think they've ever met Mr. Frank. I don't know if he could point them out of a lineup or if that's a mutual problem for them both. All they've alleged essentially is John Frank was an executive, he was the head of Respironics and he went to Amsterdam. And we kind of assume that maybe when he was in Amsterdam he met with big leaders at the parent company and, you know, maybe to have conversations about this. That's not enough. It's not even close, your Honor.

So the confidential witness allegations, you know, I just -- I think Mr. Monahan did an excellent job of talking about why they're of no moment in this case.

So to just briefly recap, the only misstatements that we believe are actually at play here are the misstatements of the plaintiff when they claim that John Frank made any misstatements, certainly any

42

Proceedings

material misstatements, and the misstatements of the plaintiff in claiming that he had the requisite scienter to commit a fraud.

The second amended complaint is a not so veiled attempt to rope in John Frank as a last ditch effort to manufacture a complaint because in all honesty, the plaintiffs have no other option.  They want to couple together a complaint.  When there's a recall, people rush to the courts and they want answers, but that's not how the system is designed to work.  There are reasons for the heightened pleading standards and it's to avoid exactly this type of scenario.  The facts don't support the bringing of this complaint against Mr. Frank, the law doesn't support it, and this Court shouldn't tolerate it.  Justice and the law require more.  Mr. Frank deserves the benefit of a process that works.

And again, your Honor, and I thank you so much for affording me this time, we believe that there is no amount of time or opportunity to amend that can cure these very fatal defects, so we are asking that the complaint be dismissed with prejudice.  Thank you.

MS. GILMORE:  Your Honor, may we sit over there so we can --

THE COURT:  Sure.  Pull up -- you can just pull up a couple of chairs.

43

Proceedings

MS. GILMORE:  You want me to slide down one?  Okay.

(Pause in proceedings)

MS. GILMORE:  Thank you, your Honor.  Emma Gilmore and Villi Shteyn for the plaintiff.

Your Honor, we respectfully request the Court deny defendant's motion to dismiss.  Defendants made false (inaudible) about, for example, the quality of the devices and I just want to go through some of them.

ESR OPERATOR:  I'm sorry, counsel, can I just ask you not to shuffle papers near the microphone?

MS. GILMORE:  Sorry.

ESR OPERATOR:  Because it's messing up our recording.

MS. GILMORE:  Defendants made false and misleading statements --

THE COURT:  Can you hear now?

ESR OPERATOR:  Yes.  Thank you.

MS. GILMORE:  -- about the quality of the devices.  During the class period, defendants repeatedly portrayed the devices as safe.  For example, during a press release by Philips on April 14, 2020 defendant Van Houten, who's the CEO of the parent company, represented that Respironics E3 ventilator can be safely used.

During another earnings call held on April 20,

Transcriptions Plus II, Inc.

44

Proceedings

2020, defendant Van Houten again characterized the E30 as I quote, "An adaptation from a biplane ventilator to which we have added sensors, added filters so it can be safe, so that it is safe and suitable for use."

THE COURT:  So the "it is safe" is the false statement?

MS. GILMORE:  Yeah, absolutely false.

THE COURT:  Knowingly false.  Knowingly false.

MS. GILMORE:  Knowingly false.  And I will explain why it's knowingly false.

Again, on January 30, 2018 during the parent company's earnings call with investors, defendant Van Houten again characterized the Trilogy ventilator as clinically validated.  Van Houten again during an earnings call --

THE COURT:  Isn't that puffery?

MS. GILMORE:  I'm sorry?

THE COURT:  Isn't that puffery?

MS. GILMORE:  Safe?

THE COURT:  Clinically --

MS. GILMORE:  Clinically validating meaning --

THE COURT:  Yes.

MS. GILMORE:  Well, I will give you the context.

THE COURT:  Okay.

Transcriptions Plus II, Inc.

45

Proceedings

MS. GILMORE:  Clinically validated and during the same earnings call, Mr. Van Houten stressed that there is no concern on product quality, no concern.  All products are market leading also in the area of quality and reliability.  And again he stated that, the defendants themselves again stated, including the parent company, that the DreamStation Go delivers clinically proven performance.

Now, I ask your Honor most of these devices were given to patients that were already sick even though defendants knew that they were going to inhale foam that killed over so far 560 of these people using the devices.  Many thousands are already sick, and who knows what's going to happen to them, how many of them are going to die from that.

THE COURT:  How did they know about this?

MS. GILMORE:  They knew about it at least since 2016 according to the FDA and I'll go in more detail about the scienter of this.  But I wanted to first tell you about some of the false and misleading statements of the company.  And I submit to your Honor if you are one of the users of these devices and you are repeatedly told that they were safe, would you have not wanted to know that you are inhaling chemicals that could kill you?  I submit the answer is absolutely yes, you would have

46

Proceedings

wanted to know.  And you --

THE COURT:  Isn't that a lawsuit by someone who used it?

MS. GILMORE:  Honest, defense counsel seems to think he would be okay inhaling the foam.

THE COURT:  No, but this is not a lawsuit by, you know, by someone who used it.

MS. GILMORE:  No, but those are not -- securities fraud are not mutually exclusive, right, with consumer fraud cases.  We have here the elements we need to prove, to plead and later on prove are that defendants made false and misleading statements, which they did here, with knowledge of their misleading nature to investors.  So you can have a false consumer --

THE COURT:  So the misleading statements is that they were safe?

MS. GILMORE:  Yes, they were safe.  And they repeatedly said that during the class period.  There are other statements that they made that we allege are safe and we allege why they were safe.  For example, they make statements about regulatory compliance and quality compliance.  The parent company said Philips actively maintains quality systems globally, important, globally, that established standards for its product design and manufacturing processes and that these standards are in

Transcriptions Plus II, Inc.

47

Proceedings

compliance with the FDA and also with the International Organization for Standardization requirements.

In observation number 60, FDA specifically found that management with executive responsibility, who was defendant Frank, had not ensured that the quality policy --

THE COURT: Had what?

MS. GILMORE: Had not ensured.

THE COURT: Ensured. Okay.

MS. GILMORE: Ensured that the quality policy was maintained at all levels of the organization. This is specific findings by the FDA that makes that statement absolutely false.

THE COURT: I thought the argument was made that it was with respect to only one, the one that the FDA inspected.

MS. GILMORE: The FDA inspected several products from the Trilogy family. There were many products within that Trilogy family that contained the foam.

THE COURT: No, but I thought he said that it was only referring to one particular facility.

MS. GILMORE: Yeah. The statement that the company made refers to Philips maintaining this quality system globally. That's globally. But this global

48

Proceedings

statement, the statement about this quality system being maintained globally was false because they specifically found that at least with respect to Philips Respironics, which is part of the global company, that this was not true, that they did not maintain the quality systems that complied with the FDA.  And they specifically found that under multiple regulations and guidances, Philips was required to have the mechanism in place to identify and investigate products and quality defects and take corrective action including making such reports to the FDA.

THE COURT:  Including what?  I didn't hear.

MS. GILMORE:  Making such reports to the FDA. The FDA specifically found in observation number 5 that a correctional removal was not reported by Philips to the FDA as required, another reason why the statement was false and misleading.

Now, let's talk about scienter which I think is very important.

THE COURT:  Had they reported it to the FDA would it have been a true statement?

MS. GILMORE:  It wouldn't have been a true statement, no.  Well, it still wouldn't have been a true statement because they didn't report it publicly, so the public didn't know about it.

Transcriptions Plus II, Inc.

49

Proceedings

Let's talk about Van Houten's scienter. Van Houten is the CEO of the parent company. The complaint alleges that Mr. Van Houten attended meetings where the issue of the foamed aggregation was discussed. Why? Because Philips, during the class period, had a quality and regulatory committee that met periodically to discuss quality and regulatory concerns related to its products. Defendant Van Houten attended all the quality and regulatory committee meetings that were held in 2018, 2019, 2020, and 2021. Among the topics discussed at the quality and regulatory committee meetings were --

THE COURT: He attended? That he attended?

MS. GILMORE: Yes. Attended every year, all the meetings from 2018, '19, '20, and '21. Among the topics discussed at the committee meetings were the status and outcome of quality investigations and related matters, the complaint handling and post market surveyance. They're important. And the adherence to the company's quality management system. So I through his personal attendance at these meetings, Mr. Van Houten was aware of the foam degradation issues that were the repeated subject of customer complaints --

THE COURT: Is there an allegation that this foam problem was discussed at the meetings he attended?

MS. GILMORE: Not specific the foam but I think

Transcriptions Plus II, Inc.

Proceedings

it can be deduced and plausible to deduce that this issue of foam degradation would have been discussed at this meeting because it was part of the surveyance discussions that took place.  So post market surveyance, which was the topic that was discussed at the meetings, showed problems with the foam as early as 2015 and the internal tests at least conducted by Philips Respironics confirmed that these problems existed as early as 2016.

Van Houten himself later said that he learned about the foam in the devices having been degraded from post market surveyance action which was the very topic that was the constant subject of this quality and regulatory committee meetings that Mr. Van Houten attended each year from 2018 through 2021.

CW1 as well, meaning confidential witness CW1, explains that Mr. Van Houten frequently visited the United States, particularly Pittsburgh which is where Philips Respironics is located and that the foam degradation issues would have been escalated to Van Houten given the importance of the company.  CW1 was not such a low level employee.  He was a VP of sales at (indiscernible) U.S. and sleep respiratory division.

THE COURT:  I have the summary of CW1 but go over again what CW1 said.

MS. GILMORE:  He explained that Mr. Van Houten,

51

Proceedings

the CEO of the parent company, frequently visited the United States, particularly Pittsburgh which is where the subsidiary that manufactured the faulty product was located, and that the foam degradation issue would have been escalated to him given the importance of this product to the company.  Again, the company was selling this product, I think it was several million of them, 50 million of them globally.

THE COURT:  Okay.  So he doesn't know, the informant doesn't know it for a fact.  He's just drawing -- he's saying it would have been.

MS. GILMORE:  It would have been escalated which is perfectly fine because the CEO -- there is no requirement that the confidential witness have direct contact with the CEO for the confidential witness to have been able to deduce the facts that he alleged happened.  Right?  He just has to be in a position that enables him to deduce facts that he's saying.  Here, based on his position which was directly at the sleep and respiratory division, CW1, who frequently traveled to the subsidiary, that the CEO of the parent company would have known about this issue because it was a very important thing for the company.

Van Houten also made specific statements describing the quality of the devices again showing his

52

Proceedings

familiarity with the problem.

Now, let's go to John Frank's scienter.  John Frank we allege was CEO of the sleep and respiratory care segment or business and also played the role in the parent company.  Frank, it's very clear, attended all the management review meetings since 2010.

THE COURT:  What is his role?  What was his role?  You said he was -- repeat what you said about his relationship to the parent company.

MS. GILMORE:  So Frank, we have --

THE COURT:  No, just repeat it.

MS. GILMORE:  Okay.

THE COURT:  You have it in your notes because you were reading from it.

MS. GILMORE:  Yeah, I do, but I want to show you an exhibit also.  So Frank was the CEO of the sleep and respiratory care business globally, and he also -- even let's assume that we don't know what happened, we allege that he had a dual role, one at the parent company as part of the management of the parent company because he was in charge of the sleep and respiratory care business globally, and also he was the CEO of this sleep in respiratory care business at Philips Respironics.

So he attended all the management review meetings since 2019 and the FDA doesn't -- redacted the

Transcriptions Plus II, Inc.

53

Proceedings

exact date from 2019, we don't know which month, where the foam degradation issues were discussed. And according to the FDA form 483, the sleep and respiratory care business leader, which is Frank, and the head of quality, the top echelon in charge of the business, attended all the management review meetings where specifically the foam degradation issue was discussed.

Now, I understand that Mr. Frank's counsel says that the FDA form does not specifically single out Mr. Frank or mention him by name, but they do. And maybe not necessarily by name, but it's pretty clear that that was Mr. Frank.

At page 24 of the FDA form 483, which we had introduced before as an exhibit, the FDA said that the top management for the overall sleep and respiratory care organization is the business leader and general manager, quote, manager with executive responsibility. He was required to attend all the management review meetings and in fact that person attended all the management review meetings where the foam degradation issue was discussed since at least it says 2019 and we don't know the date, the exact date. And then it lists the date but they're redacted. So we know for sure that Mr. Frank attended those meetings where the foam, specifically the foam degradation issue was discussed.

Transcriptions Plus II, Inc.

54

Proceedings

Now again, I just wanted to --

THE COURT:  Say that again what you just read from the --

MS. KRAMER:  Judge, I couldn't hear you.

THE COURT:  Could you read me again what you read from 483?

MS. GILMORE:  I don't know if your Honor wants to -- I think it may be easier if we both are on the same page.

THE COURT:  Okay.

MS. GILMORE:  Page 24.  So it says sleep and respiratory care management and with executive --

THE COURT:  What paragraph?  You're starting from the beginning?

MS. GILMORE:  Your quality manual.  You see where it says (inaudible).  The last big paragraph before --

THE COURT:  Why don't you point it out to me?

MS. GILMORE:  Yes, okay.

THE COURT:  Okay.

MS. GILMORE:  The (inaudible) --

THE COURT:  Just let me read it myself for a minute.

(Pause in proceedings)

THE COURT:  Okay.  So how does this reference

55

Proceedings

anyone in particular?

MS. GILMORE:  So it says that Philips Respironics business leader, right, business leader was required to attend all the meetings and they attended all those meetings where the foam degradation issue was discussed.  So Mr. Frank, there can be no doubt Mr. Frank attended all the meetings since at least since whatever the month in 2019 where the foam degradation issue was discussed.

Mr. Frank's lawyer said that well, this doesn't say that it's Mr. Frank but there's no question that Mr. Frank was the business leader that is discussed here. And the reason why it's also clear is because just recently in the consumer MDL case, Philips introduced this chart that showed that Mr. Frank actually is the business leader just by the company's words, not ours, and that he filled leadership position at the parent company.

THE COURT:  Let me see that.  I assume you've seen this?

MS. KRAMER:  Actually, your Honor, I was just asking co-counsel.  I don't believe this is part of this record and I question clearly how the MDL exhibits are appropriate here in this motion.

MS. GILMORE:  Well, let me -- I think we want

56

Proceedings

to be transparent with the Court so --

MS. KRAMER: I'm sorry, I was speaking.

MS. GILMORE: Okay.

MS. KRAMER: Please.

THE COURT: Please, please, let me just look at it.

MS. KRAMER: So to answer your Honor's question, no, we were not provided with this in advance.

THE COURT: Let me make a copy of this.

MS. GILMORE: So it's clear that Mr. Frank attended those meetings. We also discussed that Mr. Frank himself made a couple of false and misleading statements during the class period and we discussed why those statements were misleading, false and misleading, even though they were made before 2020. And the reason why these were made in 2018 and 2019, Mr. Frank was in charge of Philips Respironics, was aware of the issues and the internal reports from Philips Respironics that found the foam degradation existed since 2015 and that's in our brief.

But more importantly, the Court does not need to decide whether or not Mr. Frank was the maker of the statement because under Second Circuit jurisprudence, all that is necessary to plead corporate scienter is that the, and I quote, "The pleaded facts must create a strong

57

Proceedings

inference that someone whose intent could be imputed to a corporation acted with the requisite scienter." That's also Mr. Frank.

It is very clear within the Second Circuit that scienter by management level employees is generally sufficient to attribute scienter to the corporate defendants. The leading case, which I think makes very clear by Mr. Frank's scienter should be imputed to the parent is *Loreley*. In *Loreley*, and we cited that in our brief, 797 3d 176, 178 (2d Cir. 2015), the Second Circuit there imputed to the company for statements made by the company in its offering documents the scienter of a managing director with knowledge of the alleged undisclosed facts.

Similarly in *Richman v. Goldman Sachs,* 868 F.Supp.2d 261, 277, 281, and note 10 (SDNY 2012), the court imputed to the bank the scienter of its mortgage department head with respect to statements made by the bank in the company's annual reports and forms 10K.

In *Pennsylvania Public School Employees' Retirement System v. Bank of America*, 874 F.Supp.2d 341, 336 (SDNY 2012), the Court imputed the knowledge of a vice president and assistant vice president to the bank for statements made by the bank in SEC filings, press releases, and earnings calls. The same for -- I'll

58

Proceedings

shorten it.  *In re MBIA Securities Litigation*, 700 F.Supp. 2d 566, the court imputed the scienter of a managing director and head of real estate to the company.

In *Lapin v. Goldman Sachs*, 506 F.Supp.2d 221, 242 the court imputed to the company the scienter of senior analysts and investment bankers.

Likewise, in *In re JPMorgan Chase*, 363 F.Supp.2d 595, 627 (SDNY 2005) the court observed that the scienter of a vice chairman, vice president, and a managing director can be imputed to the company.  For instance, former statements made by the company in various public documents.

So again, it's very important to acknowledge that the individual making the alleged misstatement and the one with scienter need not be one and the same.

And I just want to quickly go over three very important cases.

*Loreley*, which is the key case in the Second Circuit which the Court should follow, again 797 F.3d 160, 177 (2d Cir. 2015).  The Court there imputed the scienter of a managing director with knowledge of the undisclosed facts of the company.  There was no involvement by the managing director per se in making the alleged misstatements.  And I want to briefly go over the facts of that case.

59

Proceedings

THE COURT:  Well, do you disagree with that principle before she goes over these cases?

MR. MONAHAN:  It depends on what principle. I'm not totally sure what point she's trying to make.  I certainly do believe and it is my position that -- I heard a lot of statements here about somebody at the company and it's certainly my position that -- I think she's saying that John Frank's scienter should be attributed to my client but I think we're already outside of the realm here because she Respironics versus my company.  But I do think that there is an additional requirement that even if it could be attributed to my client, he had to have some involvement in the statements.

THE COURT:  I didn't hear the last one.

MR. MONAHAN:  He had to have some involvement the challenge statements, not necessarily writing it but reviewing it, some sort of -- they call it connective tissue or nexus.

MS. GILMORE:  Which is exactly what we're going to show.

MR. MONAHAN:  And it's *Jackson v. Abernathy* is the case you're thinking of.

MS. GILMORE:  And *Jackson*, by the way, relies on *Loreley* which is the case I'm going through with your

Transcriptions Plus II, Inc.

60

Proceedings

Honor right now.  The key case in the Second Circuit is *Loreley* on which *Jackson* relies.  And in *Loreley*, plaintiffs invested in a failed CDO, some sort of financial products.  The defendants there were three Wachovia subsidiaries that created and sold the financial instrument to the plaintiff.  And the operating materials contained false and misleading statements about -- because they omitted a hedge fund role in selecting the assets, collateral, and the hedge fund to benefit -- in other words, they shorted the stock which was contrary to plaintiff's interest.

And the Second Circuit found that a strong inference by a managing director can be imputed to the company because the managing director knew or should have known that omitting those undisclosed facts would have misled investors.

The same is true here.  And not to go into details, but these cases are very important and I want to put them on the record again as to why it is more than fair to impute Frank's scienter to the company, are *In re Henry Schein*, 2019 WL 8638851 at *22, (EDNY Sept. 27, 2019) and *Patel v. L-3 Communications,* 2016 WL 1629325 at *1617 (SDNY Apr. 21, 2016).

I wanted to -- also these defendants are trying to distinguish *Patel v. L-3* saying that in that case

61

Proceedings

there was the CFO of the subsidiary was of a segment that comprised a large part of the company's revenue, but that's a distinction without a difference.  If the Court reads the case carefully, that case only involved one misconduct and only one contract.  And the Court specifically on the record found that the (indiscernible) CFO said that that particular contract was just a small -- was an element of the negative cash flow but quote, "It was a very small portion of it.  It was a low margin contract."  And indeed the Court found that the accounting fraud in that contract was not even a red flag that would have alerted the parent company's CFO of accounting fraud.

So here, we have a lot of evidence that the misconduct at issue was material to investors.  It was important because obviously of the fact that a lot of people could have died, and in fact over 500 -- we have so far 561 deaths.

It was also quantitatively, in addition to quantitatively material, because it is a stain on the company's reputation which resulted also in the CEO stepping down.

And last but not least, I want to cover the connective tissues cases that defendant is talking about and say why there is a connective tissue here and why

62

Proceedings

Frank's scienter should also be imputed to the company.

It's appropriate here to impute Franks' scienter to Philips because one reason, the alleged misstatements are specifically linked to the business that Frank was leading (inaudible).  Frank was in charge of the relevant products.  He was in charge of the devices.  Frank was the manager with executive responsibility as the company called it and he was a business leader for Philips respiratory care business.  The top management for the overall Philips sleep and respiratory care organization as we've learned.  He was also very much played a leading role in the company.

As the chief executive officer of Philips sleep and respiratory business, Frank reported directly to defendant Van Houten, the CEO of the parent company, and together with Van Houten, discussed with the investors issues of high importance related to Philips ventilator business including a partial termination by the U.S. Government of a contract for ventilators awarded to Philips.

The compliance language also that the company made and the other specific statements that the company made about the devices could only have come from defendant Frank.  Again, during the relevant time defendant Frank held a dual role at Philips.  And we show

63

Proceedings

in his LinkedIn account, he specifically distinguishes between the years he was working at Philips Respironics and the years he was working at the parent company.  The same for Zoom.  That page has subsequently been deleted but it was entered as an exhibit in our papers.

And then I want to go very quickly and distinguish the connective tissue cases that defendants raised.

*Jackson v. Abernathy*, 960 --

THE COURT:  Can you stop for a minute?  I'm sorry, I didn't remember --

MR. MONAHAN:  Mr. Monahan.  I'm sorry, Judge, I didn't see you were looking at me.

THE COURT:  What do you have to say about this point that she's making assuming you were listening?

MR. MONAHAN:  I think I was sort of listening. I mean it's the same sort of thing I would say that this is the building blocks of failure I guess on the theory of scienter and I think we're at the level of does the speaker, does the person involved in the statement, does there have to be a link between that person and the person who supposedly has the contrary knowledge.  And I think I disagree, respectfully, with Ms. Gilmore here. The cases like *Jackson v. Abernathy* which postdated the *Loreley* case that she seems to focus on, as well as *In re*

64

Proceedings

*Renewable* (2d Cir. 2022) which cites *Jackson* itself.  And there, assuming the truth of this allegation and assuming the truth means assuming that the people that supposedly knew the contrary facts actually did know the contrary facts, "Plaintiff has not connected a plan manager or any other unnamed managerial employee to any alleged misstatement which is fatal to his argument for corporate scienter."

And then you go to the *Jackson* case which that cites.  All of this of course postdates *Loreley*.  In short, Jackson's, that's the plaintiff, proposed amended complaint sets forth allegations that three employees knew of problems with the gown.  This is a hospital gown.  But it provides no connective tissue between those employees and the alleged misstatements.

So it does -- this is just one of I think four building blocks that fail on their theory.  But I disagree with Ms. Gilmore here that connecting the person with the alleged contrary knowledge of the statement is not required.  You need that nexus, you need that connective tissue.

THE COURT:  I thought we were talking about what you could impute to the company from assuming there was scienter.

MR. MONAHAN:  No, that's the second issue.  All

65

Proceedings

right?  I mean that's the other building block.  Here, I'll just read from -- how about *Pathfinder*?  "The knowledge and actions of the subsidiary company's agents cannot be imputed to the parent company."  So that's another problem.  It's a totally separate and distinct reason why they haven't pled scienter here, Judge.  It's the they cross the Atlantic point I'll call it.

THE COURT:  Can you say that again?  I just want to digest it.

MR. MONAHAN:  "The knowledge and actions of the subsidiary company's agents cannot be imputed to the parent company."

THE COURT:  But it could be imputed to the subsidiary.

MR. MONAHAN:  Well, they might be.  I mean I think they probably could be depending on the level of the person.  Of course the subsidiary here is Philips Respironics which is not even a defendant in this case nor could it because it's not an issuer.

MS. GILMORE:  May I finish, your Honor?  Your Honor, it's very clear from our briefing and the things I put on the record which are also in the brief, that a knowledge of -- there is no point that says that knowledge of actions of a subsidiary cannot be imputed to the company.  That's simply not true.  You have to look

66

Proceedings

at the context.  The context here makes clear that the knowledge of Mr. Frank should be (inaudible) to the company.

It is true that (indiscernible) subsidiary parent relationship --

THE COURT:  Sorry, I didn't --

MS. GILMORE:  Just a simple subsidiary parent relationship is not enough.  You have to allege specific facts.  Here, we allege facts that first, the misstatements specifically go past the devices which were under Mr. Frank's belly.  And also, we know that Mr. Frank played the role in the parent  company, a very high role.  And we cite at least three cases, one being the Second Circuit case that makes clear that you can impute that knowledge to the parent.  And I just wanted to briefly --

THE COURT:  Impute what knowledge?

MS. GILMORE:  The knowledge of somebody high up in the subsidiary to the parent particularly when that person has a dual role working for the subsidiary and doing work for the parent which is what we allege here.

And I wanted to distinguish the connective tissue cases quickly so that we have this on the record.

*Jackson v. Abernathy*, (2d Cir. 2020).  That case specifically relies on *Loreley* which shows why the

Transcriptions Plus II, Inc.

67

Proceedings

Court can impute the scienter of Frank here to the company.  In that case also there are allegations that three employees not --

THE COURT:  To the parent company you're saying.  To the parent company.

MS. GILMORE:  Yes.  In the *Jackson* case which relies specifically on *Loreley*, in the Jackson case we have allegations that there were three lower level employees who knew of problems with the company's surgical gowns.  Importantly, none of those three employees were alleged to have ever made any public facing statement, unlike here where Mr. Frank did make public facing statements.

Also importantly, those three employees did not themselves possess scienter unlike here where Mr. Frank undoubtedly has scienter.  And unlike here, in *Jackson*, it says Jackson otherwise offered only general allegations of warnings made to unidentified senior executives.  That's not what we have here.

Next, in *Renewable Energy*, which is a summary order with no precedential value from the Second Circuit, October 2022, the plaintiffs has to impute the scienter of a planned manager, a plan manager, for the parent. That's not what we have here.  We have the CEO of a subsidiary whose products were the repeated subject of

Transcriptions Plus II, Inc.

68

Proceedings

repeated  misstatements by the company and who also played a role as parent, as the parent company.

So again, *Renewable Energy*, plaintiff seeking to impute the scienter of a plan manager to the company. Plaintiffs there asserted that the manager of one of the company's many plants experienced some mechanical issues and therefore he must have known that the monthly inventory reconciliations were not correct.  Of course the plan manager was not connected in any way to the alleged misstatement there.  It was also not alleged, unlike here, to have made any public facing statements of any kind during the class period.

In *Liu v. Intercept Pharmaceuticals*, another connective tissue case cited by defendants, I quote here what the Court said.  "There must be allegations sufficient to show that those management level employees knew both of the alleged undisclosed facts and were aware of the alleged misstatement."  Of course here we have both.

In *Schiro v. Semex*, 396 F.Supp.3d 283, (SDNY 2019), plaintiffs failed to allege that the so-called officer who was terminated from the company reported directly to the company's senior management.  Here, we have allegations that Mr. Frank reported directly to the parent's CEO and that he himself played a role at the

Transcriptions Plus II, Inc.

69

Proceedings

parent company.

In *Menora v. International Flavors & Fragrances*, 2021 WL 1199035, the court said that the individual whose scienter plaintiffs sought to impute to the parent company, or to the company, remained a consultant, was a consultant or maybe a strategic advisor. So it wasn't even clear that person was an employee at all. And also --

THE COURT: Employee of what? You're talking about, referring to the parent?

MS. GILMORE: In *Menora*, no, it was just the -- not a parent subsidiary. It was just somebody whose scienter -- a strategic advisor that the plaintiff wanted to impute scienter to the company but the court said well, it's not even clear whether this person is a consultant or he's actually employed by the company.

And moreover, without presenting the court with a descriptive title or any details about his role at the company, the court has no way of analyzing whether or not this person had a sufficiently senior and meaningful position at the company. That's not what we have here. We have specific allegations.

In *Francisco v. Abengola* (phonetic) --

THE COURT: All right, stop. I don't -- you don't have to go through all of those cases.

70

Proceedings

MS. GILMORE:  Okay.  Then I just want to quickly talk to motive and then I'm done.

THE COURT:  Okay.

MS. GILMORE:  And motive, we are not required to allege motive but we did.  And the motive here, while not required, bolsters all inference of scienter.  The motive here is that the company --

THE COURT:  The motive of whom?

MS. GILMORE:  Of the company, of all defendants including Mr. Frank.  Is that the company wanted to delay the recall as much as possible in order to build its inventory or replacement and to avoid loss of market share.  And the complaint has specific facts that completely support this motive.  And I will quote, when an analyst asked Mr. Van Houten what is the impact of the defective DreamStation devices on the sales of the company, Mr. Van Houten said, "It's a good thing that we have launched DreamStation II.  The product is already authorized for sale in the USA.  Therefore, in relation to your question can it impact sales in the short term, yes, but only on a limited basis because in the U.S., which is our biggest market share and the majority of the demand, we have the Dream series II machine."  Completely supporting the allegation of motive from the horse's mouth.  That is at paragraph 337 and 354 of the --

71

Proceedings

THE COURT:  How does that do that?  Tell me how it supports it.

MS. GILMORE:  Because they didn't institute the recall until they made sure that they have new products that didn't have the foam.  Only at that time did they let the market know about it.

THE COURT:  Okay.

MS. GILMORE:  Unless the Court has any other questions, we rest.

THE COURT:  No.

MS. GILMORE:  If the Court is inclined to dismiss (inaudible).

THE COURT:  Does anybody want to say anything more?

MR. MONAHAN:  We'll try to be short, Judge, but I'd like maybe five minutes.

THE COURT:  I told you there's no clock here. If you want to go home for dinner --

MR. MONAHAN:  I'd do have to go.  May I sit here, please?

MS. GILMORE:  Yes.

MR. MONAHAN:  I have a shiva to go to tonight, but that's not a problem.

You had asked a question about the FDA report and what it covered and what it did not cover and I'm not

72

Proceedings

sure that you got an answer from plaintiff's counsel. Just to be clear, that was an inspection by the FDA that they cite, pled in Murrysville, Pennsylvania.

THE COURT: I know. You said that. Because you said that in your initial argument, that's why I asked the question.

MR. MONAHAN: I know. But I wanted to make sure that you had the answer because you did ask that. And I don't know how many sites there are globally among Philips group companies. I know there are 300 affiliates. But apparently the theory here is that a problem at one cite is securities fraud at the parent. We reject that.

I want to come back to in exchange you and I had earlier about, you know, you don't want to eat the foam. I get it. I totally get it. And you know, my point is instead well this is actually not going to hurt you. It may be annoying but it's not going to hurt you. The thing I don't think I made clear enough before when we were talking about this, Judge, is how is this a problem for investors? How is this a fraud on investors? Again, I'm in Pittsburgh, I'm dealing with personal injury suits. I think they're wrong, but I'm dealing with them, I'm dealing with people who say they're annoyed by eating foam and I'll deal with them over

73

Proceedings

there.  But this is a case under the PSLRA brought by investors.  This is not that.

I need to expressly categorically reject the notion that there have been any deaths, let alone 561, which is asserted here as if a fact.  There is no support for that and what's going -- and I reject it as false.  What's going on here, Judge, is that plaintiff's lawyers, plaintiff's lawyers filed reports, they're called MDR reports, medical device reports, on behalf of their clients saying that somebody was injured or somebody died, that doesn't make it so.  Plaintiffs --

THE COURT:  Where did they file these reports?

MR. MONAHAN:  They filed them with the FDA.

THE COURT:  Okay.

MR. MONAHAN:  They're called MDRs.  They filed with the FDA.  And they say this is what happened.  And that's my say so.  I'm the plaintiff's lawyer, that's my say so.  It doesn't make it true.  That's just an allegation just like there's all sorts of flawed allegations in plaintiff's complaint.

Again, and also, how does this have anything to do with securities fraud on investors, by the way?

THE COURT:  Well, I suppose that if it's a problem, investors might choose not to invest.

MR. MONAHAN:  I suppose if it's a problem then

Transcriptions Plus II, Inc.

74

Proceedings

of course you're back to scienter, right?  You need a statement too, right?  So there needs to be first a statement that's materially misleading.  So they have to get over that.  And then second, we're back to scienter and there's nothing that the parent company or Mr. Frank or any of my clients were aware of these issues at any earlier time.

There was a mention at the beginning of Ms. Gilmore's presentation about the parent company quality and regulatory committee meetings.  And the sort of suggestion implicit in all of this is that every quality issue, every complaint among the 300 affiliates goes up to the parent company.  And I'm sorry, that's just not how, you know, multinational companies work with multiple affiliates.

Every subsidiary has its own quality organization.  They deal with complaints as they come in.  That's what Respironics deals with.  They get complaints.  This other affiliate gets their complaints.  Not everything goes up to the parent level.  None of their confidential witnesses attended any of these meetings.  This is total speculation.

THE COURT:  So where in the record is the basis for what you said just now?

MR. MONAHAN:  Which part?  How about this?  I

75

Proceedings

got this.  The FDA's 483 report, which is in the record, says that the complaints came out of Respironics.  What was that phrase, the monitoring, post surveillance monitoring and that means looking at complaints.  That would be the cite in the record I would point your Honor to.

So this is more of a would have been, you know, would have known.  You know, we don't have a confidential witness actually in these meetings but, you know, it would have maybe come up there.  That's not enough under the PSLRA.

All right.  So what's going on in the back and forth that happened at the end here about the connective tissue, here's what's going on.  Mr. Frank said some statements.  He has said statements.  My client made some statements and here they are.  And let's just put them all into a blender and jumble them up.  And because Mr. Frank allegedly has scienter, allegedly, assuming he does, all of these statements are then enough to make securities fraud, but that's not how it works.  You need to look at each statement.

And I don't think Ms. Kramer would disagree that Mr. Frank is responsible for his own statements, and that's fine.  Obviously, as she said, they're not material and misleading or with scienter.  His own

Transcriptions Plus II, Inc.

76

Proceedings

statements, we have my client's different people, the parent level, that's where the connective tissue falls into play.  That's where there's the absence of a nexus.  And they can't get past that by just saying that Frank made statements.  You can't just sort of globulate all these statements together and treat them all the same way.

Again, you know, I heard Ms. Gilmore say things that -- I'm sorry, my paper is over here -- that I thought I misheard but maybe I didn't.  Again, here's another piece of the scienter that fails.  Again, the knowledge and actions of the subsidiary company's agents cannot be imputed to the parent company.  So that's just a separate point.  So they fail at the parent subsidiary issue.  They fail there.  Then secondarily they fail because of the blender,  because they don't have a connection between Frank and the statements made by my clients.  I heard --

THE COURT:  Didn't they say that Frank had some relationship with the parent?

MR. MONAHAN:  Yeah, but what is that based on, Judge.  It's based on confidential witness one who says that he was a member of the executive committee when the SEC filings show that he wasn't.  It's based on a LinkedIn which says that he worked at Philips, of course

77

Proceedings

the brand name.  What is it based on?  It's based on the fact that he oversees the sleep and respiratory care products.  Those are the products that Respironics makes.  There's not anything particularized here to support this dual role thing.  In fact, I think that the handout that they gave, which I hadn't seen before, actually doesn't support a dual role at all.  I mean there's nothing in there that suggests that he has a parent company connection.  So they can say it.  There's no particularized facts in the PSLRA to support it, your Honor.

I did not hear a single word about my CFO client, Abhijit Bhattacharya.  I did not hear a single word about him which I thought was telling on the allegations there.

And I think, unless your Honor has any further questions, pass to Ms. Kramer.

MS. KRAMER:  If I may, if your Honor wants to hear from me very briefly as well.

THE COURT:  Go ahead.  You make good arguments.

MS. KRAMER:  Again, I'll be super brief about this.  What I just sat here and listened to is a little bit concerning and I just want to touch on a couple of quick points.

Number one, Ms. Gilmore, when she was walking

78

Proceedings

your Honor through the FDA 483 report mischaracterized what's in there. We heard a lot of statements from Ms. Gilmore that John Frank was at all of the meetings, he was at every single meeting and they've been happening since 2019. That's just not correct and it's not what the report says.

If your Honor will recall when I was giving my argument on scienter and specifically noting that the 483 report has absolutely no connection to the two statements that they have alleged are false and misleading, statements of John Frank, that's the September 2018 and the July 2019. Those are the only two statements, your Honor, that they are alleging are false and misleading and attributable to Mr. Frank. This report has zero to do with that. Zero.

And in this report, as I mentioned earlier, your Honor, the earliest conceivable date that there would have been a conversation about the foam as set forth in the report is January 31, 2020. I told your Honor that in my argument. And then Ms. Gilmore sat here and changed that date. So just for the record and clarity of the record, it says right here in the report that Ms. Gilmore was referring to that the polyester or polyurethane foam degradation issues concerning the CPAPs or BiPAPs, the Trilogy ventilators, if they were

Transcriptions Plus II, Inc.

79

Proceedings

discussed at all, apologize, discussed at all and then if there's a redaction, management review meetings since the 2019 and then it's redacted, whatever they're referring to, report let's say, dated January 31, 2020.  So what she is referring to is a document or information that is dated January 31, 2020.  And again, your Honor, that's of no moment as it relates to the alleged misstatements of Mr. Frank.  Again --

THE COURT:  Because?

MS. KRAMER:  Because the 2018 statement, which of the two statements, there's no reference to any product.  And the 2018 statement generally references the launch of the Trilogy Evo which is not the machine that was ultimately recalled and it was not designed to include the same foam.  As I mentioned earlier, a few of the devices ended up (indiscernible) the foam and they were later recalled.  But all of this has no connection to the FDA 483 report.  They can't get scienter.  They just can't get there.  So that's point number one.

This is all very much a last ditch effort and attempt to build this kind of knowledge and nexus and we hear about the confidential witnesses.

I just briefly want to draw your Honor's attention to your Honor's own decision while you were sitting by designation in the Ninth Circuit in *Cutler v.*

80

Proceedings

*Kirchner*, 2017 U.S.App Lexis 15538 (9th Cir. 2017).

THE COURT:  Three judges.

MS. KRAMER:  There you go.

THE COURT:  If it was an unpublished opinion, it doesn't indicate who wrote it.

MS. KRAMER:  Well, you were there.

THE COURT:  I was there.

MS. KRAMER:  So I wanted to bring this to your Honor's attention because we think it provides a really good counter example of the type of confidential witness allegations that can raise an inference of scienter.  In that case, the panel and presumably your Honor, credited the allegations of a confidential witness who was quote, "one of 12 people to participate in quarterly meetings of the defendant's international executive board and was able to describe how defendant's senior management team kept abreast of critical information and received updates from key employees."

THE COURT:  Sounds right to me.

MS. KRAMER:  That's absolutely right.  And as your Honor, you know, participated in that case and sat by designation, that's the type of confidential witness, you know, scrutiny and specificity that one needs.

And I will leave your Honor with this because I started my whole argument with this.  Timeline matters.

81

Proceedings

Standard matters. This is a fraud case. They must particularize their allegations. And as Ms. Gilmore sat here, respectfully, I heard the following statements. He, meaning John Frank my client, had a dual role at the parent company. That is false. That is not a true statement. He did not have a dual role. I told you who he wasn't in the beginning of today's argument. He was not an executive at the parent company. He was not a maker of any of the statements. He did not participate in the earnings calls. That is a false statement that Ms. Gilmore is putting into the record. She also said he attended all of the meetings. And your Honor said how do you know that? There wasn't a good answer for that.

There are other statements Ms. Gilmore said, and we have it in the record. She said at certain times when you asked her how do you know, which are excellent questions, the responses were the statements "could have only come from John Frank, from him."

She also said at one point that it can be deduced and is plausible that foam was discussed at the meetings.

She also said, and I quote, at one point in response to your Honor's question about how she knows the information she's submitting, "It's very clear." And she also said at one point along the way that Mr. Frank

82

Proceedings

undoubtedly had scienter and made public statements. Those statements are dangerous because they defy the very critical standard that the plaintiff must comply with. It is not a suggestion, it's not a good idea. They must allege with particularity. We've been at this for more than a year and a half. Mr. Frank sits here as a defendant in a federal case alleging fraud.

We are asking that this case be dismissed with prejudice and no amount of time or amendment can cure these very fatal defects. Thank you, your Honor.

MS. GILMORE: Your Honor, may I have two minutes? Because counsel said that I put something false in the record which is completely untrue.

The documents after you have --

THE COURT: Excuse me. When do you have to leave by?

MR. MONAHAN: I'll be all right. It's fine, Judge.

MS. GILMORE: The documents --

MR. MONAHAN: I think it goes to like 9:30.

THE COURT: (Inaudible).

MR. MONAHAN: I'm not sure what -- I think it's 7:30 to 9:30 actually.

THE COURT: Okay.

MR. MONAHAN: I should be fine. It's in Long

83

Proceedings

Island.

MS. GILMORE:  Your Honor, I'm sure you have time to look at the record.  The documents speak for themselves.  The FDA specifically stated that management with executive responsibility, the leader -- what is the specific word?  The business leader, which as we know from the exhibit is no doubt other than Mr. Frank, was required to and did, he did attend all the meetings where the foam degradation was discussed at least as of January 1, 2020, at least that.  It doesn't matter whether he was a maker of the statement.  His scienter can and should be and it is more than fair to impute his scienter here to the company, to the parent company.

Two, the 561 deaths, they were reported by the FDA.

THE COURT:  I mean I don't quite follow that. Repeat that last part again.

MS. GILMORE:  I'm sorry?

THE COURT:  Repeat the last argument that you made.

MS. GILMORE:  So the FDA form 483, on page 24 it states very clearly that the management with executive responsibility, the business leader, who is Mr. Frank, and we know that also because of Exhibit 119 which says Mr. Frank is the business leader, was required to and did

84

Proceedings

attend all the meetings where the foam degradation issue was specifically discussed at least since January 2020. Those are not my words.  It's on the FDA report.  Okay?

The FDA inspection is not just any inspection. They actually inspected and uncovered the company's own records so it is very reliable document.

The deaths, the 561 deaths reported were reported by the FDA as of February.  They weren't just reported by plaintiff's lawyers in another case.  They were by the FDA.

MR. MONAHAN:  Judge, I need to respond to that.

MS. GILMORE:  Again, securities fraud and securities fraud cases are not mutually exclusive.  What we need to show here is that the defendants made false and misleading statements to investors.  And we show that.  As an investor in the company, I would have wanted to have known about the risk associated, about what kind of product they were peddling because an investor has every right to be able to make a reasonable assessment of the risks associated with investing in a company.

Again, we address the cases and the fact as to why Frank's knowledge should be imputed to the company in addition to the fact that the CEO of the parent has scienter as well.

And we also address the fact that here there is

85

Proceedings

a connection between Frank, his position, his high position at the company, and he does have a dual role which is why we allege, and they can dispute it all they want, this is not a disputed issue of fact at the motion to dismiss stage.

And the FDA form 483, defense counsel for Frank says that the E30 ventilator was not recalled. It was recalled. It has the foam, the dangerous foam. And the FDA form 483 states that on page 2 that the foam existed in the Trilogy ventilator product. The E30 ventilator is part of the Trilogy ventilators, part of the Trilogy family. So --

MR. MONAHAN: E30 is not (inaudible).

MS. GILMORE: It is.

MR. MONAHAN: It's not. No, you're thinking of Evo. Those are --

MS. GILMORE: Evo. Sorry. That's Evo, Evo ventilator.

MR. MONAHAN: Those are totally different products.

MS. GILMORE: Right. Evo ventilator which is the one at issue.

And also the FDA didn't state that Mr. Frank would not have had scienter before or knowledge of the issues before 2020. In fact, on page 24 the FDA said

Transcriptions Plus II, Inc.

86

Proceedings

that since at least January 31, 2020 or earlier there was knowledge at Philips.  We know that there was knowledge at Philips about the foam at least since 2015.

THE COURT:  Okay.  Are we done?

MR. MONAHAN:  I just need to say something about that death comment again just because it really upsets me, Judge.  So here's --

THE COURT:  Can you hear?

ESR OPERATOR:  I can hear.  You need the microphone, Judge.  Defense counsel was quite --

MR. MONAHAN:  Here's how it works.  There was a suggestion that these deaths were somehow sort of less or like the number that is endorsed by the FDA.  Here's how it actually works, Judge.  So plaintiffs' lawyers get the plaintiffs to file these MDR reports with the FDA that say oh, I'm reporting a death.  The FDA statutorily does two things.  One, they release the numbers, which I guess is the 561, so people know that that's how many reported deaths.  And along with that, there is a statement by the FDA in what they release and in the statute that says we didn't investigate these, we don't know if it's true or not.  We're just reporting what is being told to us.  I'm obviously paraphrasing.

But the suggestion that the FDA has reached a conclusion here about that is false.  Otherwise I'm good,

Transcriptions Plus II, Inc.

87

Proceedings

Judge.

THE COURT:  Okay.

MS. GILMORE:  Your Honor, one death is too many.

MR. MONAHAN:  It's zero.

MS. KRAMER:  The only point I'll add to this Friday and then we can be done is that, Mr. Monahan can correct me if I'm wrong, in the MDL as we sit here today there's been no determination that the foam degradation issue has caused any patient harm.  And I think that's, you know, the state of the world right now.  So making any statements about causation is also Mr. Monahan's point which it's just not true and not the situation.

But with that, your Honor, I have nothing further to say and really do bank the Court and your Honor for the time and attention to this matter.

THE COURT:  My pleasure.

MS. GILMORE:  Thank you, your Honor.

MS. KRAMER:  Thank you so much.

MR. MONAHAN:  We're good?

THE COURT:  Yes, we're good.

MR. MONAHAN:  Thank you, Judge.

(Matter concluded)

-oOo-

88

**C E R T I F I C A T E**

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **29th** day of **April**, 2024.

_Mary Greco_
Transcriptions Plus II, Inc.

Transcriptions Plus II, Inc.