UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUBHASH PATEL, Individually and On Behalf of All Others Similarly Situated,<br>                                                      Plaintiff,<br>v.<br>KONINKLIJKE PHILIPS N.V., FRANS VAN HOUTEN, and ABHIJIT BHATTACHARYA,<br>                                                      Defendants. | Case No. 1:21-cv-04606-MKB-MMH |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION**

**INTRODUCTION**

In a blatant attempt at a "second bite at the apple," Defendants ask the Court to reconsider its decision sustaining securities fraud claims against Defendant Koninklijke Philips ("Philips KPNV" or "Philips") and its CEO, van Houten. On September 23, 2024, the Court denied in part Defendants' motion to dismiss Plaintiffs' allegations in a carefully considered 43-page opinion (ECF No. 55 (the "Opinion" or "Op.")). Following extensive briefing on the motion to dismiss and a lengthy oral argument, the Court correctly found that the Complaint sufficiently pleaded van Houten's scienter and it imputed his scienter to Philips.

Dissatisfied with the outcome, Defendants attempt to convince the Court to reverse itself. Defendants' motion fails to meet the strict standard for reconsideration. First, Defendants merely re-state earlier arguments, which is an impermissible ground for reconsideration. The Court has already spent considerable time considering and fully rejecting these arguments. Defendants' motion is also substantively flawed because the Court correctly applied binding authority to the facts of the case, did not misconstrue any pertinent allegations, nor did it overlook controlling decisions that were put before it. The Court should quickly dispose of the motion so Plaintiffs can proceed to discovery on their securities fraud claims against Defendants.

1

**ARGUMENT**

**A. Reconsideration Is an Extraordinary Remedy Rarely Granted**

Defendants fail to articulate any legitimate basis for their request for reconsideration. They must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Key Mech. Inc. v. BDC 56 LLC*, 330 F.3d 111, 123 (2d Cir. 2003); *Chioke v. Dep't of Edu. of City of N.Y.*, 2018 WL 5446796, at *2 (E.D.N.Y. Oct. 29, 2018) ("The standard for granting a motion for reconsideration is strict….") (Korman, J.). "It is well-settled that a party may move for reconsideration and obtain relief only" if it demonstrates "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 108 (2d Cir. 2013). Local Rule 6.3, which governs reconsideration, "should be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court." *LaSala v. Needham & Co.*, 2006 WL 1206241, at *3 (S.D.N.Y. May 2, 2006). "The threshold for prevailing on a motion for reconsideration is high." *Nakshin v. Holder*, 360 F. App'x 192, 193 (2d Cir. 2010).

Defendants ignore this standard and fall far short of meeting it. Defendants point to nothing even potentially warranting reconsideration. No intervening change in law. No newly available evidence. No error whatsoever, clear or otherwise. Indeed, nothing not already fully considered and soundly rejected by the Court. Instead, Defendants use their motion as an opportunity to submit an 8-page brief that merely repeats their selective attacks on the Complaint's scienter allegations.

**B. Reconsideration Should Be Denied Because Defendants Seek to Re-Litigate Issues That This Court Already Addressed and Decided**

"Reconsideration is not a proper tool to repackage and relitigate arguments and issues already considered by the Court in deciding the original motion." *Ceparano v. Suffolk County*,

2013 WL 1749898, at *2 (E.D.N.Y. Apr. 17, 2013). Defendants' motion for reconsideration should be denied—first and foremost—because it adds nothing new but simply seeks to re-litigate issues that Defendants already raised and this Court already decided. Defendants resurrect their unsuccessful argument that the allegations about van Houten's attendance at KPNV's Quality and Regulatory Committee Meetings where post-market surveillance issues about Philips' products were discussed cannot support an inference of his scienter. (Recon. Br. at 5-6). Defendants made the same losing argument in their opening brief (claiming they were "vague allegations of 'discussions'" that "do not support an inference that van Houten had access to specific information contradicting his public statements" (ECF No. 48-1 ("MTD Br.") at 15), and again in their reply (arguing that "complaint handling and post market surveillance" discussions are not detailed enough to infer van Houten's scienter) (ECF No. 48-25 ("MTD Reply Br.") at 4-5).

Defendants advance another failed argument, namely that van Houten's later admission that "the issue with the DreamStation 1 family and related products came out of our post-market surveillance, where we have picked up reports from users" does "not state [with precision] when, how or from whom he personally learned of the issue." (Recon. Br. at 4). Defendants made this argument in their opening and reply briefs (MTD Br. at 15-16, MTD Reply Br. at 5), and the Court rejected it (Op. at 16-17). Lastly, Defendants argued and the Court considered non-culpable explanations of van Houten's scienter, finding his scienter "readily inferable." (Op. at 17).

## C. Reconsideration Should Also Be Denied Because Defendants Are Wrong on the Merits

Defendants' motion should also be denied because it is wrong on the merits. As Plaintiffs argued and the Court found, the Complaint's allegations, holistically analyzed, more than adequately support a strong inference of van Houten's scienter. The test is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues*

3

*& Rts., Ltd.*, 551 U.S. 308, 322-23 (2007) (*Tellabs II*). As the Second Circuit has instructed in *Novak*, absent allegations of motive, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.*

As confirmed in Defendants' annual report to investors, at all relevant times, Philips KPNV had a Quality & Regulatory Committee that met periodically to discuss quality and regulatory concerns related to Philips' products. Van Houten personally attended all the Quality & Regulatory Committee meetings held in 2018, 2019, 2020, and 2021. The Complaint alleges precisely the specific topics discussed at those meetings, as set forth in the annual report: (i) quality and regulatory dashboards, which displayed key performance indicators for business groups and markets, measuring performance and continuous improvement to enhance quality and compliance; (ii) the status and outcome of quality investigations and related matters; (iii) ***complaint handling and post-market surveillance***, ***i.e., monitoring of a medical device after its market release***; and (iv) adherence to the Company's Quality Management System. Post-market surveillance available to Defendants showed problems with the foam by 2018, the first year van Houten was in attendance. The Complaint *also* alleges that van Houten admitted learning that the foam in the devices was degrading from post-market surveillance actions—the very topic that was the constant subject of the Quality & Regulatory Committee meetings he attended starting with early 2018. These allegations more than sufficiently establish his scienter at the pleading stage.

Defendants attack the Court for supposedly "misconstru[ing]" van Houten's admission that he learned about the foam degradation from post-market surveillance. (Recon. Br. at 4).

4

Defendants self-servingly argue that van Houten's acknowledgment during Philips KPNV's conference call with investors that "the issue with the DreamStation 1 family and related products c[a]me out of *our* post-market surveillance" where "*we* have picked up reports from users" cannot possibly refer to van Houten or his knowledge. *Id*. As they see it, the reference is to *Philips Respironics'* post-market surveillance only, and van Houten is not alleged to have attended the post-market surveillance meetings of *Philips Respironics*. But the Court misconstrued nothing because during **Philips KPNV**'s earnings call with investors van Houten **did not** say that the post-market surveillance refers to Philips Respironics (which he could easily have noted). The "readily available" inference, as the Court concluded, is that van Houten was talking about *his knowledge*, and that of *Philips KPNV*, derived from his attendance at the company's Quality and Regulatory Committee meetings *where the post-market surveillance issues were discussed* as early as 2018.

Accordingly, the Court correctly found that "with reference to particularized facts—namely the frequency and content of the QRC meetings—Plaintiffs have sufficiently pleaded an inference of van Houten's scienter." (Op. at 16). The Court correctly applied *Novak*, finding that Plaintiffs sufficiently "identif[ied] the QRC meetings as the place where van Houten learned about the foam issues, specifically through discussions about post-market surveillance." (Op. at 16-17). The Court correctly held that the Complaint "established van Houten's scienter as of early to mid-2018, after he had attended a QRC meeting." (Op. at 17). The baseless premise of Defendants' motion is shown by their contention that "Plaintiffs did not and cannot allege that the foam degradation issue was escalated to the QRC until KPNV's disclosure to investors in April 2021." (Recon. Mot. at 3, n.1). It is in fact incontrovertible that van Houten attended the QRC meetings as far back as 2018, that QRC meetings have as a major objective post-market surveillance, and it is beyond "readily inferable," as the Court found, that material issues regarding a major product

5

line like the respiratory devices that received numerous consumer complaints and failed multiple tests by 2018, were discussed at the QRC meetings.

Defendants again seek to draw a supposedly "sharp[] contrast[]" between the more exacting details of the Form 483 Report and the details surrounding the Quality and Regulatory Committee meetings. (Recon. Br. at 5). But no such precise details are required at the pleading stage when discovery has not commenced. The Form 483 Report contained "smoking-gun" details because the Food and Drug Administration ("FDA") secured several internal communications from Philips Respironics as part of its on-site investigation. Plaintiffs have no access to Philips KPNV's internal communications at this stage. This is precisely why it is black letter law that no smoking-gun evidence of the type Defendants demand is required. *Tellabs II*, 551 U.S. at 310 (instructing that the inference of scienter "***need not be irrefutable, i.e., of the 'smoking-gun' genre***, or even the most plausible of competing inferences"). Defendants accuse the Court of allegedly "overlook[ing] the Form 483" (Recon. Br. at 5), but the Court did no such thing. To the contrary, the Court was fully aware of the Form and its contents, cited it no less than ***twenty-three times*** in its Opinion, and concluded that "Plaintiffs' inability to provide exact details [about the QRC meetings] is not fatal to their claim." (Op. at 16). The Court cogently explained Plaintiffs' compliance with *Novak*. (Op. at 16-17).[1]

---

[1] *In re Marsh & Mclennan Cos. Secs. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) has already been unsuccessfully raised by Defendants in their motion to dismiss, it is not controlling, and it is easily distinguishable, as Plaintiffs have shown in their opposition. (ECF No. 48-21 ("MTD Opp.") at 34 n.13). Similarly, *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678 (2d Cir. 2022), a decision affirming a district court's judgment, was unsuccessfully cited by Defendants in their reply brief supporting their motion to dismiss, and is a summary order with no precedential effect. *See* 2d Cir. R. 32.1.1. It is also inapposite as the complaint contained no allegations that identified *any* reasonably available information whatsoever that would have revealed the issues to defendants, and the contents of the press release contained no indication, "implicitly or explicitly," that anyone learned of the alleged mistakes before the press release was issued. *Renewable Energy Grp.*, 2022 WL 14206678, at *1-3. Here, in contrast, the Complaint identifies information about

Defendants also take a jab at the Court for supposedly failing to consider the competing, nonculpable inference that van Houten was not aware of the issue until "shortly before KPNV's April 2021 disclosure." (Recon. Br. at 8). Defendants are wrong. The Court fully understood the law espoused by *Tellabs II* and *Novak*, discussed in detail Defendants' attempts to "undermine the[] allegations," and properly applied the law to the facts when it ruled against van Houten. (Op. at 9, 16-17). The Court explained that "[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." (Op. at 9). The Court specifically observed that, "to qualify as strong, an inference of scienter … must be cogent ***and at least as compelling as any opposing inference of nonfraudulent intent***." *Id*. Applying this standard to the facts alleged, the Court found that Plaintiffs' inference that van Houten became aware of the foam issue as of early to mid-2018 was more compelling than Defendants' competing inference, concluding that the "allegation—that the parent company would have discussed post-market surveillance suggesting there were product defects in the devices of one of its subsidiaries—is both plausible and ***readily inferable***." (Op. at 17).

Nothing more was required of the Court, and it did not lack "common sense" (Recon. Br. at 7) in finding Plaintiffs' inference more compelling than Defendants' flimsy excuses. *See also City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 315 (S.D.N.Y. 2013) (denying motion for reconsideration on assertion that court failed to perform *Tellabs II*'s competing inference analysis, because "[a]lthough the point was not expressly stated as such, the

---

the foam issues existing in 2018 and gained through post market surveillance, and this information was available to van Houten at the time he attended the Quality and Regulatory Committee meetings in 2018. Van Houten also admitted learning about the issues through post-market surveillance.

Court considered and rejected as implausible the asserted competing inference that defendants were merely naively overenthusiastic about the timetable they had set," when it found that defendants "knew or had to appreciate that the schedule … was no longer viable"); *In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, at *2 (S.D.N.Y. Apr. 11, 2011) (denying reconsideration where "[t]he court specifically reviewed the standard for pleading scienter and determined that, while Plaintiffs did not sufficiently allege motive and opportunity, Plaintiffs' allegation of recklessness is sufficient to survive Defendants' motion to dismiss").[2]

The Court already considered Defendants' argument that van Houten generally "increased" his holdings during the Class Period, finding this point appeared inconsistent with motive. (Op. at 13-14). But it held that van Houten acted with scienter under the ***alternative*** prong because the Complaint sufficiently alleged facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." (Op. at 8-9, 14, 16-17). "There is no *per se* rule that stock purchases negate any inference of scienter, including an inference based on recklessness." *Fannie Mae*, 2011 WL 13267340, at *3 (denying reconsideration because the "Court's finding of an inference of

---

[2] Defendants claim that "Plaintiffs also never offer a cogent explanation as to why things somehow changed for Mr. van Houten in 2021 such that he decided only then—and not in 2018, 2019 or 2020—to disclose the foam issue." (Recon. Br. at 8). But there are many cogent explanations for the timing of van Houten's admission, including that it was just a few short months before the FDA inspected Philips Respironics' facilities in 2021 and obtained evidence about the foam degradation, as the Form 483 Report indicates (reflecting dates of inspection between 8/26/2021 – 11/9/2021). Someone at the company could also have been threatening to blow the whistle. Another cogent explanation is that Defendants waited in order to extract more proceeds from the sale of the devices and, at the height of COVID in 2020, even secured emergency approval from the FDA for the faulty Evo ventilator while concealing from the FDA and the public that Evo used the same degradable foam. These explanations are far more compelling than Defendants' baseless protestations of innocence. *See*, *e.g.*, *Ind. Pub. Ret. Syst. v. SAIC, Inc.*, 818 F.3d 85, 96-97 (2d Cir. 2016) (rejecting inference that it is simply implausible that defendants would deliberately conceal misconduct that would soon come to light because this "argument confuses expected with realized benefits," and if defendant "believed that it had more time, then 'the benefits of concealment might have exceeded the costs.'") (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (*Tellabs III*)).

scienter even though there were stock purchases did not constitute clear error"); *In re Aphria, Inc. Sec. Litig.*, 2021 WL 4442818, at *2 (S.D.N.Y. Sept. 28, 2021) (denying motion for reconsideration that argued the court disregarded the individual defendants' acquisition of company shares because plaintiffs alleged scienter under the alternative prong); *In re Ashanti Goldfields Sec. Litig.*, 2004 WL 626810, at *5 (E.D.N.Y. Mar. 30, 2004) ("[N]et purchases of stock by defendants do not necessarily negate an inference of scienter on a motion to dismiss."). (MTD Opp. at 42) (collecting cases).³ Here, moreover, Defendants do not state that van Houten "***purchased***" shares, only that he "***increased***" his holdings.⁴

The Complaint contains additional allegations that, when considered holistically with the rest of the other allegations, support a strong inference of van Houten's scienter. During the Class Period, he routinely discussed the quality, performance, and customer reception of the devices. *See*, *e.g.*, Compl. ¶215 (stating that "Philips' Sleep & Respiratory Care business continues to grow"

---

³ Defendants impermissibly cite *Slayton v. Am. Express Co.*, 604 F.3d 758, 775 (2d Cir. 2010) (Recon. Br. at 7), an opinion they previously failed to put before the Court. *See* Local Rule 6.3; *see also Grabin v. Marymount Manhattan Coll.*, 2014 WL 3639136, at *2 (S.D.N.Y. July 22, 2014) (denying reconsideration motion where defendants argued the Court "overlooked the significance" of case law not presented in defendants' summary judgment papers). Regardless, the facts in *Slayton* bear no resemblance to the ones alleged here. In affirming the district court's dismissal, the *Slayton* court found the allegations convincingly demonstrated that defendants lacked the knowledge to predict the extent of a portfolio's deterioration. *Slayton*, 604 F.3d at 775-76. There also were no admissions by defendants. Moreover, the allegations suggested defendants acted in "good faith" by "inform[ing] themselves and the public of the risks." *Id.* at 777. Here, Defendants deflected and lied, including during the April 2021 earning call, where van Houten blamed ***consumers*** for the foam's desintegration. The FDA slapped down those bogus claims. (ECF No. 39 ("Compl.") ¶151). In *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196-97 (2d Cir. 2008), another case cited by Defendants, Plaintiffs failed to plead scienter under *any* of the prongs.
⁴ It is not clear that van Houten greatly increased his holdings by ***purchasing*** stock or whether the increase was largely the result of performance shares ***granted to him*** as part of his compensation (or through exercising low-cost options). While corporate insiders of domestic issuers are required to publicly disclose their transactions, insiders of foreign issuers have no such reporting requirements. Defendants are cagey about how this purported increase happened. Accordingly, Defendants' motive argument carries particularly diminished weight. *See* MTD Opp. at 41-42.

with the market's supposedly "strong acceptance of its market leading home ventilation offerings"); Compl. ¶220 (highlighting, in Respiratory Care, the "continued" "strong performance led in ventilation by the award-winning Trilogy range"); Compl. ¶293 (remarking that "the E30 … is an adaptation from a bi-plane ventilator, to which we have … added filters, ***so that it is safe and suitable for critical care***"). Van Houten's references to specific information about the Devices reflect his intimate knowledge about these products, further contributing to a strong inference of his scienter. *See* MTD Opp. at 38-40.[5] The scandal also claimed van Houten's scalp. His departure, in close proximity to the commencement of a criminal investigation by the U.S. government into the devices, provides additional evidence of his scienter. *See* MTD Opp. at 40-41.

When Plaintiffs' allegations are accepted as true and considered holistically, the inference of van Houten's scienter is far more compelling than any opposing inference. At the very least, ***a tie goes to the Plaintiffs***. *Tellabs II*, 551 U.S. at 314.[6]

## CONCLUSION

The Court got it right the first time. Because Defendants present nothing the Court overlooked, much less that should alter anything in the Court's Order, Defendants' motion for reconsideration should be denied.

Dated: October 21, 2024                           Respectfully submitted,
                                                                       **POMERANTZ LLP**

                                                                       */s/ Emma Gilmore*

---

[5] The Court does not have to explicitly reference every fact or case it reviewed when analyzing Plaintiffs' claims. *Ferrand v. Credit Lyonnais*, 292 F. Supp. 2d 518, 521-22 (S.D.N.Y. 2003) (reconsideration denied), *aff'd*, 110 F. App'x 160 (2d Cir. 2004); *Warren v. City of New York*, 2010 WL 2026502, at *1 (E.D.N.Y. May 19, 2010) (reconsideration denied).

[6] Defendants' remaining cases, unsuccessfully cited in their motion to dismiss, are easily distinguishable. In *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 601-03 (S.D.N.Y. 2016), the allegations did not support a strong inference of scienter under *any* of the two prongs (motive *or* evidence of conscious misbehavior or recklessness). The same is true for *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-31 (2d Cir. 1994).

Jeremy A. Lieberman
Emma Gilmore
Villi Shteyn
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

*Lead Counsel for Lead Plaintiffs and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiffs and the Proposed Class*