UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUBHASH PATEL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KONINKLIJKE PHILIPS N.V. AND FRANS VAN HOUTEN,<br><br>Defendants. | Case No. 1:21-cv-04606-ERK-MMH |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................ 3

Defendants Made False and Misleading Statements ........................................................ 3

Defendants Knew About Problems With Foam Degradation For Years But Concealed Them From Investors ........................................................................................ 4

The Truth About the Risks Related to the Devices Slowly Emerges ................................ 5

PROCEDURAL HISTORY ........................................................................................ 6

ARGUMENT .......................................................................................................... 7

I. THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23 ........................................................................ 7

A. The Rule 23(a) Requirements Are Satisfied .............................................. 8

1. The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable ............................................................ 8

2. Questions of Law or Fact Are Common to the Class ..................... 9

3. Plaintiffs' Claims Are Typical of the Class ................................. 10

4. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class ........................................................................ 11

B. The Requirements of Rule 23(b)(3) Are Satisfied ................................... 12

1. Common Questions of Law and Fact Predominate ...................... 12

a. NYSE Listing Is Strong Evidence of Market Efficiency .. 16

b. The Five *Cammer* Factors Confirm Market Efficiency .... 17

c. Mechanical Damage Tabulations For Individual Class Members Will Not Defeat Predominance ......................... 22

d. Reliance Is Also Presumed Under *Affiliated Ute* .............. 23

2. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy ..................... 23

II. POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL ........................................................... 25

CONCLUSION........................................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972)....................23

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................7, 11, 12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)....................2, 8, 13

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)....................11

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................13, 14, 16, 17

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) ....................10

*Califano v. Yamasaki*,
442 U.S. 682 (1979)....................2

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .................... *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ....................15, 17, 22

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
504 F.3d 229 (2d Cir. 2007)....................8

*Cheney v. Cyberguard Corp.*,
213 F.R.D. 484 (S.D. Fla. 2003)....................18

*Conn. Ret. Plans & Tr. Funds v. Amgen, Inc.*,
2009 WL 2633743 (C.D. Cal. Aug. 12, 2009)....................11

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)....................23

*Cromer Fin. Ltd. v. Berger*,
205 F.R.D. 113 (S.D.N.Y. 2001) ....................13

*Darquea v. Jarden Corp.*,
2008 WL 622811 (S.D.N.Y. Mar. 6, 2008) ....... 7

*Dietrich v. Bauer*,
192 F.R.D. 119 (S.D.N.Y. 2000) ....... 9

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ....... 13

*Dura-Bilt Corp. v. Chase Manhattan Corp*.,
89 F.R.D. 87 (S.D.N.Y. 1981) ....... 13

*Epifano v. Boardroom Bus. Prods., Inc.*,
130 F.R.D. 295 (S.D.N.Y. 1990) ....... 7

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ....... 8, 13

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ....... 10

*Guadagna v. Zucker*,
332 F.R.D. 86 (E.D.N.Y. 2019) ....... 8

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ....... 15, 16

*In re Agent Orange Prod. Liab. Litig.*,
818 F.2d 145 (2d Cir. 1987) ....... 10

*In re Baldwin-United Corp. Litig.*,
122 F.R.D. 424 (S.D.N.Y. 1986) ....... 11

*In re Beacon Assoc. Litig.*,
282 F.R.D. 315 (S.D.N.Y. 2012) ....... 13

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ....... 8

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009) ....... 18

*In re Diamond Foods, Inc., Sec. Litig.*,
295 F.R.D. 240 (N.D. Cal. 2013) ....... 22, 23

*In re DVI, Inc. Sec. Litig.*,
639 F.3d 623 (3d Cir. 2011) ....... 17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
245 F.R.D. 147 (S.D.N.Y. 2007), *order aff'd in part, vacated in part*, 574 F.3d 29 (2d Cir. 2009)....................10

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)....................10

*In re Hebron Tech. Co. Sec. Litig.*,
2020 WL 5548856 (S.D.N.Y. Sept. 16, 2020)....................25

*In re Indep. Energy Holdings PLC, Sec. Litig.*,
210 F.R.D. 476 (S.D.N.Y. 2002)....................2, 7

*In re JPMorgan Chase & Co. Sec. Litig.*,
2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)....................17, 23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018)....................11

*In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*,
2013 WL 396117 (D.N.J. Jan. 30, 2013)....................13

*In re Oxford Health Plans, Inc.*,
191 F.R.D. 369 (S.D.N.Y. 2000)....................10

*In re: Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016), *aff'd in part, vacated in part on other grounds sub nom. In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017)....................25

*In re Prudential Sec. Inc. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995)....................9

*In re SCOR Holding (Switzerland) AG Litig.*,
537 F. Supp. 2d 556 (S.D.N.Y. 2008)....................10, 24, 25

*In re Sumitomo Copper Litig.*,
182 F.R.D. 85 (S.D.N.Y. 1998)....................10

*In re Vale S.A. Sec. Litig.*,
2022 WL 122593 (E.D.N.Y. Jan. 11, 2022)....................8

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006), *clarified sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007)....................11

*In re Vivendi Universal, S.A.*,
242 F.R.D. 76 (S.D.N.Y. 2007)....................9

*In re Winstar Commc'ns Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013) ....................14

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) ....................2, 24

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005) ....................18

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ....................22

*Lapin v. Goldman Sachs & Co.*,
254 F.R.D. 168 (S.D.N.Y. 2008) ....................16

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
967 F.2d 742 (2d Cir. 1992) ....................23

*Lumen v. Anderson*,
280 F.R.D. 451 (W.D. Mo. 2012) ....................16, 17

*Maywalt v. Parker & Parsley Petroleum Co.*,
147 F.R.D. 51 (S.D.N.Y. 1993) ....................2

*Menkes v. Stolt-Nielsen S.A.*,
270 F.R.D. 80 (D. Conn. 2010) ....................8, 9

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
446 F. Supp. 2d 163 (S.D.N.Y. 2006) ....................13

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) ....................2, 7

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) ....................22

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008) ....................15

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008) ....................7

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ....................24

*UFCW Loc. 1776 v. Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2010) ....................13

*Vinh Nguyen v. Radient Pharms. Corp.*,
287 F.R.D. 563 (C.D. Cal. 2012) ..................................................18

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) ..................................................23

*Wagner v. Barrick Gold Corp*.,
251 F.R.D. 112 (S.D.N.Y. 2008) ..................................................9, 10

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ..................................................8

**Statutes**

17 C.F.R. §240.10b-5 ..................................................1

15 U.S.C. §78j(b) .................................................. *passim*

15 U.S.C. §78t(a) .................................................. *passim*

**Rules**

Fed. R. Civ. P. 23 .................................................. *passim*

Lead Plaintiff Richard Sun and Plaintiff Subhash Patel ("Plaintiffs") submit this memorandum in support of their motion for class certification pursuant to Federal Rule of Civil Procedure 23.[1] Plaintiffs seek certification of the following Class:

> All persons and entities other than Defendants,[2] current or former officers and directors of Philips, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest, who purchased or otherwise acquired Koninklijke Philips N.V.'s ("Philips" or the "Company") securities between February 21, 2018 and November 1, 2022, both dates inclusive (the "Class Period")[3] on (i) any stock exchanges located in the United States, (ii) on any alternative trading systems located in the United States, or (iii) pursuant to other domestic transactions, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Philips and van Houten.

**PRELIMINARY STATEMENT**

This lawsuit is a textbook example of a case warranting class action treatment. Plaintiffs seek to prove that, like other Class members, they were injured by a common course of misconduct—the issuance of false and misleading statements and material omissions by Defendants concerning (1) Philips' commitment to compliance, quality, and safety; and (2) the portrayal of certain Philips products as safe and well-received by consumers, while Defendants were in possession of material information undermining the accuracy of their statements. The questions of law and fact relevant to the merits—issuance of false and misleading statements, reliance, materiality, scienter, loss causation and economic loss—are identical for each and every

---

[1] Unless otherwise noted, citations to "¶__" refer to the Second Amended Class Action Complaint ("SAC" or "Complaint"). Dkt. No. 39.

[2] The Defendants are Philips and François Adrianus van Houten ("van Houten").

[3] While the Complaint alleges a class period starting on February 23, 2016 (¶1), the first misstatement or omission sustained by the Court occurred on February 20, 2018, after the market closed. Dkt. No. 55 (Memorandum & Order) at 23-25 & n.5; *see* ¶214; Declaration of Emma Gilmore ("Gilmore Decl.") Exhibit 1 (reflecting that Philips' 2017 Form 20-F was filed on February 20, 2018, after the market closed). Accordingly, the Class Period for which certification is now sought starts on February 21, 2018.

member of the putative Class. Indeed, class action treatment is especially appropriate because many members of the putative Class have relatively small losses, making it unfair and inefficient to force them to vindicate their claims individually.

The use of class action procedures to adjudicate claims under federal securities law has been upheld by the Supreme Court, as well as by the Second Circuit. *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available."); *In re Indep. Energy Holdings PLC, Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (class action treatment is "particularly appropriate" for securities fraud claims, and under such circumstances courts should err in favor of certifying a class). The Supreme Court has warned against imposing restrictions on certification of federal securities claims where it is not mandated by the text of *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013). Likewise, "the Second Circuit…has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (citations omitted); *see also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well financed defendants would leave most investors "without any recourse").

As detailed below, this action satisfies all the requirements for class certification under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. This action also satisfies the two core requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact and superiority of a class action over other available methods

for adjudication. Thus, class certification is warranted.

## STATEMENT OF FACTS

### Defendants Made False and Misleading Statements

Philips is an international health technology company and its common shares trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "PHG". ¶57, 67. Throughout the Class Period, Philips' U.S. subsidiary, Philips Respironics, Inc. ("Philips Respironics") manufactured several popular Bi-Level Positive Airway Pressure (BiPAP), Continuous Positive Airway Pressure (CPAP), and mechanical ventilator devices ("Devices"). Many of these devices utilized polyester-based polyurethane (PE-PUR) foam for sound abatement purposes. ¶2. During the Class Period, Philips sold millions of these devices. ¶3. Unbeknownst to the market but known to Defendants, the foam in these devices was subject to degradation, which meant that foam particles could enter the Devices' air pathway and be ingested or inhaled by the user. ¶4. The degrading foam could also "off-gas certain chemicals" that possessed toxic properties with carcinogenic effects. *Id*.

Defendants repeatedly represented to investors that Philips' business success depended on the quality of its products and its compliance with global regulations and standards. *See, e.g.*, ¶331. Defendants claimed that Philips was taking the necessary precautions to ensure quality through the standardization and adoption of industry best practices via its quality systems. *See* ¶¶214, 249, 283, 330-31. Defendants also told investors that Philips was actively maintaining quality systems that establish processes for its product design, manufacturing and distribution processes, and that these standards complied with Food and Drug Administration (FDA)/International Organization for Standardization (ISO) requirements. ¶102. In truth, however, these statements were false and misleading when made because Defendants' quality control systems were not in fact in compliance with FDA regulations, and the Company was

aware that foam issues and complaints had been ongoing with Philips' products since 2015, exposing Philips to a heighted regulatory risk than its public statements let on. ¶¶156–57. Furthermore, Defendants portrayed their products in a positive light, claiming they were safe and well-received, despite documented evidence (including numerous complaints and tests) showing foam degradation in the Devices. *See* ¶¶220, 257, 286, 293-95.

The Court held that Plaintiffs adequately pled material misrepresentations and omissions regarding (i) Philips' commitment to compliance, quality, and safety, and (ii) the business and its products. Dkt. No. 55 at 23-32. It also found that "statements asserting the Form 20-F's compliance with the Exchange Act's reporting requirements, including that each 'fairly presents, in all material respects, the financial condition and results of operations of the Company,' [were] also misleading." *Id*. at 29 n.8.

**Defendants Knew About Problems With Foam Degradation For Years But Concealed Them From Investors**

An investigation conducted by the FDA at Philips Respironics, the subsidiary that manufactured the Devices, revealed numerous instances of customer complaints and tests conducted by or at the request of Philips or its subsidiary that showed that the foam in the Devices was susceptible to degradation. *See* ¶¶102-55. Philips did not disclose this heightened risk to investors.

Philips acknowledged in documents filed publicly with the Securities and Exchange Commission ("SEC") that it held regular meetings where quality issues related to its products were discussed. ¶132. Specifically, at all relevant times, Philips had a Quality & Regulatory Committee that met periodically to discuss quality and regulatory concerns related to its products. *Id*. Defendant van Houten attended all the Quality & Regulatory Committee meetings held in 2018, 2019, 2020, and 2021. *Id*. and n.5 Among the topics discussed at the Quality &

Regulatory Committee meetings were (i) quality and regulatory dashboards, which displayed key performance indicators for business groups and markets, measuring performance and continuous improvement to enhance quality and compliance; (ii) the status and outcome of quality investigations and related matters; (iii) ***complaint handling and post-market surveillance***; and (iv) adherence to the Company's Quality Management System. Philips, Annual Report (Form 20-F) (Feb. 23, 2021), §11.4.

Accordingly, through his personal attendance at these meetings, van Houten was aware of the foam degradation issues that were the repeated subject of customer complaints and internal tests and analyses conducted by Philips and/or its subsidiary. Van Houten ***admittedly learned*** that the foam in the Devices was degrading ***from post-market surveillance actions***—the very topic that was the constant subject of the Quality & Regulatory Committee meetings during the Class Period. ¶¶337, 344, 346, 348, 391. Post-market surveillance showed problems with the foam as early as 2015, and internal tests confirmed these problems as early as 2016. *See* ¶¶102-157, 342, 344, 346, 387. The Court found that the Complaint adequately pled van Houten's scienter as of early to mid-2018, after he attended a Quality & Regulatory Committee meeting, and imputed his scienter to Philips. Dkt. No. 55 at 17, 22.

**The Truth About the Risks Related to the Devices Slowly Emerges**

During the Class Period, as detailed above, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Philips' securities and operated as a fraud or deceit on Class Period purchasers of Philips' securities. Later, when Defendants' prior misrepresentations became known to the market, the price of Philips' securities declined as the prior artificial price inflation dissipated over time. ¶¶9-49. As a result of their purchases of Philips' securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*,

monetary damages, under the federal securities laws. When the truth emerged through a series of corrective disclosures or materializations of risks, the Company's stock price plunged. ¶¶342-458. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members suffered significant losses and damages. ¶454.

## PROCEDURAL HISTORY

Plaintiff Subhash Patel filed a class action complaint on August 16, 2021, alleging violations under Sections 10(b) and 20(a) of the Exchange Act. Dkt. No. 1. Richard Sun moved to be appointed as a Lead Plaintiff on October 15, 2021 (Dkt. No. 6). On November 3, 2021, Mr. Sun was appointed Lead Plaintiff and Pomerantz LLP was appointed Lead Counsel pursuant to an order issued by the Hon. Judge Margo K. Brodie. Dkt. No. 10. On January 3, 2022, Plaintiffs filed an amended class action complaint. Dkt. No. 16. Defendants moved to dismiss that complaint, and the motion was fully briefed on May 18, 2022 (Dkt. Nos. 28-32). Before the Court ruled on the motion, Plaintiffs informed the Court of their intention to amend the complaint in light of additional factual developments, including a subpoena issued by the U.S. Department of Justice on Philips Respironics and certain of Philips' subsidiaries. Dkt. No. 37.

On November 28, 2022, the case was reassigned to the Hon. Judge Edward R. Korman. On November 29, 2022, the Court granted Plaintiffs' request to file a SAC. Plaintiffs filed their SAC on November 30, 2022. Dkt. No. 39. Defendants moved to dismiss the SAC, and the motion was fully briefed on April 24, 2023. Dkt. Nos. 47-48. The Court heard oral argument on the motion on April 24, 2024. Subsequently, the Court granted in part and denied in part Defendants' motion to dismiss the SAC on September 23, 2024, dismissing John Frank and Abhijit Bhattacharya as Defendants but sustaining claims against Defendants van Houten and Philips. Dkt. No. 55 ("Opinion").

Defendants moved for reconsideration of the Opinion, and the motion was fully-briefed on October 28, 2024 (Dkt. No. 58). The motion remains pending. Defendants filed their answer and affirmative defenses to the SAC on November 11, 2024. Dkt. No. 60.

## ARGUMENT

### I. THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23

To certify a putative class, the Court must determine whether four threshold requirements of Fed. R. Civ. P. 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). In addition, the Court must determine whether the action is maintainable under Fed. R. Civ. P. 23 (b)(1), (2) or (3). *Id.* at 614. "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

Class actions promote judicial economy by aggregating small claims into one lawsuit. "Class actions…permit the plaintiffs to pool claims which would be uneconomical to litigate individually.… [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Shutts,* 472 U.S. at 809. It is well settled that "[t]here is a strong public policy in favor of private enforcement of the nation's securities laws." *Epifano v. Boardroom Bus. Prods., Inc.*, 130 F.R.D. 295, 298 (S.D.N.Y. 1990). Thus, Courts in the Second Circuit have repeatedly acknowledged that "[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally." *Darquea v. Jarden Corp.*, 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008) (citation omitted). In a securities fraud action, if a court is in doubt as to whether to certify a class action, it should err in favor of certification. *Indep. Energy Holdings*, 210 F.R.D. at 479.

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), Rule 23 is not a "license to engage in free-ranging merits inquiries at the [class] certification stage." *Amgen*, 568 U.S. at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance, it is not appropriate to delve into merits issues such as scienter, materiality, or loss causation. *See, e.g., Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011) ("*Halliburton I*"); *Amgen*, 568 U.S. at 464–65; *Guadagna v. Zucker*, 332 F.R.D. 86, 92 (E.D.N.Y. 2019) (discussing how overlap with the merits "is not an invitation for courts to decide the case through a class certification motion").

### A. The Rule 23(a) Requirements Are Satisfied

#### 1. The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable." *See In re Vale S.A. Sec. Litig*., 2022 WL 122593, at *3 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022). Impracticable does not mean impossible, but only that the difficulty of joining all class members make use of the class action appropriate. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C*., 504 F.3d 229, 244–45 (2d Cir. 2007). Further, plaintiffs need not allege the exact number or identity of class members. *See In re Blech Sec. Litig*., 187 F.R.D. 97, 103 (S.D.N.Y. 1999). "Joinder is generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen S.A*., 270 F.R.D. 80, 90 (D. Conn. 2010) (citing *Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997)). "In securities fraud class

actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (collecting cases) (citation omitted); *accord Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 116 (S.D.N.Y. 2008).

During the Class Period, Philips' shares were listed on the NYSE and the Euronext Amsterdam under the symbols "PHG" and "PHIA," respectively. *See* Gilmore Decl. Exhibit 2, Expert Report of Zachary Nye, Ph.D. ("Nye Report") ¶12. During that time, on average, there were approximately 912.6 million Philips' common shares issued and outstanding. *Id.* ¶57. Although Plaintiffs have not at this time ascertained the precise number of potential Class members, they believe that there are many thousands of geographically dispersed members of the proposed Class. The precise identity of the members can be readily identified from the securities brokerage and nominee firms' books and records. Clearly, the proposed Class consists of a sufficient number of persons (*i.e.*, more than 40) to make joinder impracticable. *See Menkes*, 270 F.R.D. at 90.

**2. Questions of Law or Fact Are Common to the Class**

The Rule 23(a)(2) requirement that "there are questions of law or fact common to the class" is a "low hurdle" that is "easily surmounted." *See In re Prudential Sec. Inc. P'ships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995) (citation omitted). *See also Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) (commonality requirement "has been applied permissively by courts in the context of securities fraud litigation"). Commonality is established so long as the plaintiffs can "identify some unifying thread among the [class] members' claims…." *Vivendi*, 242 F.R.D. at 84 (citation and internal quotation marks omitted). Even a single common legal or

factual question will suffice. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 166–67 (2d Cir. 1987).

Here, common questions of law and fact include: (i) whether Defendants' statements were materially false and misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether the price of the Company's stock was artificially inflated during the Class Period; and (iv) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses. The misstatements were made to the Class as a whole, and injured market participants in the same way. In comparable situations, courts have consistently found the commonality requirement to have been satisfied. *See, e.g.*, *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 571 (S.D.N.Y. 2008); *Wagner*, 251 F.R.D. at 116; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 157–58 (S.D.N.Y. 2007), *order aff'd in part, vacated in part*, 574 F.3d 29 (2d Cir. 2009). Indeed, here, like all Section 10(b) cases, the commonality of the shareholders' claims is self-evident. *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).

#### 3. Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiffs be typical of the claims of the class. The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). "Typicality does not require that the situations of the named representatives and the class members be identical." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000); *see also In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998). A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation omitted). In other words:

> Because this inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investor[s'] perception of the transaction, or even the information furnished to him at the time will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986), *abrogated on other grounds by Dukes*, 564 U.S. at 351, *as recognized in In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 572 (S.D.N.Y. 2018).

Plaintiffs satisfy the typicality requirement. They each purchased the Company's shares during the same period of time as the putative class members purchased or held their shares. Dkt. Nos. 1, 16-1. Their claims, like those of all other Class members, derive from the same legal theories and the same misrepresentations and omissions. Accordingly, Plaintiffs' claims are typical of those of the Class. *Conn. Ret. Plans & Tr. Funds v. Amgen, Inc.*, 2009 WL 2633743, at *5-6 (C.D. Cal. Aug. 12, 2009).

#### 4. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

The Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is unquestionably met. The focus of a court's inquiry is "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. It is important to emphasize that "[t]he conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations and internal quotation marks omitted), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*,

471 F.3d 24 (2d Cir. 2006), *clarified sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007).

Here, Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem*, 521 U.S. at 594–95, and no actual or potential conflicts exist. Plaintiffs and all Class members have suffered losses from purchasing the Company's securities at artificially inflated prices. They have been injured by the identical wrongful underlying misrepresentations and omissions of Defendants. Each of the Plaintiffs has been involved in this litigation, has communicated with counsel throughout the course of this action, and each is willing to serve as a representative party on behalf of the Class and understands his/her duties as Class representatives. *See* Gilmore Decl. Exhibits 3-4.

Plaintiffs have engaged qualified, experienced and capable attorneys. Proposed Class Counsel are highly experienced in complex class litigation, especially securities fraud actions, and have the ability and willingness to prosecute this action vigorously. Gilmore Decl. Exhibit 5 (firm resume). Lead Counsel's vigorous pursuit of the Class's interests is well documented in their advancement of the Class's claims in this Action, including, *inter alia*, in their partial defeat of the Defendants' motion to dismiss.

**B. The Requirements of Rule 23(b)(3) Are Satisfied**

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication.

**1. Common Questions of Law and Fact Predominate**

"Predominance is a test readily met in certain cases alleging consumer or securities fraud…." *Amchem*, 521 U.S. at 625. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the

issues subject only to individualized proof." *See UFCW Loc. 1776 v. Eli Lilly & Co*., 620 F.3d 121, 131 (2d Cir. 2010) (citation omitted); *see also Dura-Bilt Corp. v. Chase Manhattan Corp*., 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("[T]o allow various secondary issues of plaintiffs' claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws."). Plaintiffs will prove, on a common basis, the elements of their Sections 10(b)[4] and 20(a) claims.[5] "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810.[6] Here, reliance (or transaction causation) will be established on a common basis under the "fraud-on-the-market" theory. As explained in *Basic Inc. v. Levinson*, 485 U.S. 224, 241–42 (1988) (alteration in original) (citation omitted):

---

[4] The elements of a claim for securities fraud under Section 10(b) are: a material omission or misrepresentation; scienter; a connection with the purchase or sale of a security; reliance; economic loss; and loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).

[5] In addition to an underlying Section 10(b) violation by a controlled entity, Section 20(a) liability requires control of the primary violator by the defendant. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006). Control can be proved class-wide. *See, e.g.*, *In re Beacon Assoc. Litig*., 282 F.R.D. 315, 333 (S.D.N.Y. 2012).

[6] Aside from reliance and damages (as to which individual issues do not defeat predominance), courts routinely find that the other elements can be proved with common evidence. *See In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig*., 2013 WL 396117, at *12 (D.N.J. Jan. 30, 2013) ("Defendants' liability will depend on the same evidence relating to the materiality of the misstatements and omissions at issue and Defendants' state of mind in making such statements or failing to disclose certain information .… In addition…loss causation for the putative class is also capable of proof through common evidence. Each class member's claim for relief is based on the same corrective disclosures .…"); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) ("With one exception [reliance], there is no dispute that each element necessary to establish liability…is common to the class…. The proof for the claims of misrepresentation or omission, materiality, and [Defendant's] scienter are all based on a common nucleus of facts and a common course of conduct."). Because merits determinations are to be eschewed, the Supreme Court has recently confirmed that neither materiality nor loss causation has to be proved at the class certification stage to trigger *Basic*'s presumption of reliance. *See Amgen*, 568 U.S. at 467 (materiality); *Halliburton I*, 563 U.S. at 811–12 (loss causation).

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

The Court further explained:

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations…may be presumed for purposes of a Rule 10b-5 action.

*Id*. at 247. To invoke the fraud-on-the-market-presumption, "plaintiffs must demonstrate that (1) the alleged material misstatements were [publicly] known, (2) that the security traded on an efficient market, and (3) that the plaintiff purchased his shares between the time the misleading statement was made and the time the truth was revealed." *In re Winstar Commc'ns Sec. Litig*., 290 F.R.D. 437, 445 (S.D.N.Y. 2013). Plaintiffs demonstrate all three.

Here, there can be no dispute that the alleged misrepresentations were public, as they were made in SEC filings, press releases, and earnings calls. Also, the members of the proposed Class, by definition, purchased Philips' securities during the Class Period after alleged misrepresentations were made and before the truth was revealed. The final requirement, that Philips' securities traded in an efficient market, is established in the Nye Report, as discussed herein. As such, Plaintiffs are entitled to the fraud-on-the-market presumption of reliance.

In *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989), the court set forth certain factors as an aid to determine whether the market for any stock is open and efficient: (1) whether there "existed an average weekly trading volume during the class period in excess of a certain number of shares," to wit, 1% for a "substantial presumption" of efficiency, 2% turnover for a "strong presumption" (*Id*. at 1293); (2) whether "a significant number of securities analysts followed and reported on [the] company's stock during the class period"; (3) whether the

company's stock "had numerous market makers"; (4) whether "the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met"; and (5) whether "empirical facts show[ ] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id*. at 1284–87.

"The vast majority of courts have used the *Cammer* factors as 'an analytical tool rather than as a checklist.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) (citation omitted) (collecting cases). "If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008).

In *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 271 (2014) ("*Halliburton II*") the Supreme Court clarified the standard for fraud-on-the-market. Notably, the Court stated that the three prerequisites to invoking the fraud-on-the-market presumption were really proxies for the fact that the misrepresentation or omission affected the market price of the security (*i.e.*, "price impact"). *Id.* at 280. *Halliburton II* further clarified that a plaintiff can show fraud on the market ***either*** by providing evidence that the company's stock generally traded on an efficient market, ***or*** by direct evidence that the misleading statement had a price impact. *Id*. Defendants, by the same token, may also show a lack of price impact by direct evidence to rebut the presumption. *Id.* The Court *also* confirmed that market efficiency for purposes of the fraud-on-the-market presumption is not tied to any academic strain of market efficiency. *Id.* at 272. Instead, it is based on the "fairly modest premise that 'market professionals generally consider

most publicly announced material statements about companies, thereby affecting stock market prices.'" *Id.* (citation omitted). Accordingly, "[d]ebates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point." *Id*. In short, *Halliburton II* holds plaintiffs are not ***required*** to show price impact to obtain a fraud-on-the-market presumption of reliance. Rather, plaintiffs may show that they are entitled to a presumption of reliance through either showing market efficiency ***or*** direct evidence that the misrepresentation or omission had an impact on the stock's price.

**a. NYSE Listing Is Strong Evidence of Market Efficiency**

Throughout the Class Period, the Company's shares were listed and traded on the most well-developed securities markets in the world: the NYSE and Euronext Amsterdam. Nye Report ¶¶59-63. Congress, the Supreme Court, and *Cammer* all recognize that such well-developed markets are generally efficient in reflecting publicly-available information in the prices of securities traded on those markets. In *Basic*, the Supreme Court noted that in "drafting [the 1934] Act, Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets…Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." 485 U.S. at 245–46; *see also Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (*Basic* recognized the NYSE as efficient). Similarly, *Cammer* quoted with approval treatise commentary that "there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: the [NYSE]." 711 F. Supp. at 1292 (citation omitted).

"[N]o argument could be made that the [NYSE] is not an efficient market." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008). Accordingly, consistent with

*Cammer* and *Basic*, "[m]ost courts to consider the issue have concluded that a stock's listing on the New York Stock Exchange is a strong indication that the market for the stock is efficient." *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *7 (S.D.N.Y. Sept. 29, 2015). *See also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."), *abrogated on other grounds by Amgen*, 568 U.S. at 455; *Barclays*, 310 F.R.D. at 81 ("most courts agree that such listing is a good indicator of efficiency."); *Lumen*, 280 F.R.D. at 459–60 (cases "too numerous to cite[] establish the NYSE and NASDAQ are at least entitled to a *presumption* of efficiency — making it incumbent upon Defendants to rebut the presumption.").

**b. The Five *Cammer* Factors Confirm Market Efficiency**

Dr. Nye's holistic analysis of the *Cammer* factors and other indicia of market efficiency demonstrate beyond dispute that Philips' common stock traded in an efficient market during the Class Period.

**Factor One—Weekly Trading Volume:** "[A] large weekly volume of stock trades…implies significant investor interest in the company [which] implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. During the Class Period, the average weekly trading volume of Philips' stock listed on the NYSE as a percentage of shares outstanding was 7.3%. Nye Report ¶21. Thus, the average weekly reported trading volume of the Company's stock during the Class Period exceeds the 2% "strong presumption" of market efficiency in *Cammer*.

**Factor Two—Analyst Coverage:** Analyst coverage on a stock implies that information about the company is rapidly reflected in the stock price. *Cammer*, 711 F. Supp. at 1286. During the Class Period, at least 22 well-known investment firms followed and published reports on

Philips. Nye Report ¶25. More than 1,300 analysts' reports on the Company were issued during the Class Period. *Id.* In addition, during the Class Period, financial information was further disseminated to investors via media coverage, investor conferences, trade magazines, the Company's presentations and SEC filings. *Id.* ¶26. Furthermore, the Company's filings with the SEC were publicly available online during the Class Period at no cost. *Id.* ¶27. This volume of news coverage supports an inference that the stock traded on an efficient market. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (524 news items over two years showed efficient market).

**Factor Three—Market Makers and the Potential for Arbitrage:** A market maker is an entity that agrees to purchase or sell securities on demand, to support a liquid market for the shares. *In re Xcelera.com Sec. Litig*., 430 F.3d 503, 515 (1st Cir. 2005); *In re Countrywide Fin. Corp. Sec. Litig*., 273 F.R.D. 586, 613–14 (C.D. Cal. 2009). The number of market makers is not germane to the Company's stock because its stock traded on the NYSE during the Class Period. *See* Nye Report ¶30. Stocks that trade in an auction market like the NYSE have a single designated market maker (formerly referred to as a specialist) to maintain a competitive and efficient market, as opposed to multiple market makers found on the NASDAQ market. *See id*. ¶¶30, 32. However, the presence of a designated market maker supports a finding of efficiency. *Id.* ¶¶29-30. *See Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 573 (C.D. Cal. 2012) (finding that the existence of a designated market maker satisfies *Cammer* Factor 3). In addition, as is the case with all NYSE-listed equities, the Company's stock also traded on other national securities markets and Alternative Trading Systems ("ATSs") during the Class Period, including the NASDAQ. Nye Report ¶31. There were over 120 active market makers trading the Company's stock during the Class Period, (*Id.* ¶32.), which supports a finding of efficiency.

*Cammer*, 711 F. Supp. at 1283 n.30 (11 market makers justifies substantial presumption of efficiency).

The existence of arbitrageurs, who are generally understood to be sophisticated investors who can act rapidly to take advantage of pricing discrepancies and thus ensure that market prices reflect all public information, is the fundamental hallmark of market efficiency. Nye Report ¶¶34-36. During the Class Period, arbitrageurs were not constrained in their ability to short shares of the Company's stock. *Id.* ¶36. Additionally, for each year-end during the Class Period, institutional holdings were at least 64.5% of the available New York Registry Shares, *i.e.*, shares listed in the U.S. on the NYSE (Nye Report ¶12), and over 340 institutional investors held such stock. *Id.* ¶38. With respect to Philips' Euronext Amsterdam shares, institutions held at least 58.6% of the shares available, and there were over 640 institutional shareholders. *Id*. Furthermore, the fact that, for the New York Registry Shares, reported institutional holdings, on average, were over 47 times the short interest in the stock during the Class Period implies that short selling was not constrained. *Id*. Thus, the fact that trading in the Company's stock was facilitated by a designated market maker on the NYSE and that arbitrage opportunities could have been exploited during the Class Period are evidence in support of market efficiency. *Id.* ¶29.[7]

**Factor Four—S-3 Eligibility:** The *Cammer* Court found that a company's eligibility to

[7] Similarly, the cost of trading and arbitrage opportunity for the Company, showed by the "bid-ask" spread, demonstrates that it traded in an efficient market. Nye Report ¶¶39-40. Bid/ask spreads are a measure of transaction costs and low transaction costs indicate that arbitrage opportunities can be exploited readily. *Id*. ¶39. During the Class Period, the Company's NYSE-listed stock had an average and median bid-ask spread of 0.04%/0.03%, which was smaller than the average and median bid-ask spread of a random sample of stocks also listed on the NYSE, 0.09%/0.06%. *Id*. This further supports the conclusion that the Company's common stock traded in an efficient market during the Class Period. *Id*. ¶40.

file a short-form registration statement, *i.e.*, Form S-3, supports a finding of an efficient market. *Cammer*, 711 F. Supp. at 1285. A company is entitled to S-3 registration if it meets certain requirements. Nye Report ¶43. It is the SEC's view that these S-3 eligible companies—those that disclose financial information to the SEC and issue press releases to the public—have already disseminated information to the marketplace, and, therefore, that the market operates efficiently for them. *Id.* ¶44. Form F-3 for foreign issuers in the U.S. is the functional equivalent to Form S-3 used by U.S. issuers and the requirements are essentially identical. *Id.* ¶45. Philips filed Forms F-3 before the start of the Class Period and was eligible to file Form F-3 throughout the Class Period, which further supports market efficiency. *Id.* ¶46. *See Cammer*, 711 F. Supp. at 1287 ("it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S–3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.").

**Factor Five—Cause and Effect Relationship of Unexpected Material News and Stock price:** This factor requires showing that there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. Dr. Nye employed an event study to determine the impact of new material information on the Company's stock price. *See* Nye Report ¶49. In an efficient market, it would be expected that the price of a stock would respond to news. *Id.* ¶¶47-48. The event study is a multiple step process to test this response. *Id.* ¶48. Those steps include: "(i) the *a priori* definition and selection of events to study; (ii) identification of a study period; (iii) estimation of a regression model to remove non-company-specific effects from the

security's return; (iv) testing for statistical significance; and (v) interpretation of empirical results." *Id.* To determine which events to study in his analysis, Dr. Nye relied on a large body of event study literature that has evaluated what types of information affect stock prices. *Id.* ¶50.

Consistent with this literature, Dr. Nye examined 22 dates during the Class Period consisting of dates on which the Company released quarterly or year-end financial results. *Id.* ¶¶50-51. Such earnings-related announcements are an objective set of events to examine, which has been shown in the academic finance literature to impact securities' prices. *Id*. ¶50. Out of the 22 events examined, 17 (*i.e.*, 77.3%) are associated with a statistically significant Company-specific return at or above the 95% confidence level. *Id.* ¶51. At the 95% level of confidence, a statistically significant return is expected to occur 5% of the time. *Id*. Thus, one should expect a random sample of 22 days to contain 1.1 days with a return that is statistically significant at the 95% confidence level. *Id*. Given that Dr. Nye's sample contained over 15 times as many statistically significant dates as should be expected from a randomly selected 22-day sample (at or above the 95% confidence level), Dr. Nye's analysis confirms that Philips' stock price typically reacted more strongly on event dates than on non-event dates. *Id*.

While evidence of "directionality" is not required to show general market efficiency for purposes of a securities class action, Dr. Nye also analyzed the directionality of the movements in Philips' stock price. *Id*. ¶52. Dr. Nye's review of the news and analysts' reports demonstrates that the direction of the Company-specific returns observed on each event date was consistent with that expected in an efficient market, thereby providing additional evidence of efficiency. *Id.* Specifically, the event dates on which predominantly *positive* Company-specific news reached the market were associated with statistically significant *positive* returns, and the event dates on which predominantly *negative* Company-specific news reached the market were associated with

statistically significant *negative* returns. *Id*. On the event dates associated with a statistically insignificant Company-specific return, the Company's disclosures were generally in line with the market's prior expectations, and/or conveyed a mix of offsetting positive and negative information, such that the insignificant price reaction is consistent with that expected in an efficient market. *Id.*

Based on his analysis, Dr. Nye concluded that for the Class Period (1) "Philips' stock price typically reacted more strongly on event dates than on non-event dates" (*Id.* ¶51); (2) the event study shows "a strong cause-and-effect relationship existed between the information disclosed on the event dates and resulting stock price movements" (*Id.* ¶52); and (3) the Company's stock price "promptly responded to the disclosure of new, material, unexpected information," supporting his conclusion that "the market for Philips' stock was efficient throughout the Class Period." *Id*. ¶53.[8]

#### c. Mechanical Damage Tabulations For Individual Class Members Will Not Defeat Predominance

Where liability can be proved class-wide, it is "well-established" Second Circuit precedent that "'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.,* 778 F.3d 401, 405 (2d Cir. 2015) (citation omitted). This is especially true for securities fraud cases, where the process of computing damages after liability is established is "virtually a mechanical task." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013) (quoting *Blackie*, 524 F.2d at 905). *See Barclays,* 310 F.R.D. at 74 ("Issues and facts surrounding

[8] In addition to these five *Cammer* factors, courts have also relied on three supplemental factors enumerated in *Krogman v. Sterritt*: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the 'float')." 202 F.R.D. 467, 474 (N.D. Tex. 2001). Dr. Nye's analysis found these three factors to also support market efficiency. Nye Report ¶¶54-57.

damages have rarely been an obstacle to establishing predominance in section 10(b) cases."). For this reason, courts do not require a formal damages model to demonstrate that damages can be determined on a classwide basis. Instead, to the extent any evidence is required, an event study like that provided by Dr. Nye (Nye Report ¶¶49-53) will suffice. *See*, *e.g.*, *JPMorgan Chase.*, 2015 WL 10433433, at *7; *Diamond Foods*, 295 F.R.D at 251–52. Dr. Nye has provided a detailed explanation of how damages can be calculated on a class-wide basis using the "out-of-pocket" method. Nye Report ¶¶68-73. This method has been endorsed by the Second Circuit. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 105-07 (2d Cir. 2017).

#### d. Reliance Is Also Presumed Under *Affiliated Ute*

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), the Supreme Court held that reliance is presumed where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992). In such circumstances, individual reliance need not be proven. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131. Here, reliance may be presumed under *Affiliated Ute* based on Defendants' omissions of material information.

### 2. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation. Together with predominance, the superiority requirement "ensures that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards &*

*Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007) (citation omitted). As discussed, courts have universally recognized the superiority of class actions in cases alleging securities fraud, especially where the fraud-on-the-market presumption applies.

This Court analyzes four factors in determining the superiority of the class action:

> A) the class members' interests in individually controlling the prosecution…of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by…class members; C) the desirability…of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties [to be encountered] in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors weigh in favor of class certification in this case.

The members of the proposed Class have little incentive to pursue individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 304 (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail," particularly when many of the putative plaintiffs have suffered economic loss of *de minimus* value). A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct, it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 320 n.4 (2007) ("Nothing in the PSLRA, we have previously noted, casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses' — a matter crucial to the integrity of domestic capital markets." (citation omitted)). Moreover, there are thousands of class members. "Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources." *SCOR*, 537 F. Supp. 2d at 579. It would also "risk disparate results among those

seeking redress." *Id*. Finally, there is no reason to expect any difficulties in managing this case as a class action. Indeed, class actions of this size and complexity are common.

## II. POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL

In confirming its appointment of Lead Counsel as Class Counsel, this Court must consider the factors enumerated in Rule 23(g)(1)(A):

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Under these criteria, the Pomerantz firm is eminently qualified, and this Court should confirm their appointment as Class Counsel in this case. Gilmore Decl. Exhibit 5 (firm resume). For over eighty-five years, Pomerantz has been a leader in litigating securities fraud cases on behalf of investors in both class and individual actions, setting important precedents. *See, e.g., In re Hebron Tech. Co. Sec. Litig.*, 2020 WL 5548856, at *6 (S.D.N.Y. Sept. 16, 2020) (noting that Pomerantz has "extensive experience as lead counsel in securities class actions"); *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 362 (S.D.N.Y. 2016) ("There is no real dispute that Pomerantz is an established firm with considerable class action experience, and the [c]ourt has now had multiple opportunities to observe Pomerantz's performance. The [c]ourt finds that the Pomerantz firm has both the skill and resources to represent the Classes adequately."), *aff'd in part, vacated in part on other grounds sub nom. In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017).

Pomerantz has committed substantial time and resources to representing the Class, has worked vigorously to prosecute this action, and has and will continue to zealously and competently represent the interests of the members of the Class. Lead Counsel have effectively

used their experience to vigorously pursue the interests of all Class members including filing factually detailed complaints, mounting a successful defense of the allegations in response to the Defendants' motion to dismiss, and engaging Defendants in the discovery process. Thus, Plaintiffs have satisfied Rule 23(g).

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Plaintiffs as the Class Representatives; (3) appointing Pomerantz LLP as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: February 28, 2025

**POMERANTZ LLP**

*/s/ Emma Gilmore*
Jeremy A. Lieberman
Emma Gilmore
Villi Shteyn
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

*Lead Counsel for Plaintiffs and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Additional Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF WORD COUNT

I hereby certify that this brief contains 8,442 words, which complies with the word limit of Local Civil Rule 7.1(c).

Executed on February 28, 2025

*/s/ Emma Gilmore*
Emma Gilmore