UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――

SUBHASH PATEL, Individually and On
Behalf of All Others Similarly Situated,

                Plaintiff,

– against –

KONINKLIJKE PHILIPS N.V. and
FRANS VAN HOUTEN,

                Defendants.

―――――――――――――――――――――――――――――

**NOT FOR PUBLICATION**

**MEMORANDUM & ORDER**

21-cv-4606 (ERK) (MMH)

KORMAN, *J.*:

Lead Plaintiff Richard Sun and Plaintiff Subhash Patel ("Plaintiffs") brought this putative class action alleging violations of Section 10(b) of the Securities Exchange Act of 1924 (the "Exchange Act") and SEC Rule 10b-5 against Koninklijke Philips N.V. ("KPNV") and individual Defendants François Adrianus "Frans" van Houten, Abhijit Bhattacharya, and John Frank, as well as violations of Section 20(a) of the Exchange Act by these same individual Defendants. ECF No. 39, Second Am. Compl. ("SAC") ¶¶ 470–87. A prior Order dated September 23, 2024, granted Defendants' motion to dismiss all claims against Bhattacharya and Frank but denied the motion as to van Houten and KPNV after concluding that Plaintiffs adequately alleged van Houten's scienter, which is imputed to KPNV. *Patel v. Koninklijke Philips N.V.*, No. 21-CV-4606, 2024 WL 4265758, at *7–9, *16

1

(E.D.N.Y. Sept. 23, 2024). Defendants now move for reconsideration only as to van Houten's scienter. *See* ECF No. 58-1, at 1.

## BACKGROUND

Plaintiffs' factual allegations are recited in my prior opinion and briefly repeated here as is necessary to resolve this motion. *See Patel*, 2024 WL 4265758, at *1–3. Plaintiffs are investors in KPNV common stock; they sued individually and on behalf of a putative class of persons and entities who acquired KPNV common stock between and including on February 23, 2016, and November 1, 2022 (the "Class Period"), alleging that they purchased stock at artificially inflated prices and suffered losses when the share price fell after KPNV's belated disclosure of product defects. SAC ¶¶ 1, 4–19, 55–56.

At all relevant times, Van Houten was KPNV's Chief Executive Officer. *Id.* at ¶ 58. Among KPNV's subsidiaries is Philips Respironics, Inc., which at all relevant times was wholly owned by KPNV.[1] *Id.* ¶ 57. Before and throughout the Class Period, KPNV's Sleep and Respiratory Care division in the company's Connected Care segment manufactured Bi-Level Positive Airway Pressure ("BiPAP"), Continuous Positive Airway Pressure ("CPAP"), and mechanical ventilator devices (all three are hereinafter referred to as "devices") to assist

---

[1] John Frank was the CEO of Philips Sleep and Respiratory Care at all relevant times. *Id.* ¶¶ 60, 412. Abhijit Bhattacharya was KPNV's Chief Financial Officer at all relevant times. *Id.* ¶ 59.

2

individuals with sleep, breathing, and respiratory conditions. *Id.* ¶¶ 2, 67–71, 93, 242. Philips Respironics was involved in the manufacture and recall of these devices. *See* ECF No. 48-19 ("Form 483").

As early as 2015, KPNV began receiving complaints about degradation of the foam used in these ventilators, which caused physical harm to users who inhaled the foam particles. SAC ¶¶ 4–5, 106. From at least April 2016 onwards, KPNV internally investigated and documented the foam degradation issue. *Id.* ¶¶ 6, 109–12, 156. In 2018, Philips established a Quality & Regulatory Committee ("QRC"), which, amongst other compliance topics, discussed "[c]omplaint handling and post market surveillance." *Id.* ¶ 132. Van Houten attended all QRC meetings held from 2018 to 2021, including seven meetings in 2018, eight meetings in 2019, and five meetings in 2020—prior to the foam degradation issue becoming public. *Id.* ¶ 132 & n.5.

Neither Philips Respironics nor KPNV spoke publicly about the foam degradation issue until April 26, 2021, when van Houten noted a "quality issue" with certain sleep and respiratory care products in a press release accompanying KPNV's 2021 First Quarter Earnings report and when he later spoke about the issue on an earnings call with investors. *Id.* ¶¶ 9, 334–38. Van Houten stated on the earnings call that knowledge of the foam degradation issue "come[s] out of our post-market surveillance, where we have picked up reports from users that lead us to do this warning." *Id.* ¶ 344. Following KPNV's recall of several devices in June 2021,

KPNV's stock price fell. *Id.* ¶¶ 12, 14, 32–49. By July 26, 2021, KPNV had announced it would take a reserve of EUR 500 million due to the recall. *Id.* ¶¶ 16, 370.

Plaintiffs allege that Defendants made materially false or misleading statements or omissions regarding the scope of the foam degradation issue, safety protocols, and KPNV's business outlook in regulatory filings and public statements throughout the Class Period. *See id.* ¶¶ 158–341, 474. They support their allegations by comparing certain of Defendants' public representations against the Form 483 Report, a report issued by the Food & Drug Administration ("FDA") in November 2021 after a site investigation of Philips Respironics, which concluded, *inter alia*, that Philips Respironics's risk analysis and procedures for preventative and corrective action were inadequate. *See id.* ¶¶ 19–28, 103 & n.1; ECF No. 48-19. The Form 483 Report stated that "firm management, including management with executive responsibility, were aware of potential foam degradation issues concerning CPAPs, BiPAPs, and Trilogy ventilators since at least 01/31/2020, or earlier." ECF No. 48-19, at 25. The report also stated that "[p]olyester polyurethane foam degradation issues concerning CPAPs, BiPAPs, and Trilogy Ventilators were discussed at . . . management review meetings." *Id.*; *see also* SAC ¶ 140. Defendants do not challenge that Plaintiffs sufficiently allege actionable misrepresentations. Instead, Defendants ask for reconsideration of the prior finding as to van Houten's scienter. ECF No. 58-1, at 1.

4

**LEGAL STANDARD**

The grounds justifying reconsideration are "an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation omitted). "[T]he standard for granting a motion for reconsideration is 'strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 377 (2d Cir. 2024) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)); *see also* E.D.N.Y. L.R. 6.3. Reconsideration is an inappropriate vehicle for presenting information that could have been presented previously and for elaborating on arguments already made and that the Court has fully considered. *See Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012).

**DISCUSSION**

**I. Prior Ruling as to van Houten's Scienter**

My prior Order held that Plaintiffs' allegations created a strong inference of van Houten's scienter under a theory of recklessness. *Patel*, 2024 WL 4265758, at *7. This is because Plaintiffs allege that van Houten stated on a 2021 earnings call that the foam degradation issue was discovered through post-market surveillance, a topic discussed at KPNV's QRC meetings, which van Houten attended from 2018

through 2021. *Id.* The previous decision held that particularized allegations regarding the "frequency and content of the QRC meetings" supported a strong inference of van Houten's scienter. *Id.*

The prior order also rejected Defendants' arguments seeking to undermine an inference of scienter. In support of their motion to dismiss, Defendants argued first that the complaint failed to state precisely what van Houten learned and at which QRC meetings; and second that it was improbable that the QRC meetings discussed the post-market surveillance of Philips Respironics products specifically, since KPNV has over 300 subsidiaries. ECF No. 48-1 at 15. Defendants' first argument was rejected because it was sufficient that Plaintiffs identified "the QRC meetings as the place where van Houten learned about the foam issues, specifically through discussions about post-market surveillance." *Patel*, 2024 WL 4265758, at *7. The September 23 Order also rejected Defendants' improbability argument because it was "both plausible and readily inferable" that "the parent company would have discussed post-market surveillance suggesting there were product defects in the devices of one of its subsidiaries." *Id.*

## II. Bases for Reconsideration

Defendants seek reconsideration of the previous ruling as to van Houten's scienter on two grounds: First, they contend that I misread the Complaint to allege that van Houten acknowledged learning about the foam degradation issue from the QRC meetings he attended. Specifically, Defendants maintain that I misconstrued

van Houten's statement that the "issue . . . come[s] out of *our* post-market surveillance, where *we* have picked up reports [of problems]" as an admission of van Houten's knowledge, when his statement refers solely to knowledge obtained by Philips Respironics, not himself or KPNV. ECF No. 58-1, at 4–6 (emphasis added). In support, Defendants point to the Form 483 Report—which they contend I overlooked—indicating that *Philips Respironics*'s post-market surveillance discovered the issue and that *Philips Respironics*'s management met quarterly to discuss it. *Id.* at 5–6. Defendants correctly point out that van Houten is not alleged to have been at these Philips Respironics meetings. *Id.* at 5. Therefore, Defendants assert, van Houten's reference to "post-market surveillance" in the 1Q2021 earnings call, *see* SAC ¶ 337, does not suggest the inference that *he* learned of the foam degradation issue at QRC meetings prior to 2021. Rather, Defendants identify Form 483 and the lack of direct allegations regarding van Houten's personal knowledge as proof that a "strong inference" of scienter has not been pled. ECF No. 58-1, at 6.

Second, Defendants argue that I did not consider competing, nonculpable inferences and weigh them against the inference of scienter, as required by Supreme Court and Second Circuit precedent. *Id.* at 6–8; *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007); *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 111 (2d Cir. 2009). They note that my prior opinion rejected attributing motive to van Houten and instead found his scienter through a theory of recklessness, *see* ECF No. 58-1, at 2, under which the law requires correspondingly stronger

7

allegations of intent to deceive. *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 776 (2d Cir. 2010) ("where the plaintiffs cannot make a motive showing, to raise a strong inference of scienter, their circumstantial evidence of fraud must be correspondingly greater."). As Defendants see it, it is senseless for van Houten to have known about the foam issue since 2018 but continue to increase his KPNV stockholdings throughout the Class Period. ECF No. 58-1, at 7–8. A stronger inference, they argue, is that Philips Respironics conducted post-market surveillance and investigated the foam issue, only escalating the matter to KPNV and van Houten shortly before KPNV's April 2021 disclosure. *Id.*

Without deciding whether these arguments are properly presented on a motion for reconsideration; their merits do not compel me to alter the conclusions expressed in my earlier opinion.

### III. The Court Did Not Base Its Finding of van Houten's Scienter on a Misunderstanding of His Statements on the April 2021 Earnings Call.

Defendants' first argument—that the Complaint does not allege facts supporting a strong inference that van Houten personally learned of the foam degradation issue at the QRC meetings—is unavailing. *See* ECF No. 58-1, at 4–6. Defendants point out that van Houten's statement on the 1Q2021 earnings call that "[t]he issue . . . come[s] out of our post-market surveillance" is not a direct admission that he personally learned of the issue from post-market surveillance. *Id.* at 4. But at this stage, though "ambiguities count against inferring scienter," a direct

8

admission from van Houten regarding how he learned of the foam degradation issue is not required. *Tellabs*, 551 US at 326. Instead, "the [C]ourt's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* Viewing the allegations in the Second Amended Complaint holistically, it is inferable that van Houten's statement on the earnings call identified how he personally learned of the foam degradation issue.

It is sufficient—at this stage in the litigation and for purposes of establishing van Houten's scienter—that Plaintiffs allege the following facts: First, there were numerous customer complaints regarding foam degradation in ventilators manufactured by KPNV and its subsidiaries prior to 2018. SAC ¶¶ 103–116; 247. Second, the foam degradation issue affected a significant number of KPNV's products, as evidenced by the fact that the eventual recall of devices impacted by the issue applied to millions of devices. *Id.* ¶¶ 12, 155. Third, the QRC held periodic meetings from 2018 to 2021, during which "post market surveillance" was discussed. *Id.* ¶ 132. Fourth, van Houten attended all meetings held by the QRC from 2018 to 2021. *Id.* Fifth, when asked about issues reported by users of KPNV ventilators on an April 2021 earnings call, van Houten stated that "this is coming out of our own post-market surveillance actions." *Id.* ¶ 337. As my prior Order found, when viewed together these allegations are sufficient to establish scienter as of early to mid-2018—after van Houten attended a QRC meeting. *Patel*, 2024 WL 4265758, at *7.

Neither Defendants' emphasis on van Houten's use of "we" and "our" nor on the Form 483 report alter my conclusion on this point. ECF No. 58-1, at 2, 4. Indeed, it is readily inferable that in referring to "*our* post-market surveillance" van Houten was alluding precisely to the post-market surveillance discussed at QRC meetings he attended. Likewise, while the Form 483 report suggests that post-market surveillance of devices was conducted by *Philips Respironics* at the subsidiary level, *see* SAC ¶ 391, and initially discussed at meetings which van Houten did not attend, ECF No. 48-19, at 25, it does not undercut the inference that the results of this post-market surveillance were discussed at *KPNV*'s QRC meetings, which van Houten did attend. SAC ¶ 132. It is readily inferable, at this early stage, that the QRC's discussions would include a subsidiary's post-market surveillance of a product line that was significant to the parent company's bottom line, had received numerous consumer complaints, and was subject to federal regulatory scrutiny.

Defendants' insistence that Plaintiffs plead precisely what van Houten learned at which QRC meeting, *see* ECF No. 58-1, at 2–3, requests too demanding a standard at this stage. *See Tellabs*, 551 U.S. at 322–23 (an inference of scienter "need not be irrefutable, i.e., of the 'smoking gun' genre"). Identifying the exact timing and precise manner in which contrary information was learned is not necessarily required to allege scienter. *In re NIO, Inc. Sec. Litig.*, No. 19-CV-1424, 2021 WL 3566300, at *9 (E.D.N.Y. Aug. 12, 2021) (holding that failure to "*specifically identify* the reports or statements that are contradictory to the statements made [by defendants]"

10

did not defeat a strong inference of scienter established through circumstantial evidence (emphasis in original)); *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 522 (E.D.N.Y. 2025) ("[T]here may be an adequate showing of scienter through recklessness where the complaint alleges that the defendants had access to certain information . . . and supports those allegations with particular facts."). By "identifying the QRC meetings as the place where van Houten learned about the foam issues, specifically through discussions about post-market surveillance," Plaintiffs have sufficiently supported the allegation that van Houten knew about the foam issues as early as mid-2018. *Patel*, 2024 WL 4265758, at *7.

## IV. The Court Appropriately Weighed Nonculpable Inferences Against the Inference of Scienter.

Defendants' second argument was raised previously and, as before, fails on the merits. Defendants raised the same competing nonculpable inference—that van Houten only became aware of the foam issue shortly before the 2021 disclosure—in their motion to dismiss. *See* ECF No. 48-1, at 17. My prior opinion set forth the competing inference analysis prescribed by *Tellabs*, and "[a]lthough the point was not expressly stated as such, [I] considered and rejected as implausible the asserted competing inference" that van Houten only became aware of the issue in 2021 when I found that the allegations most readily supported the inference that he had access to or received information regarding the foam issues beginning in early to mid-2018. *See Patel* 2024 WL 4265758, at *7; *City of Austin Police Ret. Sys. v. Kinross Gold*

11

*Corp.*, 957 F. Supp. 2d 277, 315 (S.D.N.Y. 2013). Fundamentally then, Defendants argue that I overlooked their "subjective assessment of the substance" of the competing inference analysis rather than "new compelling facts or law." *See Ferrand v. Credit Lyonnais*, 292 F. Supp. 2d 518, 521 (S.D.N.Y. 2003) (rejecting argument on motion for reconsideration where movant "merely [took] issue with the Court's analysis and interpretation of relevant law" rather than "citing facts or *controlling* decisions that the Court may have overlooked" (emphasis in original)).

Nevertheless, for the avoidance of doubt, I add the following to my competing inference analysis. "To adequately plead scienter, a plaintiff must proffer facts that support a 'strong inference' of a mental state 'embracing intent to deceive, manipulate, or defraud.'" *In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F. Supp. 3d 192, 197 (E.D.N.Y. 2022) (quoting *Tellabs*, 551 U.S. at 318). That mental state can be established by allegations showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). In the securities fraud context, a strong inference of scienter alleged via evidence of recklessness is one that is "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." *Tellabs*, 551 U.S. at 324. Additionally, to qualify as "strong" the inference must be "at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. Thus, the competing inference analysis is "inherently

comparative," requiring courts to consider "plausible, nonculpable explanations for the defendant's conduct." *Id.* at 323–24.

Defendants argue, as they did in support of their motion to dismiss, that it "makes no sense" that van Houten knew about the foam degradation issue as early as 2018, did nothing about it, and simultaneously increased his stockholdings in KPNV. ECF No. 58-1, at 7–8. Instead, Defendants urge me to accept what they consider to be the more compelling inference that van Houten learned of the foam degradation shortly before he informed investors about it on the April 2021 Earnings Call. *Id.* at 8. I disagree because I find it at least as plausible that given the business implications of the foam degradation defects, Philips Respironics would have escalated knowledge of this issue to the QRC, which discussed this sort of issue at meetings that van Houten attended. *See* SAC, at ¶¶ 132, 446. To be sure, van Houten increasing his KPNV stockholdings during the Class Period weighs in favor of a nonculpable inference. *See Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017) (finding that corporate "officers' stock positions in the [defendant] company further support[ed] [a] nonculpable inference"). However, it is not entirely beyond the pale that van Houten would have increased his KPNV stockholdings despite learning of the foam degradation issue. *See Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 556 (S.D.N.Y. 2017) (finding scienter as to 10-b defendant where the "culpable inference of scienter that [the defendant] was complicit *despite his failure to unload his stock before the*

*scheme unraveled* is at least as powerful as any nonculpable inference" (emphasis added)).

On the other hand, I do find it implausible, based on the facts alleged, that knowledge of such a severe product defect was kept from van Houten for years, despite his attendance at a multitude of meetings designed to discuss this sort of issue. Thus, I reaffirm my previous finding that under *Tellabs*'s comparative analysis, Plaintiffs have alleged facts giving rise to a strong inference of van Houten's scienter.

## **CONCLUSION**

Defendants' motion for reconsideration is denied in its entirety.

                                              **SO ORDERED.**

Brooklyn, New York
October 27, 2025

*Edward R. Korman*
Edward R. Korman
United States District Judge